1

2

3

4

5            UNITED STATES DISTRICT COURT

6            EASTERN DISTRICT OF CALIFORNIA

7

8   **LT. RICHARD T. GENGLER and**           **1:06-CV-00362 OWW LJO**
    **LT. DANIEL S. McSEVENEY,**
                                            **MEMORANDUM DECISION AND**
9                      **Plaintiffs,**      **ORDER RE: DEFENDANTS' MOTION**
                                            **TO DISMISS (DOC. 31)**
10                      **v.**

11  **UNITED STATES OF AMERICA THROUGH**
    **ITS DEPARTMENT OF DEFENSE AND**
12  **NAVY; and SECRETARY DONALD C.**
    **WINTER,**
13
                       **Defendant.**
14

15

16              **I.   INTRODUCTION**

17       Before the court for decision is Defendants' motion to

18  dismiss for lack of subject matter jurisdiction, Fed. R. Civ.

19  Pro. 12(b)(2), and for failure to state a claim, Fed. R. Civ. P.

20  12(b)(6).  (Doc. 31, filed Aug. 3 2006.)

21

22       **II. BACKGROUND/PROCEDURAL HISTORY**[1]

23       Plaintiffs Richard T. Gengler and Lt. Daniel S. McSeveney

24  are Naval Officers and Aviators who are currently stationed with

25  the Operational Test Evaluation Squadron Nine (VX-9) in China

26  _____

27       [1]    The information contained in this factual background
    section is gleaned from the entire record, including various
28  declarations submitted by the parties.

                              **1**

1  Lake, California.  They are assigned as Operational Test

2  Directors for the F/A-18C-F weapons system programs and currently

3  are on "detachment" in Key West, Florida, performing operational

4  tests on a radar system.  (Doc. 16 at 1; Pltfs' Decls. at ¶7;

5  Gunter Decl. at 3.)

6      Plaintiffs both entered the Navy in April 1996, after

7  signing separate "Aviation Officer Candidate Program Service

8  Agreements (the "Service Agreements").  The Service Agreements

9  were drafted by the Navy and signed on the Navy's behalf by

10  another Naval Officer.  Among other things, the Service

11  Agreements state that each consented to "serve on active duty as

12  a commissioned officer for a period of seven years from date of

13  designation as a Naval Aviator."  (Pltfs' Decls. Ex A, at ¶2.)[2]

14      Plaintiffs successfully completed their flight training and

15  were designated as Naval Aviators in February 1999 (Gengler) and

16  April 1999 (McSeveney), respectively.  The Navy asserts that

17  Plaintiffs confirmed their <u>eight</u> year term of duty when

18  Plaintiffs were given their "winging orders," a document both

19  Plaintiffs received in 1999.  (Doc. 25, Gunter Decl. at ¶2).[3]

20  Plaintiffs assert, however, that the <u>seven year</u> commitment term

21  contained in their Service Agreements was confirmed orally by a

22  "Student Control Officer" in April 1999.  (Plaintiffs' Decls. at

23  _____

24      [2]   Although the Agreement also contains language requiring
   Plaintiffs to serve eight years as Reserve Officer upon
25  acceptance of a commission, that language appears not to be an
   issue here.
26

27      [3]   The so-called "winging" orders do not appear in the
   record, but Defendant acknowledged during oral argument that the
28  documents were not signed by Plaintiffs.

1    ¶6.)[4]

2         It is undisputed that Plaintiffs have served with

3    distinction since 1999.  Each logged more than 150 hours in

4    combat situations and each received numerous medals for valor

5    during combat.  (Doc. 16 at 4.)

6         When their contractual seven-year term of active duty

7    approached its end, both Plaintiffs notified their Commanding

8    Officers that they would be requesting release from active duty

9    ("RAD").  (Pltfs' Decls. at ¶8.)  The Navy denied Plaintiffs'

10   requests.  (*Id.*)  Plaintiffs appealed the denial to (a) their

11   Commanding Officer, (b) the Naval Personnel Department, (c) the

12   Board for Correction of Naval Records ("BCNR"), and (c) the

13   Secretary of the Navy.  (*Id.* at ¶¶9-13 & Ex. I-S.)  All these

14   appeals were rejected, and the Navy informed Plaintiffs that

15   their administrative remedies had been exhausted.  (*Id.* at Ex.

16   E.)

17

18   _____

19        [4]   Plaintiffs' counsel suggested at oral argument that the
     Student Control Officer directly responded to the contents of
20   Plaintiffs' winging orders and, essentially, told them "not to
     worry about it."  This representation, however, is not evidence.
21   Plaintiffs' own declarations make no direct link between the
     winging orders and the representations made by the "Student
22   Control Officer."  For example, Lt. Gengler states:

23             On April of 1999 I received orders to report to my next
               command, Strike Fighter Squadron 125, for follow-on
24             training in the F-18 Hornet.  Shortly thereafter, I
               spoke to the Student Control Officer at my training
25             squadron's administration department (VT-22, NAS
               Kingsville, TX), who verbally reaffirmed the seven year
26             term contained in the Agreement.

27   (Doc. 17 ¶6.)

28

                                    3

1    The seven year termination dates for Plaintiffs Gengler and

2    McSeveney were April and February 2006, respectively.  Plaintiffs

3    assert that being required to serve beyond the seven-year

4    contractual term constitutes irreparable harm in and of itself.

5    Plaintiffs also point out that there is the potential for even

6    more severe hardships if they are deployed outside the

7    Continental United States.  At the time the habeas petition in

8    this case was filed, Plaintiffs' were on "shore duty" assigned to

9    a "non-deployable" unit in California.  Plaintiffs believe that

10    it is likely that their status will change.  According to Lt.

11    McSeveney:

12            The Navy gives orders to its sailors and officers in
              approximately three-year blocks, typically alternating
13            between "sea duty" and "shore duty."  A sea tour
              typically lasts 36 months, while a shore tour lasts 33
14            months.  During a sea tour, Navy personnel are assigned
              to an operational unit such as an aircraft squadron,
15            destroyer or submarine, and are expected to deploy
              either on a set schedule or as needed, dictated by
16            operational necessity.  While on a shore tour,
              personnel are assigned to a non-deployable unit, such
17            as a training squadron, test unit or recruiting office,
              and are not expected to deploy in an operational
18            capacity.  This alternating rotation is designed to
              ensure that Navy sailors and officers are able to spend
19            adequate time with their families away from the
              stresses of operational duty.  By refusing to honor my
20            contract and delaying the administrative process for
              two years, the Navy has put me in an administrative
21            limbo between shore duty and sea duty.  According to my
              contract, my time in the Navy should have been complete
22            last month, February 2006.  My current set of orders
              for shore duty end[ed] March 2006.  Since the Navy is
23            attempting to keep me in for an eighth year, this will
              leave me with eleven months of service to complete.
24            The Navy will not issue Permanent Change of duty
              station (PCS) orders for members with less than twelve
25            months of service remaining since the cost of moving an
              entire family is prohibitive for that small amount of
26            time, so my current shore tour orders will be extended.
              The effect of that eleven-month extension, however, is
27            to change my duty status from non-deployable to
              deployable to locations outside the Continental United
28            States ("CONUS").  Like many active duty Navy personnel

**4**

1     on sea duty with a limited amount of time remaining in
2     their service, it is highly likely that this change in
   status will result in my being deployed to Iraq, where
3     I will augment U.S. ground forces in hard-to-fill
   billets.  In other words, the Navy is not attempting to
4     keep me in service to take advantage of my extensive
   training and tactical expertise as a strike fighter
5     pilot, but simply to use me as a body to fill the
   position of an Army officer the Army failed to recruit
6     or entice to stay in the service.  The navy has never
   made a request of me to serve any extra time in my
7     trained capacity as a strike fighter pilot.  in fact,
   the Navy currently has a surplus of officers as
8     evidenced by the Involuntary Release from Active Duty
   (IRAD) policy, which resulted in the released of more
9     than 400 officers in December 2003 and another 120 in
   May of 2004.

10  (McSeveney Decl. at ¶15.)[5]

11      According to Lieutenant Commander Jeremy W. Gunter,

12  assignment of Plaintiffs overseas is "unlikely at this point"

13     I am [] responsible for filling Individual Augmentee
   (IA) assignments for six to twelve month deployments to
14     Iraq, Afghanistan, and other places where additional
   manpower for the Global War on Terror may be needed.
15     These billets are located all over the world and
   included some in the Continental United States.  While
16     I do not have overall control of the selection process
   for officers who fill IA billets, I do coordinate the
17     orders for officers under my assignment who are
   selected for such deployments.  Neither LT Gengler nor
18     LT McSeveney is currently under orders to deploy as an
   IA.  While it is possible that their Commanding Officer
19     may select one or both of them for such an assignment
   if he were asked to provide officers, it is my opinion
20     that it is unlikely at this point.

21  (Gengler Decl. at ¶4.)

22      Plaintiffs highlight several other aspects of their personal

23  situations.  First, Lt. McSeveney recently purchased a home in

24  Denver, Colorado, which his family planned to occupy in December

25  2005.  (McSeveney Decl. at ¶16.)  Instead, the house sits empty

26  _____

27      [5]   Plaintiffs claim that the same deployment framework
applies to Gengler, except that his shore duty ended in May 2006.
28  (Gengler Decl. at ¶15.)

1  "and the mortgage payment is rapidly eating into [his family]

2  savings." (*Id*.)  He has also been forced to cancel numerous

3  aviation-related job interviews pending the outcome of this case.

4  (*Id*.)  Finally, McSeveney states that his wife scheduled an in-

5  vitro fertilization attempt for this summer and that these plans

6  would be disrupted if the Navy chooses to deploy him.  (*Id*.)

7      Lt. Gengler has been accepted for admission to the

8  University of Chicago Business School.  His acceptance, however,

9  is contingent upon his attending classes in August 2006.

10  Additionally, Gengler believes that his ability to obtain a

11  deferment of admission may be adversely affected by his age.  He

12  is currently 33 years old and the oldest student accepted at

13  Chicago Business school this year was 35.  (*See* Gengler Decl. at

14  ¶16.)

15      Plaintiffs allege that the Navy approved the discharge

16  requests of as many as eight other fixed-wing jet pilots with the

17  same Service Agreements as Plaintiffs after they served only

18  seven years of active duty.  The Navy responded to this

19  allegation at oral argument by explaining that those pilots had

20  less exemplary service records and were selected for discharge on

21  those grounds.  However, the Navy has yet to produce any evidence

22  regarding these eight other pilots.

23      In a supplemental declaration filed on July 25, 2006, Lt.

24  Gengler describes a recently enacted reduction in force policy

25  issued by the Navy.  Specifically, Gengler asserts that Navy has

26  acknowledged it is "overmanned with pilots and is looking to

27  remove 300 of them by September 30, 2006 presumably in advance of

28  the next fiscal year."  (Doc. 21.)

**6**

Because the pilots in question have not volunteered to retire, the Navy would have to pay them a severance package to force them out. I believe this severance package basically equates to two years salary by law.

In a cost saving effort, the Navy has decided to implement the [Voluntary Separation Pay] program (see attached Exhibit A). They have identified some target population within each different job type that they want to reduce, and have offered those candidates the opportunity to participate. This target group consists of more than the actual number of candidates [than] the Navy is looking for, in order to allow for competition among the candidates.

The concept is simple and works as follows: Each participant is allowed to bid on an amount that they would be willing to take to leave the Navy by September 30, 2006. The Navy will then grant separation, starting with the lowest bidders and working higher, until they have reached their desired level of separations. In our community (pilots), the number of individuals they are looking to separate is approximately 300. In fact, one of our friends, who left our squadron about one year ago, is a candidate even though he does not want to separate from the Navy. He is an F/A 18 pilot just like co-plaintiff McSeveney and myself, and could do any job for the Navy that either McSeveney or I could do. The Navy will literally pay him money to separate prior to September 30, 2006, while at the same time refusing [to let us] leave.

(*Id.*)

### III.  **PROCEDURAL HISTORY**

On March 31, 2006, Plaintiffs filed their complaint, which contains five causes of action. The first is a breach of contract action brought pursuant to the Contracts Disputes Act and Suits in Admiralty Act. (Doc. 1, at ¶¶25-32.) The second is a claim for equitable estoppel based on the allegation that the Navy made "misrepresentations regarding the applicable [service] period to invoke Plaintiffs' reliance." (*Id.* at ¶¶33-40.) The third is a claim brought under the Administrative Procedures Act,

**7**

1  alleging that the Navy's rejection of Plaintiffs' discharge

2  requests was "arbitrary and capricious, an abuse of discretion,

3  or otherwise contrary to law..." (*Id.* at ¶¶41-42.)  The fourth

4  claim is a petition for a writ of habeas corpus, requesting

5  discharge from the Navy.  (*Id.* at ¶¶43-48.)  Finally, the fifth

6  cause of action is for declaratory relief and requests, among

7  other things, a declaration that "Defendant's position throughout

8  this dispute was not substantially justified..." and that

9  "Plaintiffs [are] prevailing parties entitled to costs and

10  attorneys fees accrued throughout this dispute as allowed by the

11  Equal Access to Justice Act." (*Id.* at ¶¶49-50.)  Plaintiffs seek

12  specific performance of the seven year term in their Service

13  Agreements and attorneys fees and costs.  (*Id.* at ¶¶51-52.)

14      On the same day the complaint was filed, Plaintiffs filed an

15  ex parte motion for a temporary restraining order, requesting the

16  entry of an order "preventing Defendants from changing

17  Plaintiffs' status from non-deployable to deployable or otherwise

18  sending them to Iraq or any location outside [the Continental

19  United States." (Doc. 2 at 2, filed March 31, 2006.)  A few days

20  later, the parties reached an agreement as to the requested

21  injunctive relief.  The Navy promised that Plaintiffs would

22  remain on non-deployable status until July 10, 2006 in exchange

23  for Plaintiffs withdrawing their request for a temporary

24  restraining order.  On June 1, 2006, the parties extended the

25  duration of the agreement until August 9, 2006, pending further

26  internal discussion by the Navy regarding Plaintiffs' discharge

27  requests.  Subsequently, the Navy notified Plaintiffs that they

28  would not be discharged.  Plaintiffs filed an ex parte motion for

**8**

1  a temporary restraining order on July 25, 2006.  (Doc. 15.)

2  Defendants were afforded an opportunity to oppose on July 27,

3  2006.  (Docs. 24 & 25.)  After a hearing on the motion, held

4  August 4, 2006, the request for a temporary restraining order was

5  denied, although the Navy was ordered to give Plaintiffs' at

6  least twenty (20) days notice prior to changing their status from

7  non-deployable to deployable.  (Doc. 37.)

8      The United States moved to dismiss on August 3, 2006.  (Doc.

9  31.)  Plaintiffs opposed (Doc. 39), and the United States replied

10  (Doc. 47).

11

12                    **IV.   STANDARD OF REVIEW**

13  **A.   Motion to Dismiss for Lack of Subject Matter
      Jurisdiction (Fed. R. Civ. Pro 12(b)(1)).**

14

15      "Federal courts are courts of limited jurisdiction. They

16  possess only that power authorized by Constitution and

17  statute....It is to be presumed that a cause lies outside this

18  limited jurisdiction, and the burden of establishing the contrary

19  rests upon the party asserting jurisdiction." *Kokkonen v.

20  Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)(internal

21  citations omitted); *see also Tosco Corp. v. Communities for a

22  Better Environment,* 236 F.3d 495, 499 (9th Cir. 2001)(plaintiff

23  bears the burden of proving subject matter jurisdiction).

24      A motion to dismiss on jurisdictional grounds can be "either

25  facial or factual."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

26  2000).  In a facial attack, a court must "take all of the

27  allegations of material fact stated in the complaint as true and

28  construe them in the light most favorable to the nonmoving

**9**

1   party." *See Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir.

2   2002).  In a factual challenge, "a court may look beyond the

3   complaint to matters of public record without having to convert

4   the motion into one for summary judgment...It also need not

5   presume the truthfulness of the plaintiffs' allegations." *White,*

6   227 F.3d at 1243.

7

8       **B.   Motion to Dismiss for Failure to State a Claim (Fed. R.**

9           **Civ. Pro 12(b)(6))**.

10      A complaint may be dismissed for failure to state a claim

11  pursuant to Federal Rule of Civil Procedure 12(b)(6) if it

12  "appears beyond doubt that the non-movant can prove no set of

13  facts to support its claims." *Simpson v. AOL Time Warner Inc.,*

14  452 F.3d 1040, 1046 (9th Cir. 2006).  Alternatively, dismissal

15  can be based on the lack of a cognizable legal theory. *SmileCare*

16  *Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F3d 780, 783

17  (9th Cir. 1996).  In evaluating such a motion "[a]ll allegations

18  and reasonable inferences are taken as true, and the allegations

19  are construed in the light most favorable to the non-moving

20  party, but conclusory allegations of law and unwarranted

21  inferences are insufficient to defeat a motion to dismiss."

22  *Simpson,* 452 F.3d at 1046.

23  //

24  //

25  //

26  //

27  //

28

1

**V.   DISCUSSION**

2

**A.   Service of Process**.

3   In its opposition to the motion for a temporary restraining

4   order an its opening memorandum in support of its motion to

5   dismiss, the United States asserted that Plaintiffs did not

6   properly serve Defendants.   The United States withdrew this

7   objection upon receipt of the supplemental declaration of

8   Plaintiffs' counsel Timothy Lord ("Lord").[6]

9

**B.   Timeliness of Opposition**.

10   The United States also complains that Plaintiffs' opposition

11   was not timely filed.   The scheduling conference order (Doc. 38)

12   required Plaintiffs' opposition to be filed by 5:00 p.m. on

13   August 14, 2006.   According to the online service receipt,

14   Plaintiffs' points and authorities in support of the motion to

15   dismiss was filed at 5:20 p.m.   (*See* Doc. 39.)   Although

16   Plaintiffs offer no explanation for the technically untimely

17   filings, the government does not explain how it was prejudiced in

18   any way by this half hour delay.   The opposition will be

19   considered.

20

21          [6]        Counsel for the United States informed Lord via email
22   at 11:30 a.m. on Monday August 14, 2006 of the government's
     intent to withdraw the argument.   Nevertheless, Plaintiffs
23   address the service issue in their opposition, filed several
     hours later, stating "Counsel for Defendants' steadfast refusal
24   to acknowledge the frivolousness of the service allegation
     continues to waste both this Court's and plaintiffs' valuable
25   time and resources. As such, Plaintiffs request this court
     immediately dismiss the allegations and take note of its
26   continued presentation by Defendants counsel, especially in the
     face of her personal attacks on the undersigned's alleged sharp
27   litigation tactics."   (Doc. 39 at 2.)

28

1

2          **C.    <u>Subject Matter Jurisdiction</u>.**

3          Plaintiffs suggest several bases for subject matter

4   jurisdiction over their claims, alleging in the complaint:

5               Plaintiffs are authorized to bring this suit and this
               Court has jurisdiction pursuant to § 603 of the
6               Contracts Dispute Act of 1978..., 41 U.S.C. §§ 601-603;
               Suits in Admiralty Act, 46 U.S.C. §§ 741-752;
7               Administrative Procedures Act, 5 U.S.C. §§ 702-706;
               Declaratory Judgment, 28 U.S.C. § 2201; and Tucker Act,
8               28 U.S.C. § 1491.

9   (Compl. at ¶2.)  The United States asserts that none of these

10  statutes provide a basis for jurisdiction in this case.

11         Plaintiffs' fourth claim for relief is entitled "petition

12  for habeas corpus."  The United States does not dispute that a

13  petition for habeas corpus is the proper means by which a member

14  of the armed services can challenge a military service

15  obligation.  However, the government does rase several procedural

16  and substantive challenges to the viability of Plaintiffs' habeas

17  claim, which are discussed in Part V.D.

18                    **1.    Burden of Proof**

19         As a threshold matter, Plaintiffs assert in their opposition

20  that the United States' jurisdictional objections should fail

21  because "Defendants fail to cite to applicable precedent

22  regarding admiralty contract jurisdiction."  (Doc. 39 at 2.)

23  Plaintiffs misunderstand the applicable burden of proof.  The

24  non-moving party bears the burden of proving subject matter

25  jurisdiction in response to a Rule 12(b)(1) motion.  *Tosco Corp.,*

26  236 F.3d at 499.

27  *//*

28  *//*

### 2. Admiralty Jurisdiction

As a general rule, pursuant to the Tucker Act, 28 U.S.C. § 1491, the Court of Federal Claims has jurisdiction over claims brought against the United States or any of its agencies, including the United States Navy, "founded either upon the Constitution...any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.  The Little Tucker Act, 28 U.S.C. § 1346, grants district courts jurisdiction, concurrent with the Court of Federal Claims, over any Tucker Act-type claim where the amount in controversy does not exceed $10,000.  However, the Contracts Disputes Act carves out a limited exception to the Tucker Act, giving jurisdiction over suits "arising out of maritime contracts" to the district courts without any amount in controversy cap.  *See* 41 U.S.C. § 603; 46 U.S.C. § 741 et seq.; *Southwest Marine, Inc. v. United States*, 43 F.3d 420, 424 (9th Cir. 1994); *Southwest Marine Inc. v. United States*, 926 F. Supp. 142, 143-44 (N.D. Cal. 1995).  Accordingly, if Plaintiffs' Service Agreement is a "maritime contract," the Contracts Disputes Act provides for jurisdiction in district court.

The United States Supreme Court has recognized that "the boundaries of admiralty jurisdiction over contracts-as opposed to torts or crimes-being conceptual rather than spatial, have always been difficult to draw."  *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 23 (2004)(citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961)).

**13**

> To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. Nor can we simply look to the place of the contract's formation or performance. Instead, the answer "depends upon...the nature and character of the contract," and the true criterion is whether it has "<u>reference to maritime service or maritime transactions</u>."

*Kirby*, 543 U.S. at 23-24 (emphasis added).[7]   The question then becomes whether Plaintiffs' Service Agreement is such a contract.

Without citing any relevant legal authority or pointing to relevant language in the Service Agreements, Plaintiffs argue:

> By almost any measure, it would be difficult to conclude that Plaintiffs' service agreements that call for seven-years of service in the United States Navy aboard ships in the ocean and in flight over it are, although more than this, at least in the nature of a "maritime transaction."

(Doc. 39.)   However, an examination of the Service Agreements themselves reveals no reference to service on ships, service in the ocean, or service in airplanes that fly over the ocean.   The closest language to that effect is contained within the paragraph that sets forth the disputed seven-year service commitment:

> I consent to serve on active duty as a commissioned officer for a period of seven years from date of designation as a Naval Aviator (unless sooner released to inactive duty or discharged by the Chief of Naval Personnel).

(Service Agreement at (g)(2).)   Plaintiffs' theory demands that the words "Naval Aviator" be read to necessarily require that

---

[7]   The United States suggests that the focus of the inquiry is on whether the objective of the contract is "maritime commerce," in an apparent attempt to minimize *Kirby*'s reference to "maritime service."   (*See* Doc. 31 at 6.)   But, "[w]ithout doubt a contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction." *Kossick*, 365 U.S. at 735.

**14**

1   Plaintiffs will serve aboard ships in the ocean.[8]   Although,

2   assuredly, many Naval Aviators are deployed aboard aircraft

3   carriers for portions of their years in service, this contract

4   does not specifically commit Plaintiffs to any particular time

5   aboard a vessel.

6        Plaintiffs' counsel urges the court to consider Plaintiffs'

7   affidavits, which explain that Navy personnel are required to

8   spend substantial portions of their years in service assigned to

9   "sea duty":

> The Navy gives orders to its sailors and officers in
> approximately three-year blocks, typically alternating
> between "sea duty" and "shore duty."  A sea tour
> typically lasts 36 months, while a shore tour lasts 33
> months.  During a sea tour, Navy personnel are assigned
> to an operational unit such as an aircraft squadron,
> destroyer or submarine, and are expected to deploy
> either on a set schedule or as needed, dictated by
> operational necessity.  While on a shore tour,
> personnel are assigned to a non-deployable unit, such
> as a training squadron, test unit or recruiting office,
> and are not expected to deploy in an operational
> capacity.

17  (Gengler Decl., at ¶15.)  Specifically, Lt. Gengler states that

18  he has "made two full deployments on an aircraft carrier (the USS

19  Constellation), one lasting six months (March 2001 to September

20  2001) and the other eight (October 2002 to June 2003), as well as

21  numerous shorter detachments."  (*Id*. at ¶7.)  But, this factual

22  evidence also indicates that Plaintiffs spend extended non-

23  deployable periods of time <u>on shore</u>.  Moreover, according to

24  Plaintiffs' evidence, Naval Aviators may even be deployable to

25

26        [8]    Plaintiffs also suggest that it would be enough for
27  them to have consented to serve in airplanes <u>over</u> the ocean, but
    Plaintiffs offer no authority that suggests admiralty
28  jurisdiction would extend to such a service contract.

fill various billets on land, including particularly dangerous

Army billets in Iraq.  (*Id.* at ¶15.)  Critically, the Plaintiffs'

Service Agreements do not call for Naval Aviators to spend a

single day aboard a navy vessel or on the ocean.  The fact that

Plaintiffs were indeed deployed to sea duty pursuant to other

orders does not turn the Service Agreement into a maritime

contract.

Even if the use of the term Naval Aviator in the Service

Agreement could be read as impliedly committing Plaintiffs to

serve some portion of their years in service aboard a Navy ship,

this is not be enough to justify assertion of admiralty

jurisdiction.  "Ordinarily, a contract must be wholly maritime in

nature to be cognizable in admiralty."  *Simon v. Intercontinental

Transport (ICT) B.V.*, 882 F.2d 1435, 1442 (9th Cir. 1989).  There

are two exceptions to this general rule:

> First, admiralty may take jurisdiction of an entire
> contract if the nonmaritime obligations are merely
> incidental to the primary maritime nature of the
> contract.  Second, if the nonmaritime obligations are
> substantial, admiralty may take jurisdiction over any
> maritime obligations that can be severed from the
> nonmaritime obligations and separately adjudicated
> without prejudice to the parties.

*Id.*  A contract that does not directly provide for service aboard

a Navy vessel cannot be said to be primarily maritime in nature,

nor is their any reasonable way to sever the maritime obligations

from the non-maritime.

//

//

//

//

**3.   Neither the Administrative Procedure Act Nor the Tucker Act Waive Sovereign Immunity for the Relief Sought by Plaintiffs in this Case.**

Alternatively, Plaintiffs assert both the Administrative Procedure Act and the Little Tucker Act as bases for subject matter jurisdiction.  But, neither statutory scheme authorizes the form of relief requested here.  Plaintiffs seek specific performance of their service contracts, which is an equitable remedy.  *See United States v. Georgia-Pacific Co.,* 421 F.2d 92, 103-04 (9th Cir. 1970) (*citing Pope Mfg Co. v. Gormully*, 44 U.S. 224, 232 (1892)).

**a.   *Tucker Act*.**

First, both the Tucker Act and the Little Tucker Act impliedly forbid equitable relief in contract actions against the United States.[9]  It is well-settled law that, subject to very narrow (and wholly inapplicable) exceptions set forth in 28 U.S.C. 1491(b)(2),[10] the Court of Claims has no power to grant

---

[9]   As discussed, the Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to the Court of Federal Claims over claims brought against the United States or any of its agencies, including the United States Navy, "founded either upon the Constitution...any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491.  The Little Tucker Act, 28 U.S.C. § 1346, grants district courts jurisdiction, concurrent with the Court of Federal Claims, over any Tucker Act claim where the amount in controversy does not exceed $10,000.

[10]   28 U.S.C. § 1491(b)(2) provides:

> To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and

**17**

nonmonetary equitable relief, such as specific performance, under the Tucker Act. *First Hartford Corp. v. United States,* 194 F.3d 1279, 1294 (Fed. Cir. 1999); *Ruttenberg v. United States*, 65 Fed. Cl. 43, 50 (2005)(refusing to grant specific performance). Similarly, the Little Tucker Act impliedly forbids district courts from issuing equitable relief in contract cases against the United States. *Sharp v. Weinberger*, 798 F.2d 1521, 1523-24 (D.C. Cir. 1986) ("We know of no case in which a court has asserted jurisdiction either to grant a declaration that the United States was in breach of its contractual obligations or to issue an injunction compelling the United States to fulfill its contractual obligations.").

### b. *APA*.

The waiver of sovereign immunity in the APA incorporates limitations contained within other statutes:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency

> correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

1
2
3

action within the meaning of a relevant statute, is entitled to judicial review thereof...Nothing herein...confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

4   5 U.S.C. § 702.  Interpreting this language, an en banc panel of

5   the Ninth Circuit held in *North Star* that the APA did not waive

6   sovereign immunity for declaratory or injunctive relief if the

7   claim was grounded in contract, rather than statute, because

8   other statutes, namely the Tucker Act and Little Tucker Act,

9   impliedly forbid such relief in contract cases.

10
11
12
13
14

Generally speaking, the Tucker Act does not permit the claims court to grant equitable or declaratory relief in a contract dispute case. [citations] <u>Similarly, the Little Tucker Act does not specifically authorize the district court to grant declaratory or equitable relief against the United States in contract cases</u>. Price, 894 F.2d at 324; [citations] However, the district court does have jurisdiction to hear claims for equitable relief which "rest [ ] at bottom on statutory rights."

15   9 F.3d 1430, 1432 (9th Cir. 1993)(en banc)(emphasis added).  The

16   en banc panel then remanded the case to the three judge panel to

17   determine whether the claim was grounded in contract or statute.

18   *Id.*

19      The three judge panel held that:

20
21
22
23

If a plaintiff's claim is concerned solely with rights created within the contractual relationship and has nothing to do with duties arising independently of the contract the claim is founded upon a contract with the United States' and is therefore within the Tucker Act and subject to its restrictions on relief.

24   14 F.3d at 37.

25      Plaintiffs do not assert that their claim is grounded in

26   statute.  In fact, they seek to impose a contractual obligation

27   on the government despite contrary statutory language.  Instead,

28   Plaintiffs respond to *North Star* by broadly asserting that that

1  "it is well-established that the APA waives sovereign immunity

2  for claims of equitable relief," citing *Bowen v. Massachusetts*,

3  487 U.S. 879, 887 (1988).  In that case, the United States

4  Supreme Court reviewed a decision by the Department of Health and

5  Human Services ("DHHS") to disallow reimbursement for certain

6  services under the Medicaid program.  Specifically, the State of

7  Massachusetts filed suit under the APA, arguing that DHHS's

8  disallowance determination violated provisions of the Social

9  Security Act and implementing regulations.  The district court

10 agreed with Massachusetts on the merits and issued an order

11 "setting aside" DHHS's decision to disallow reimbursement of

12 $6,414,964.00.  *See id.* at 888.  This order had the effect of

13 requiring DHHS to reimburse Massachusetts this sum of money.  The

14 United States challenged the order, arguing that the district

15 court lacked jurisdiction to issue money damages, citing APA

16 § 702, which waives sovereign immunity for claims brought by "a

17 person suffering legal wrong because of agency action, or

18 adversely affected or aggrieved by agency action..." so long as

19 the action seeks "relief other than money damages."  The Supreme

20 Court disagreed, reasoning that

21         The State's suit to enforce § 1396b(a) of the Medicaid
           Act, which provides that the Secretary "shall pay"
22         certain amounts for appropriate Medicaid services, is
           not a suit seeking money in compensation for the damage
23         sustained by the failure of the Federal Government to
           pay as mandated; rather, it is a suit seeking to
24         enforce the statutory mandate itself, which happens to
           be one for the payment of money.
25
26 *Id.* at 900.  Separately, the court rejected the government's

27 argument that the district court lacked jurisdiction to set aside

28 the disallowance decision because "monetary relief against the

**20**

United States is available in the Claims Court under the Tucker
Act," reasoning that "the availability of any review...in the
Claims Court is doubtful" because the provision of the Social
Security Act in question could not be fairly interpreted as
mandating compensation by the government for a "past wrong."  *Id.*
at 906-07 & n.42.

The differences between this case and *Bowen* are myriad, but
need not be enumerated in great detail here because the Ninth
Circuit in *North Star* expressly refused to apply *Bowen* and a
parallel Ninth Circuit case in cases grounded in contract:

> North Star argues that the district court cannot refuse
> jurisdiction if there is no alternative forum available
> to hear North Star's claim. In support, North Star
> cites *Bowen v. Massachusetts*, 487 U.S. 879, 901 (1988)
> ... and *Marshall Leasing, Inc. v. United States*, 893
> F.2d 1096, 1101 (9th Cir. 1990).
>
> Both *Bowen* and *Marshall*, however, involve
> interpretations of § 704 of the APA which requires
> judicial review of "final agency action for which there
> is no other adequate remedy in a court."  *Bowen* could
> be interpreted as taking a more expansive view of
> district court jurisdiction under the APA than we have
> previously recognized. Describing the forms of monetary
> relief that were not "money damages" and thus were
> within the scope of § 702, the Bowen Court includes "
> 'equitable actions for monetary relief under a
> contract.' " Bowen, 487 U.S. at 895.... This suggests
> that contract actions seeking equitable relief could be
> heard in district court under the APA. Bowen, however,
> did not involve a contract and it did not address the
> "impliedly forbids" limitation on the APA's waiver of
> sovereign immunity. We therefore agree with the
> D.C.Circuit that "[w]ithout more certain direction from
> the Supreme Court, we decline to overrule this Court's
> very specific holdings that the APA does not waive
> sovereign immunity for contract claims seeking
> [equitable] relief." *Transohio Sav. Bank v. Director,*
> *OTS*, 967 F.2d 598, 613 (D.C. Cir.1992). We also note
> that it would make little sense to grant jurisdiction
> over a claim pursuant to § 704 on the ground that
> jurisdiction for that same claim is expressly or
> impliedly forbidden under § 702.  *See id*. at 608-09.

*North Star*, 14 F.3d at 38 (internal citations omitted).

1    Neither the Tucker Act, the Little Tucker Act, or the
2    Administrative Procedure Act provide a basis for Subject Matter
3    Jurisdiction in this case.[11]

4                **4.   Declaratory Judgment Act.**

5    The Declaratory Judgment Act does not provide an independent
6    basis for jurisdiction.  The Declaratory Judgment Act states, "In
7    a case of actual controversy within its jurisdiction...any court
8    of the United States...may declare the rights and other legal
9    relations of any interested party seeking such declaration." 28
10   U.S.C. § 2201(a).  The Ninth Circuit has "long held that the
11   district court must first inquire whether there is an actual case
12   or controversy within its jurisdiction." *See Principal Life Ins.*
13   *Co. v. Robinson,* 394 F.3d 665, 669 (9th Cir. 2004).  Where habeas
14   corpus is the only basis for jurisdiction, an aggrieved person
15   may not instead seek a declaratory judgment.  *LoBue v.*
16   *Christopher*, 82 F.3d 1081, 1082 (9th Cir. 1996).

17

18            **D.   Habeas Corpus.**

19   The United States does not dispute that habeas corpus is the
20   appropriate means by which an individual who claims to be
21   "unlawfully retained" by the armed services may seek relief.  See
22   *Parisi v. Davidson*, 405 U.S. 34, 39 (19  72).

23

24

25

26        [11]   *See also Chemung County v. Dole*, 781 F.2d 963, 971 (2d.
     Cir. 1986)("To the extent [plaintiff's] complaint sought specific
27   performance of the contract...requiring the [agency] to execute
     the [contract]...the district court lacked jurisdiction to
28   entertain or grant such relief.")

### 1.   The Government's Procedural Objections.

The United States asserts that Plaintiffs improperly advanced their habeas claim within the context of a general civil complaint, to circumvent various Habeas Corpus rules of procedure.  For example, Habeas Corpus Rule 2 sets forth various requirements regarding the form of a Habeas Corpus petition; Rule 5 provides that the government is not required to answer the petition until ordered to do so by a court; Rule 6 requires leave of court for discovery; and Rule 8 provides that petitioner is not entitled to a trial and the court determines whether an evidentiary hearing is warranted.

Nevertheless, the United States acknowledges that the fourth cause of action is "fashioned" as a petition for a writ of habeas corpus.  There is authority suggesting that it is appropriate to treat Plaintiffs' claim as a properly filed petition for a writ of habeas corpus.  *See Rooney v. Secretary of the Army*, 405 F.3d 1029, 1031 (D.C. Cir. 2005) (treating suit for declaratory judgment brought by soldier whose discharge had been revoked without a hearing as a petition for habeas petition).  The government does not explain how it has been prejudiced by the incorporation of Plaintiffs' habeas petition into a standard civil complaint.  The remaining claim will be treated as a petition for habeas corpus and will proceed according to the Habeas Corpus Rules.

### 2.   Plaintiffs' Evidentiary Objections.

Plaintiffs suggest that Defendants have improperly cited to evidence outside the complaint.  Specifically, Plaintiffs complain that Defendants have referenced evidence "contained in

**23**

1  the Declarations of Plaintiffs attached to the pleadings filed in
2  their Motion for injunctive relief." (*See* Doc. 39 at 5.)   The
3  only such evidence Defendants appear to have relied upon are the
4  Service Agreements.   This is entirely proper.   Under the
5  "incorporation by reference doctrine," a district court may
6  consider documents "whose contents are alleged in a complaint and
7  whose authenticity no party questions, but which are not
8  physically attached to the [plaintiff's] pleading." *Knievel v.*
9  *ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).   The Ninth Circuit has
10 also extended the application of this doctrine "to situations in
11 which the plaintiff's claim depends on the contents of a
12 document, the defendant attaches the document to its motion to
13 dismiss, and the parties do not dispute the authenticity of the
14 document, even though the plaintiff does not explicitly allege
15 the contents of that document in the complaint." *Id*.

16
17              **3.   <u>Failure to State a Claim</u>**.

18        The government correctly notes that "Plaintiffs craft their
19 habeas claim as a request for specific performance of a []
20 contract." (Doc. 31.)   Specifically, Plaintiffs allege that by
21 the terms of their Agreement, they should only be required to
22 serve seven years of active duty. (*See* Docs. 4 & 5, Ex. A,
23 Agreement ¶ 2.)   The United States maintains that Plaintiffs have
24 failed to state a claim, because, as a matter of law, 10 U.S.C.
25 § 653(a), which provides that fixed wing jet pilots such as
26 Plaintiffs have a minimum service obligation of eight years of
27 active duty, trumps any contrary terms in Plaintiffs Service
28 Agreement.

**24**

1    First, the government emphasizes a line of cases which warn

2    courts to be cautious and deferential when addressing challenges

3    to military policy.  *See e.g., Orloff v. Willoughby*, 345 U.S. 83,

4    93-94 ("Orderly government requires that the judiciary be

5    scrupulous not to interfere with legitimate [military] matters as

6    the [military] must be scrupulous not to interfere with judicial

7    matters"); *Sebra v. Neville*, 801 F.2d 1135, 1142 (9th Cir.

8    1986)("Even if this court were to review [a] claim for damages

9    flowing from the alleged violations of applicable [military]

10   regulations, it would do so cautiously and with deference.").

11       The government then argues that federal statutes <u>always</u>

12   supercede the terms of service agreements, citing many of the

13   same cases it raised in opposition to Plaintiffs' motion for a

14   temporary restraining order.  For example, the government relies

15   upon *Antonuk v. United States*, 445 F.2d 592 (6th Cir. 1971), a

16   case in which an Army Reservist was ordered to serve on active

17   duty pursuant to 10 U.S.C. § 673a (now 10 U.S.C. § 12303) as a

18   sanction for having more than five unexcused absences from

19   scheduled training drills over a one-year period.  *Id.* at 593-94.

20   Title 10 U.S.C. § 673a (now § 12303) provides that any Reservist

21   who is not assigned to or participating satisfactorily in his

22   reserve unit may be assigned to active duty for 24 months.

23   Antonuk claimed that this statute did not apply because his

24   enlistment terms stated that if he failed to perform

25   satisfactorily, he would only have to serve 45 days on active

26   duty.  *Antonuk*, 445 F.2d at 598.  The court found that

27   "reservists may be activated pursuant to 10 U.S.C. § 673a,

28   notwithstanding clauses in their enlistment contract to the

**25**

1    contrary." *Id.* at 599.  To a certain extent, Plaintiffs'

2    situation is distinguishable from that in *Antonuk*.  Antonuk

3    enlisted on February 4, <u>1965</u>.  *Id.* at 553.  Congress first

4    enacted the operative statue as part of the Department of Defense

5    Appropriation Act of <u>1967</u>, 80 Stat. 980, § 101(a), and made the

6    provision permanent by the Military Selective Service Act of

7    1967, Pub. L. 90-40.  Accordingly, the enlistment contract

8    <u>preceded</u> the statute.  The *Antonuk* court held that Congress,

9    under its constitutional power to raise armies, could abrogate

10   the terms of its Reserve enlistment contracts.  *Id*. at 599.

11   Here, in contrast, Plaintiffs' service Agreements explicitly

12   contradict a <u>pre-existing</u> statute and there is no indication that

13   the Navy (or Congress) acted to abrogate the terms of Plaintiffs'

14   service agreements subsequent to their formation.

15       The government also cites *United States v. Larionoff*, 431

16   U.S. 864 (1977), and *Beckering v. United States*, 22 Cl. Ct. 30

17   (1990) for the proposition that service members are subject to

18   all applicable federal law, whether or not set forth in their

19   service agreement.  In *Larionoff*, seven Navy plaintiffs sued for

20   their re-enlistment bonus money, which was denied to them after

21   they re-enlisted.  431 U.S. at 865.  Congress passed a statute

22   that provided a bonus for these plaintiffs, but this statute was

23   later repealed.  *Id.* at 866-68.  The United States Supreme Court

24   recognized that "a soldier's entitlement to pay is dependent upon

25   statutory right."  *Id.* at 869 (*citing Bell v. United States*, 366

26   U.S. 393, 401 (1961)).  Thus, statute, not ordinary contract

27   principles, should govern situations involving *entitlement to*

28   *pay.  Id.  Beckering v. United States* similarly held that

**26**

"benefits owing to a military service member are governed by statutes and regulations, and not by general principles of contract law." *Beckering*, 22 Cl. Ct. at 32 (*citing Larionoff*, 431 U.S. at 869).

But, the subject matter -- military pay and benefits -- at issue in *Larionoff* and *Beckering* is an exception to the general rule that service agreements are subject to traditional principles of contract law. *Santiago*, 425 F.3d at 554 n.4 (noting that exceptions to the general rule have been carved out for the areas of military pay or benefits due to the "unique nature and characteristics of military service"); *see also Bell*, 366 U.S. at 401 ("common-law rules governing private contracts have no place in the area of military pay"). Here, Plaintiffs are not seeking benefits or pay, but rather specific performance of the durational terms of their service agreements and obligations to perform eight years on active duty. The government does not provide an exception to the general rule that traditional contract principles should apply to the service obligation.

The United States next cites *Doe v. Rumsfeld*, 435 F.3d 980 (9th Cir. 2006), which concerned a conflict between an enlistment contract and a Presidential "stop-loss" order issued pursuant to 10 U.S.C. § 12305.[12]  In *Doe*, the plaintiff had enlisted for a

---

[12]   10 U.S.C. § 12305 provides in pertinent part:

Notwithstanding any other provision of law, during any period members of a reserve component are serving on active duty pursuant to an order to active duty under authority of section 12301, 12302, or 12304 of this title, the President may suspend any provision of law relating to promotion,

one-year term in the National Guard. *Doe*, 435 F.3d at 983.
During his second one-year enlistment, Doe's unit was ordered to
active duty for a period that was eleven months longer than his
enlistment contract provided. *Id.* Doe's contract contained the
express provisions that (1) future enacted statutes and
regulations could affect the terms of his contract and that (2)
in times of national emergency, the President may order Doe to
active duty and extend his enlistment. *Id.* at 983. In Doe's
case, the contract provision regarding times of national
emergency was triggered by the President's use of his authority
under § 12305 to extend Doe's enlistment. *See id.* at 984-85.
Doe filed a habeas corpus petition which was denied. *Id.* at 983.
The Ninth Circuit upheld the lower court's decision, citing to
*Santiago v. Rumsfeld* as governing in the *Doe* case. *Id.* at 988-
89.

　　*Santiago* involved a very similar conflict between an
enlistment contract and a stop-loss order. Santiago enlisted in
the National Guard on June 28, 1996 for an eight-year term.
*Santiago*, 425 F.3d at 553. Shortly before his term was about to
expire, his enlistment was extended by a stop-loss order when his
unit received a mobilization alert prior to being ordered to
active service. *Id*. Santiago filed a writ of habeas corpus,
which was denied by the district court. *Id.* at 554. The Ninth
Circuit affirmed. *Id.* at 552.

　　　　　retirement, or separation applicable to any member of the
　　　　　armed forces who the President determines is essential to
　　　　　the national security of the United States.

1    The Ninth Circuit first held that enlistment contracts <u>are</u>

2  <u>subject to general contract law</u>, with exceptions not relevant in

3  *Santiago*.   *Id.* at 554.   The court found that Santiago's contract

4  contained terms that specifically anticipated and allowed for the

5  application of <u>current and future statutes</u>.   One section

6  contained a passage stating:

7              Many laws, regulations and military customs will
             govern my conduct and require me to do things a
8              civilian does not have to do.   The following
             statements are not promises or guarantees of any kind.
9              They explain some of the present laws affecting the
             Armed Forces which I cannot change but which Congress
10             can change at any time.

11  *Santiago*, 425 F.3d at 555.   The Ninth Circuit interpreted this

12  term to mean that the parties understood and intended that

13  "subsequently enacted, as well as pre-existing, law would

14  apply."   *Id.*   Because § 12305(a) was enacted in 1983, it was one

15  of the federal laws to which Santiago's enlistment was subject

16  when he enlisted in 1996.   *Id.*   Santiago's contract contained

17  another term that explicitly stated:

18             Laws and regulations that govern military personnel
             may change without notice to me.   Such changes may
19             affect my status, pay, allowances, benefits, and
             responsibilities as a member of the Armed Forces
20             REGARDLESS of the provisions of this
             enlistment/reenlistment document.

21

22  *Id.*   The stop-loss order which authorized suspension of

23  separation laws qualified as a change in the law.   *Id.* at 555-

24  56.   By the provisions of Santiago's enlistment contract,

25  Santiago's enlistment was properly extended.   *See also Winters*

26  *v. United States*, 412 F.2d 140, 144 & n.6 (holding Marine's

27  enlistment contract could be abrogated by <u>subsequent</u> enactment

28  of statute and reviewing other cases holding the same).

    The government maintains that 10 U.S.C. § 653 (requiring

1  fixed-wing pilots to serve eight years in active duty) likewise

2  trumps any contrary contractual terms.  But, unlike in *Doe* and

3  *Santiago*, where the contracts both incorporated pre-existing law

4  and provided for modification of the contract terms by

5  subsequent orders in times of national emergency, Plaintiffs'

6  service Agreements contain no such provision.  Gengler and

7  McSeveney's Agreements do have a clause that makes applicable

8  <u>subsequent</u> changes in law to apply to their pre-existing service

9  Agreements.  (Doc. 4 & 5, Ex. A, Agreement ¶ 1(g).)

10                    That federal statutes and pertinent regulations
                       applicable to personnel in the United States Navy <u>may</u>
11                    <u>change without notice</u> and that <u>such changes may affect</u>
                       <u>my status</u> as an Aviation Officer Candidate or a
12                    commissioned officer and <u>obligations to serve</u> as such.

13  (Agreement at g (emphasis added)).  This is an express agreement

14  that future changes in federal law may affect Plaintiffs'

15  obligation to serve as aviation officer candidates or

16  commissioned officers.  However, unlike *Doe* and *Santiago*,

17  Plaintiffs' Agreements <u>do not</u> provide that *pre-existing laws*

18  trump the terms of their service agreements, nor has the United

19  States pointed to any caselaw that so holds, absent language to

20  that effect in the service agreement.  Here, the pre-existing

21  law, 10 U.S.C. § 653, expressly provides a minimum eight-year

22  term of active duty for pilots like Plaintiffs.  This directly

23  conflicts with paragraph 2 of their service Agreements, which

24  provides for Plaintiffs to serve a seven year term of active

25  duty.

26     Although the cases cited by the government are

27  distinguishable, <u>Plaintiffs have still not cited to a single</u>

28  <u>case that is directly on point, nor have they pointed to any</u>

**30**

1   <u>authority in which the relief they seek was granted</u>.   Instead,

2   Plaintffs point to cases standing for unremarkable and largely

3   undisputed principles of law, such as "claims of breach of an

4   enlistment contract are decided under traditional notions of

5   contract law," and "[s]pecific performance is a traditional

6   equitable contract remedy which compels the breaching party to

7   perform its obligations under the contract."   (Doc. 39 at 6.)

8       Pointing to a line of cases that is more on point,

9   Plaintiffs assert that specific performance may be an

10  appropriate remedy in a habeas cases.   For example, in *Riggs v.*

11  *Fairman*, The Ninth Circuit recently held that

> Once a determination has been made that habeas relief
> is warranted, the district court has considerable
> discretion in fashioning a remedy tailored to the
> injury suffered....The Supreme Court has instructed
> that "[f]ederal habeas corpus practice, as reflected
> by the decisions of this Court, indicates that a court
> has broad discretion in conditioning a judgment
> granting habeas relief. Federal courts are authorized,
> under 28 U.S.C. § 2243, to dispose of habeas corpus
> matters 'as law and justice require.'" *Hilton v.*
> *Braunskill*, 481 U.S. 770, 775 (1987)...When
> ineffective assistance of counsel has deprived a
> defendant of a plea bargain, a court may choose to
> vacate the conviction and return the parties to the
> plea bargaining stage. See United States v. Gordon,
> 156 F.3d 376, 381-82 (2d Cir. 1998). A court may also
> order the government to reinstate its original plea
> offer to the defendant or release the defendant within
> a reasonable amount of time.   *See Nunes*, 350 F.3d at
> 1056-57 (9th Cir.2003). <u>In deciding the proper remedy,</u>
> <u>a court must consider the unique facts and</u>
> <u>circumstances of the particular case</u>. *See   Morrison*,
> 449 U.S. at 364.

24  399 F.3d 1179, 1183 (9th Cir. 2005) (emphasis added)(parallel

25  citations omitted).   Plaintiffs place particular emphasis on the

26  language from *Riggs* that requires a court to "consider the

27  unique facts and circumstances of the particular case" when

28  deciding upon the proper remedy.   Plaintiffs maintain that this

**31**

1  instruction requires a court to go beyond the pleading to "the
2  merits of the case by analyzing the evidence."  (Doc. 39 at 7.)
3  But, Plaintiffs confuse the question of determining an
4  appropriate remedy with the issue of whether they have a legally
5  cognizable claim.[13]  Whether specific performance might be an
6  appropriate legal remedy is an entirely separate inquiry from
7  whether Plaintiffs' claim will survive this motion to dismiss.

8  Plaintiffs do cite a few cases, all from the Federal
9  Circuit, in support of the merits of their contract claim.
10  First, in *AT&T Co. v. United States*, 177 F.3d 1368, 1373-74
11  (Fed. Cir. 1999), the Federal Circuit considered a fixed-price
12  contract for research and development between AT&T and the
13  United States Navy, the terms of which violated a statutory
14  prohibition against fixed-price contracts in excess of $10
15  million.  AT&T sought to have the contract declared void for
16  violating the statute.  The Federal Circuit refused to do so,
17  reasoning that the agency's noncompliance with the statute did
18  not necessarily require invalidation.  *Id*. at 1373-74.  To
19  support its conclusion, the Federal Circuit relied on *United*
20  *States v. Mississippi Valley Generating Co*., 364 U.S. 520, 563
21  (1961), where the Supreme Court explained that when a statute
22  "does not specifically provide for the invalidation of contracts
23  which are made in violation of [the statute's provisions]," a
24  court shall determine "whether the sanction on nonenforcement is
25  consistent with and essential to effectuating the public policy

26

27

28  [13]  Moreover, Plaintiffs' reading of *Riggs* would eviscerate
all motions to dismiss in habeas cases, regardless of the legal
merit of the underlying claim.

**32**

1  embodied in [the statute]."  After analyzing the applicable

2  statute and legislative history, which revealed an express

3  reluctance on Congress' part to use the statute "as the basis

4  for litigating the propriety of an otherwise valid statute," the

5  Federal Circuit determined that Congress did not intend for the

6  statute to "terminate fully performed contracts because of []

7  flawed compliance" by an agency.  177 F.3d at 1375.

8      Here, by contrast, the plain language of 10 U.S.C. § 653(a)

9  is unambiguous:

10          The minimum service obligation of any member who
            successfully completes training in the armed forces as
11          a pilot shall be 8 years, if the member is trained to
            fly fixed-wing jet aircraft, or 6 years, if the member
12          is trained to fly any other type of aircraft.

13  A review of the legislative history reveals no relevant

14  discussion of the substance of the provision, let alone any

15  discussion concerning the impact of the provision on then-

16  existing or subsequent service agreements.  *See* House Report No.

17  101-121 (1989), House Conference Report No. 101-331 (1989);

18  House Report No. 101-665 (1990), House Conference Report No.

19  101-923 (1990); House Report No. 102-527 (1992), House

20  Conference Report No. 102-966 (1992).

21      Although the *AT&T* court refused to void the contract, it

22  left open the question of what the appropriate remedy would be:

23          When a contract or a provision thereof is in violation
            of law but has been fully performed, the courts have
24          variously sustained the contract, reformed it to
            correct the illegal term, or allowed recovery under an
25          implied contract theory; the courts have not, however,
            simply declared the contract void ab initio.
26
27  *Id*. at 1376.

28  Plaintiffs next cite *Beta Systems Inc. v. United States*,

    838 F.2d 1179, 1181-82 (Fed. Cir. 1988), for the proposition

**33**

that "the risk of unintentional failure of a contract term to

comply with a legal requirement does not fall solely on the

contractor." Plaintiffs quote *Beta Systems* out of context. In

that case, like in *AT&T*, Beta Systems entered into a contract

with the government which incorporated a price index that did

not comply with a legal requirement. Specifically, a Defense

Acquisition Regulation required indexes to be "structured to

encompass a large sample of relevant items yet bear a logical

relationship to the type of contract costs being measured." *See*

*Id.* at 1185. Beta Systems asserted that the price index used in

the contract at issue did not track the price of aluminum, which

was the major construction material used for the contract. The

government asserted that "Beta [Systems] knew or should have

know that this index might not track the price of aluminum."

*Id.* The Federal Circuit rejected this argument, reasoning that

> The risk of unintentional failure of a contract term
> to comply with a legal requirement does not fall
> solely on the contractor. If the [] index that was
> selected does not comply with [the regulatory
> requirement] even approximately, it is not controlling
> whether or not Beta or the government foresaw, or
> accepted the risk of failing to foresee, this defect
> in the index. <u>In Polarad Electronics, Inc., ACAB No.</u>
> <u>1116, 2 ECR ¶ 134 (1971), on facts substantially</u>
> <u>identical to the present case, the Board held that</u>
> <u>inclusion of an "inappropriate and inadequate...price</u>
> <u>index in the escalation clause" constituted mutual</u>
> <u>mistake of a material fact, requiring correction by</u>
> <u>substitution of a proper index</u>.

*Id.* (emphasis added). Suggesting that correction of the

mistaken term might be appropriate, the Federal Circuit remanded

the case for determination of an appropriate remedy.[14]

---

[14] Elsewhere in *Beta Systems*, the Federal Circuit
specifically notes that the Defense Acquisition Regulations
specifically provide that "[a] contract may be amended or
modified to correct or mitigate the effect of a mistake,

1  Considered in context, the proposition for which Plaintiffs cite

2  Beta Systems is inapplicable.  The government has not asserted

3  here that Plaintiffs should have known of the statute imposing

4  an eight-year term at the time they signed the contract.

5      Finally, Plaintiffs cite *Urban Data Systems Inc. v. United*

6  *States*, 699 F.2d 1147 (Fed. Cir. 1983), for the proposition that

7  a "contract price term contrary to law did not invalidate a

8  fully performed contract."   While *Urban Data Systems* did

9  decline to invalidate the entire contract, it also found that

10 the illegal price terms were invalid.  *Id*. at 1154.  Instead,

11 the *Urban Data Systems* court suggested that the plaintiff would

12 be entitled to reimbursement on a "quantum valebant basis for

13 the reasonable value in the marketplace of the supplies and

14 concomitant services."  *Id*.

15     In short, none of the cases cited by Plaintiffs, all of

16 which concern commercial price terms contained within government

17 contracts, support the existence of a legally cognizable

18 contact-based claim in this case.  In none of the cases did a

19 party successfully obtain specific enforcement of an unlawful

20 contract term against the government.  Plaintiffs have not yet

21 provided any legal support for such a remedy, nor has research

22 disclosed any supportive cases.

23     Essentially, Plaintiffs seek specific enforcement of the

24 Service Agreement, which contains an erroneous term of service,

25 while the United States argues that the seven year service term

26 cannot be enforced because it is contrary to statute.  Many

27 cases have held that unlawful contracts (or unlawful contract

28

including...a mutual mistake as to a material fact."  *Id*. at 1185
(citing DAR 17-204.4 (1981)).

terms) may not be enforced.  *See Fomby-Denson v. Dept. of Army*, 247 F.3d 1366, 1374 (Fed. Cir. 2001)(reviewing the "well-settled" "principle[] of general contract law that courts may not enforce contracts that are contrary to public policy").  The Supreme Court in *Hurd v. Hodge*, 344 U.S. 24, 34-35 (1948), held that

> The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United Sates as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents.  Where the enforcement of private agreements would be violative of that policy, it is the obligation of courts to refrain from such exertions of judicial power.

*Id.*  A long line of cases from federal labor law has applied this "public policy doctrine" in determining whether to enforce agreements.  *See e.g.*, *W.R. Grace & Co. v. Local Union,* 759, *Intern. Union of Un. Rubber, Cork, Linoleum and Plastic Workers of Am.*, 461 U.S. 757, 766-67 (1983)(refusing to bar enforcement of collective bargaining agreement because it did not compromise public policy); *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 79 (1982)(refusing to command contracting party to perform under contract, as that would "command conduct that assertedly renders the promise an illegal undertaking under the federal statutes.").

Whether a contract is unlawful is determined by referencing "laws and legal precedents and not from general considerations of supposed public interests."  *W.R. Grace*, 461 U.S. at 766 (quoting *Muschany v. United States*, 324 U.S. 49, 66-67 (1945)).  However, "good faith contracts of the United States should not be lightly invalidated."

1
2
3
4
5

Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy. The courts must be content to await legislative action.

6

*Muschany*, 324 U.S. at 66-67.

7

The Restatement (Second) of Contracts, section 178,

8

concerns the enforceability of bargains that violate public

9

policy.  It provides:

10
11
12

(1) A promise or other term of an agreement is unenforceable on grounds of public policy <u>if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms</u>.

13
14

(2) In weighing the interest in the enforcement of a term, account is taken of

15
16

(a) the parties' justified expectations,

(b) any forfeiture that would result if enforcement were denied, and

17

(c) any special public interest in the enforcement of the particular term.

18
19

(3) In weighing a public policy against enforcement of a term, account is taken of

20

(a) the strength of that policy as manifested by legislation or judicial decisions,

21
22

(b) the likelihood that a refusal to enforce the term will further that policy,

23

(c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

24

(d) the directness of the connection between that misconduct and the term.

25

(emphasis added.)

26

The United States Supreme Court relied upon this provision

27

to evaluate whether public policy was violated by a plea

28

agreement providing for dismissal of criminal charges in

**37**

exchange for a waiver of the defendant's right to file a civil rights action. *Town of Newton v. Rumery*, 480 U.S. 386, 392 n.2 (1987). More recently, the Court of Federal Claims relied upon this provision to reject the government's argument that a contractor should be strictly liable for the unlawful acts of its subcontractors. *Transfair Int'l, Inc., v. United States*, 54 Fed. Cl. 78 (2002). The government in *Transfair* argued that a contract should be declared void because a <u>subcontractor</u> performed the contract in an unlawful manner (by employing an Iranian airliner to deliver goods), even though the contractor argued that it had no knowledge of the unlawful performance. Following similar decisions from other circuits, including the Seventh Circuit case, *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir. 1986), the *Transfair* court reasoned that "the defense of illegality, being in character if not origins an equitable and remedial doctrine, is not automatic but requires...a comparison of the pros and cons of enforcement." *Transfair*, 54 Fed. Cl. at 85 (quoting *Carbon County*, 799 F.2d at 273). The *Transfair* court denied the United States' motion to dismiss the contractors' suit for payment. Its reasoning is instructive:

> This court is mindful of the vital foreign policy concerns at issue and the result here is in no way intended to denigrate those concerns. But, the short of the matter is that while it is highly relevant that legal requirements, tied to those concerns, were apparently violated here, that fact alone is not decisive. Rather, this court must determine, first, whether, under the circumstances, plaintiff is responsible for the illegal performance of its subcontractor and, then, applying the balancing test of the Restatement, consider whether the nature of that illegality was such as to warrant the forfeiture

of all compensation. <u>As fact issues lurk beneath both considerations, this court must deny defendant's motion</u>.

Here, although the contract directly conflicts with a federal statute, the legislation does not explicitly state that any contract made in violation of the statute is unenforceable. There are fact inquiries that must precede any reasoned application of the restatement factors, including the strength of the public policy that underlies the statutory eight year service provision; the government's interest in a return on its investment in training Navy fixed-wing jet pilots; the impact upon Plaintiffs that would result if relief was denied; and the nature of any misrepresentations and/or mistakes that have occurred as a result of the Navy's negligence in drafting the service contracts.

The motion to dismiss the contract-based habeas corpus claim is **DENIED WITHOUT PREJUDICE, although Plaintiffs will be required to re-plead this claim**.

### 4.    Equitable Estoppel.

Plaintiffs' second claim is for equitable estoppel, essentially arguing that the government should not be permitted to advance its illegality defense.  The government moves to dismiss this claim on the ground that it fails as a matter of law.

Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor*, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006).  "[T]he party claiming estoppel

**39**

must have relied on his adversary's [misleading] conduct in such
a manner as to change his position for the worse, and that
reliance must have been reasonable in that the party claiming
the estoppel did not know nor should it have known that its
adversary's conduct was misleading." *River City Ranches #1 Ltd
v. Comm'r Internal Revenue*, 401 F.3d 1136 (9th Cir. 2005).  The
Ninth Circuit applies a two-prong test to determine when it is
appropriate to apply equitable estoppel against the government.
First Plaintiffs must demonstrate "affirmative conduct [by the
government] going beyond mere negligence," *Purcell v. United
States*, 1 F.3d 932 (9th Cir. 1993); and second that the
"government's wrongful act will cause a serious injustice, and
the public's interest will not suffer undue damage" if the
requested relief is granted, *United States v. Hatcher*, 922 F.2d
1402, 1411 n.12 (9th Cir. 1991).

In the context of ruling on an equitable estoppel claim
brought against the government, the Ninth Circuit held that
"[n]either the failure to inform an individual of his or her
legal rights nor the negligent provision of misinformation
constitute affirmative misconduct." *Suilt v. Schiltgen*, 213
F.3d 449, 454 (9th Cir. 2000).  Plaintiffs assert, however, that
the Navy's conduct went beyond mere negligence, citing *Watkins
v. United States Army*, 875 F.2d 699 (9th Cir. 1989), for the
proposition that the government's conduct in this case is
actually affirmative misconduct.  In *Watkins*, the Army was well
aware from the time of Watkins' initial enlistment in 1967 that
he had "homosexual tendencies," to which he admitted on several
occasions.  At that time, engaging in homosexual acts with other

**40**

1  servicemen was considered a crime under military law.  Watkins
2  was investigated several times by the Army for allegedly
3  committing sodomy and his fitness for duty was questioned on
4  several other occasions.  But, until 1981, he was always cleared
5  of all wrongdoing and allowed to reenlist on several separate
6  occasions because of his excellent performance.  *Id.* at 702.  In
7  1981, the Army promulgated a regulation which mandated the
8  discharge of homosexuals regardless of merit.  Soon thereafter
9  an Army Board convened and determined that Watkins should be
10 discharged.  *Id.*

11     The Ninth Circuit held that equitable estoppel could be
12 invoked against the government in *Watkins* because the Army
13 repeatedly represented over a 14-year period that Watkins was
14 qualified for reenlistment.  Although acknowledging the general
15 principle that "persons dealing with the government assume the
16 risk that government agents may exceed their authority and
17 provide misinformation," the *Watkins* court noted that the
18 government "acted affirmatively in admitting, reclassifying,
19 reenlisting, retaining, and promoting Watkins."  *Id.* at 708.
20 Furthermore, the defendant's conduct "involve[d] ongoing active
21 misrepresentations by Army officials acting well within their
22 scope of authority."  *Id.*  Consequently, the Ninth Circuit found
23 the Army's conduct to be "affirmative misconduct."  *Id*.

24     Plaintiffs conclusorily allege that ongoing
25 misrepresentation occurred when the Navy drafted Plaintiffs'
26 Agreements, presented the Agreements to Plaintiffs, signed the
27 Agreements (through a Lieutenant in 1996), and then, in 1999
28 again represented to Plaintiffs that the seven-year term

**41**

applied.  (*See* Doc. 16 at 12.)   The United States argues that

"the allegations in the instant case do not even approach the

level of affirmative misconduct set forth in Watkins." (Doc. 47

at 15.)   In other words, the United States asserts that

Plaintiffs have failed to allege that the Navy's conduct was

anything other than negligence (i.e., a mistake).

The Complaint alleges that:

> 35.   Defendants knew that the Agreements contained a
>        seven-year enlistment period;
> 36.   Defendants knew that at the time of [sic] the
>        Agreements were signed, Congress had passed a law
>        containing an eight-year enlistment periods [sic]
>        applicable to Plaintiffs
> 37.   At the time the Agreements were signed and
>        thereafter, Defendants made misrepresentations
>        regarding the applicable enlistment period to
>        invoke Plaintiffs reliance
> 38.   At the time the Agreements were signed and
>        thereafter, Plaintiffs were unaware of the nature
>        of Defendants misrepresentations
> 39.   Plaintiffs relied on Defendants'
>        misrepresentations to their detriment.
> 40.   Defendants breach act will cause a serious
>        injustice to Plaintiffs and the public interest
>        will not suffer undue damage by the requested
>        estoppel.

(Doc. 1 at 6.)[15]

The government contends that Plaintiffs must plead

affirmative misconduct in accordance with the heightened

pleading standard set forth in Federal Rule of Civil Procedure

9(b), citing *Miscellaneous Service Workers Drivers & Helpers v.*

---

[15]   In declarations attached to their motion for temporary
injunctive relief, Plaintiffs assert that a "Student Control
Officer" orally confirmed Plaintiffs <u>seven year</u> commitment in
April 1999, shortly after Plaintiffs received their "winging
orders," which indicated an <u>eight-year</u> service obligation.
(Plaintiffs' Decls. at ¶6.)   This evidence is not admissible,
however, for purposes of a 12(b)(6) motion to dismiss.

*Philco-Ford Corp.*, 661 F.2d 776, 782 (9th Cir. 1981), in which pleading pursuant to Rule 9 was required for a claim that alleged affirmative misrepresentation.[16]  This is consistent with the law that estoppel only operates against the government when misconduct is affirmative and more than mere negligence.  Plaintiffs complaint is insufficient to state a claim for equitable estoppel.  Paragraph 32 is conclusory as it fails to describe what misrepresentations about Plaintiffs' service term were made, when, or by whom.  Intentional misrepresentation is not alleged, nor do Plaintiffs allege a pattern of affirmative misrepresentations like those in *Watkins*.  Negligence is not enough.

## VI.  CONCLUSION

For the reasons set forth above,

(1)  Defendants' motion to dismiss for lack of subject
     matter jurisdiction pursuant to Fed. R. Civ. Pro.

---

[16]     The United States also makes the less persuasive argument that equitable estoppel is never appropriate where the requested relief would violate a statute, citing *I.N.S v. Pangilinan*, 486 U.S. 875, 885 (1988)("Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have power to confer citizenship in violation of [Congressional] limitations."), and *Office of Personnel Management v. Richmond*, 496 U.S. 414, 420-21 (1990).  In, *Richmond*, the United States Supreme Court recognized earlier cases which held that "not even the temptations of a hard case will provide a basis for ordering recovery contrary to the terms of [a] regulation, for to do so would disregard the duty of all courts to observe the conditions defined by Congress..."  *Id*. However, the *Richmond* court went on to limit this holding to claims for "payment of money from the Public Treasury contrary to a statutory appropriation," leaving open the question of whether a plaintiff could ever bring an estoppel suit to compel the government to act contrary to a statute.  *Id*. at 423-24.

1   12(b)(6) is **GRANTED IN PART AND DENIED IN PART.**  The

2   contract, Administrative Procedure Act, and

3   declaratory relief claims are **DISMISSED WITH**

4   **PREJUDICE.**  The only valid basis for jurisdiction in

5   this case is habeas corpus, all other bases advanced

6   by Plaintiffs are legally insufficient.

7   (2)  Defendants' motion to dismiss for failure to state a

8   claim pursuant to Fed. R. Civ. Pro. 12(b)(6) is

9   **GRANTED IN PART AND DENIED IN PART.**  As to the

10   contract-based habeas corpus claim, the motion to

11   dismiss is **DENIED WITHOUT PREJUDICE, subject to**

12   **repleading.**  As to the equitable estoppel claim, the

13   motion to dismiss is **GRANTED WITH LEAVE TO AMEND.**

14   Plaintiffs shall file a petition for habeas corpus and

15   must re-plead their estoppel claim with greater

16   specificity.

17

18   **SO ORDERED.**

19   **DATED: August 24, 2006**

20

21                                    ___**/s/ Oliver W. Wanger**___
                                      **OLIVER W. WANGER**
22                                    **United States District Judge**

23

24

25

26

27

28

**44**