**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **LT. RICHARD T. GENGLER and LT. DANIEL S. McSEVENEY,**<br><br>                    **Plaintiffs,**<br><br>                    **v.**<br><br>**UNITED STATES OF AMERICA THROUGH ITS DEPARTMENT OF DEFENSE AND NAVY; and SECRETARY DONALD C. WINTER,**<br><br>                    **Defendant.** | **1:06-CV-00362 OWW LJO**<br><br>**MEMORANDUM DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER** |

## I.   <u>INTRODUCTION</u>

Before the court for decision is an application for a temporary restraining order "for immediate discharge" from the Navy of Plaintiffs Lt. Richard T. Gengler and Lt. Daniel S. McSeveney.  (Doc. 15, filed July 25, 2006.)  Plaintiffs also seek an immediate hearing on their underlying petition for habeas corpus.  (*See id.* at 2.)

## II. <u>BACKGROUND/PROCEDURAL HISTORY</u>

Plaintiffs Richard T. Gengler and Lt. Daniel S. McSeveney are Naval Officers and Aviators who are currently stationed with the Operational Test Evaluation Squadron Nine (VX-9) in China Lake, California.  They are assigned as Operational Test

**1**

Directors for the F/A-18C-F weapons system programs and currently are on "detachment" in Key West, Florida, performing operational tests on a radar system. (Doc. 16 at 1; Pltfs' Decls. at ¶7; Gunter Decl. at 3.)

Plaintiffs both entered the Navy in April 1996, after signing separate "Aviation Officer Candidate Program Service Agreements (the "Agreements"). The Agreements were drafted by the Navy and signed on the Navy's behalf by another Naval Officer. Among other things, the Agreements state that each consented to "serve on active duty as a commissioned officer for a period of seven years from date of designation as a Naval Aviator." (Pltfs' Decls. Ex A, at ¶2.)[1]

Plaintiffs successfully completed their flight training and were designated as Naval Aviators in February 1999 (Gengler) and April 1999 (McSeveney), respectively. The Navy asserts that Plaintiffs confirmed their <u>eight</u> year term of duty when Plaintiffs were given their "winging orders," a document both Plaintiffs received without question in 1999. (Doc. 25, Gunter Decl. at ¶2).[2] Plaintiffs assert, however, that the <u>seven year</u> commitment term contained in their service Agreements was

---

[1]    Although the Agreement also contains language requiring Plaintiffs to serve eight years as a Reserve Officer upon acceptance of a commission, that language appears not to be an issue here. Plaintiffs accepted commissions in October 1996 as Ensigns, well over eight years ago. Plaintiffs suggest and Defendants do not dispute that this satisfies Plaintiffs' eight year Reserve Officer obligation.

[2]    The so-called "winging" orders do not appear in the record, but Defendant acknowledged during oral argument that the documents were not signed by Plaintiffs.

1   confirmed orally by a "Student Control Officer" in April 1999.

2   (Plaintiffs' Decls. at ¶6.)[3]

3       It is undisputed that Plaintiffs have served with

4   distinction since 1999.  Each pilot logged more than 150 hours in

5   combat situations and each received numerous medals for valor

6   during combat.  (Doc. 16 at 4.)

7       When their contractual seven-year term of active duty

8   approached its end, both Plaintiffs notified their Commanding

9   Offices that they would be requesting release from active duty

10  ("RAD").  (Pltfs' Decls. at ¶8.)  The Navy denied Plaintiffs'

11  requests, however.  (*Id.*) Plaintiffs appealed the denial to (a)

12  their Commanding Officer, (b) the Naval Personnel Department, (c)

13  the Board for Correction of Naval Records ("BCNR"), and (c) the

14  Secretary of the Navy.  (*Id.* at ¶¶9-13 & Ex. I-S.)  All these

15  appeals were rejected, and the Navy informed Plaintiffs that

16  their administrative remedies had been exhausted.  (*Id.* at Ex.

17

18          [3]   Plaintiffs' counsel suggested at oral argument that the

19  Student Control Officer directly responded to the contents of
    Plaintiffs' winging orders and, essentially, told them "not to

20  worry about it."  This representation, however, is not evidence.
    Plaintiffs' own declarations make no direct link between the

21  winging orders and the representations made by the "Student
    Control Officer."  For example, Lt. Gengler states:

22

23              On April of 1999 I received orders to report to my next
                command, Strike Fighter Squadron 125, for follow-on

24              training in the F-18 Hornet.  Shortly thereafter, I
                spoke to the Student Control Officer at my training

25              squadron's administration department (VT-22, NAS
                Kingsville, TX), who verbally reaffirmed the seven year

26              term contained in the Agreement.

27
    (Doc. 17 ¶6.)
28

E.)

The seven year termination dates for Plaintiffs Gengler and McSeveney were April and February 2006, respectively.  Plaintiffs assert that being required to serve beyond the seven-year contractual period constitutes irreparable harm in and of itself. Plaintiffs also point out that there is the potential for even more severe hardships if they are deployed outside the Continental United States.  At the time the habeas petition in this case was filed, Plaintiff's were on "shore duty" assigned to a "non-deployable" unit in California.  Plaintiffs believe that it is likely that their status will change.  According to Lt. McSeveney:

> The Navy gives orders to its sailors and officers in approximately three-year blocks, typically alternating between "sea duty" and "shore duty."  A sea tour typically lasts 36 months, while a shore tour lasts 33 months.  During a sea tour, Navy personnel are assigned to an operational unit such as an aircraft squadron, destroyer or submarine, and are expected to deploy either on a set schedule or as needed, dictated by operational necessity.  While on a shore tour, personnel are assigned to a non-deployable unit, such as a training squadron, test unit or recruiting office, and are not expected to deploy in an operational capacity.  This alternating rotation is designed to ensure that Navy sailors and officers are able to spend adequate time with their families away form the stresses of operational duty.  By refusing to honor my contract and delaying the administrative process for two years, the Navy has put me in an administrative limbo between shore duty and sea duty.  According to my contract, my time in the Navy should have been complete last month, February 2006.  My current set of orders for shore duty end[ed] March 2006.  Since the Navy is attempting to keep me in for an eighth year, this will leave me with eleven months of service to complete. The Navy will not issue Permanent Change of duty station (PCS) orders for members with less than twelve months of service remaining since the cost of moving an entire family is prohibitive for that small amount of time, so my current shore tour orders will be extended. The effect of that eleven-month extension, however, is to change my duty status from non-deployable to

**4**

1
2
3
4
5
6
7
8
9
10

deployable to locations outside the Continental United
States ("CONUS").  Like many active duty Navy personnel
on sea duty with a limited amount of time remaining in
their service, it is highly likely that this change in
status will result in my being deployed to Iraq, where
I will augment U.S. ground forces in hard-to-fill
billets.  In other words, the Navy is not attempting to
keep me in service to take advantage of my extensive
training and tactical expertise as a strike fighter
pilot, but simply to use me as a body to fill the
position of an Army officer the Army failed to recruit
or entice to stay in the service.  The navy has never
made a request of me to serve any extra time in my
trained capacity as a strike fighter pilot.  in fact,
the Navy currently has a surplus of officers as
evidenced by the Involuntary Release from Active Duty
(IRAD) policy, which resulted in the released of more
than 400 officers in December 2003 and another 120 in
May of 2004.

11 (McSeveney Decl. at ¶15.)[4]

12     According to Lieutenant Commander Jeremy W. Gunter,

13 assignment of Plaintiffs overseas is "unlikely at this point"

14
15
16
17
18
19
20
21

I am [] responsible for filling Individual Augmentee
(IA) assignments for six to twelve month deployments to
Iraq, Afghanistan, and other places where additional
manpower for the Global War on Terror may be needed.
These billets are located all over the world and
included some in the Continental United States.  While
I do not have overall control of the selection process
for officers who fill IA billets, I do coordinate the
orders for officers under my assignment who are
selected for such deployments.  Neither LT Gengler nor
LT McSeveney is currently under orders to deploy as an
IA.  While it is possible that their Commanding Officer
may select one or both of them for such an assignment
if he were asked to provide officers, it is my opinion
that it is unlikely at this point.

22
23 (Gengler Decl. at ¶4.)

24     Plaintiffs highlight several other aspects of their personal

25 situations in an attempt to demonstrate hardship.  First, Lt.

26

27     [4]     Plaintiffs claim that the same deployment framework

28 applies to Gengler, except that his shore duty ended n May 2006.
(Gengler Decl. at ¶15.)

**5**

1  McSeveney recently purchased a home in Denver, Colorado, which

2  his family planned to occupy in December 2005. (McSeveney Decl.

3  at ¶16.)  Instead, the house sits empty "and the mortgage payment

4  is rapidly eating into [his family] savings." (*Id.*)  He has also

5  been forced to cancel numerous aviation-related job interviews

6  pending the outcome of this case. (*Id.*)  Finally, McSeveney

7  states that his wife scheduled an in-vitro fertilization attempt

8  for this summer and that these plans would be disrupted if the

9  Navy chooses to deploy him. (*Id.*)

10     Lt. Gengler has been accepted for admission to the

11  University of Chicago Business School.  His acceptance, however,

12  is contingent upon his attending classes in August 2006.

13  Additionally, Gengler believes that his ability to obtain a

14  deferment of admission may be adversely affected by his age.  He

15  is currently 33 years old and the oldest student accepted at

16  Chicago Business school this year was 35. (*See* Gengler Decl. at

17  ¶16.)

18     Plaintiffs allege that the Navy approved the discharge

19  requests of as many as eight other fixed-wing jet pilots with the

20  same service Agreements as Plaintiffs after they served only

21  seven years of active duty.  The Navy responded to this

22  allegation at oral argument by explaining that those pilots had

23  less exemplary service records and were selected for discharge on

24  those grounds.  However, the Navy has yet to produce any evidence

25  regarding these cooperator pilots.

26     Moreover, in a supplemental declaration filed on July 25,

27  2006, Lt. Gengler describes a recently enacted reduction in force

28  policy issued by the Navy.  Specifically, Gengler asserts that

**6**

Navy has acknowledged it is "overmanned with pilots and is looking to remove 300 of them by September 30, 2006 presumably in advance of the next fiscal year." (Doc. 21.)

> Because the pilots in question have not volunteered to retire, the Navy would have to pay them a severance package to force them out. I believe this severance package basically equates to two years salary by law.
>
> In a cost saving effort, the Navy has decided to implement the [Voluntary Separation Pay] program (see attached Exhibit A). They have identified some target population within each different job type that they want to reduce, and have offered those candidates the opportunity to participate. This target group consists of more than the actual number of candidates [than] the Navy is looking for, in order to allow for competition among the candidates.
>
> The concept is simple and works as follows: Each participant is allowed to bid on an amount that they would be willing to take to leave the Navy by September 30, 2006. The Navy will then grant separation, starting with the lowest bidders and working higher, until they have reached their desired level of separations. In our community (pilots), the number of individuals they are looking to separate is approximately 300. In fact, one of our friends, who left our squadron about one year ago, is a candidate even though he does not want to separate from the Navy. He is an F/A 18 pilot just like co-plaintiff McSeveney and myself, and could do any job for the Navy that either McSeveney or I could do. The Navy will literally pay him money to separate prior to September 30, 2006, while at the same time refusing [to let us] leave.

(*Id.*)

### III.   **PROCEDURAL HISTORY**

On March 31, 2006, Plaintiffs filed their complaint, which contains five causes of action. The first is a breach of contract action brought pursuant to the Contracts Disputes Act and Suits in Admiralty Act. (Doc. 1, at ¶¶25-32.) The second is a claim for equitable estoppel based on the allegation that the

Navy made "misrepresentations regarding the applicable [service] period to invoke Plaintiff's reliance." (*Id.* at ¶¶33-40.)   The third is a claim brought under the Administrative Procedures Act, alleging that the Navy's rejection of Plaintiffs' discharge requests was "arbitrary and capricious, an abuse of discretion, or otherwise contrary to law..." (*Id.* at ¶¶41-42.)   The fourth claim is a petition for a writ of habeas corpus, requesting discharge from the Navy. (*Id.* at ¶¶43-48.)   Finally, the fifth cause of action is for declaratory relief and requests, among other things, a declaration that "Defendant's position throughout this dispute was not substantially justified..." and that "Plaintiffs [are] prevailing panties] entitled to costs and attorneys fees accrued throughout this dispute as allowed by the Equal Access to Justice Act." (*Id.* at ¶¶49=50.)   Plaintiffs seek specific performance of the Agreements and attorneys fees and costs. (*Id.* at ¶¶51-52.)

On the same day the complaint was filed, Plaintiffs filed an ex parte motion for a temporary restraining order, requesting the entry of an order "preventing Defendants from changing Plaintiffs' status from non-deployable to deployable or otherwise sending them to Iraq or any location outside [the Continental United States." (Doc. 2 at 2, filed March 31, 2006.)   A few days later, the parties reached an agreement as to the requested injunctive relief.   The Navy promised that Plaintiffs would remain on non-deployable status until July 10, 2006 in exchange for Plaintiffs withdrawing their request for a temporary restraining order.   On June 1, 2006, the parties extended the duration of the agreement until August 9, 2006, pending further

**8**

internal discussion by the Navy regarding Plaintiffs' discharge request.  Subsequently, the Navy notified Plaintiffs that they would not be discharged.  Plaintiffs filed the instant ex parte motion for a temporary restraining order on July 25, 2006.  (Doc. 15.)  Defendants were afforded an opportunity to oppose on July 27, 2006.  (Docs. 24 & 25.)  A hearing on the motion was set for August 4, 2006.  (Doc. 26.)

## IV.   DISCUSSION

### A.   Threshold issues: Service and Notice.

#### 1.   Notice - Temporary Restraining Order.

The United States asserts that Plaintiffs did not provide adequate notice to the Defendants when they filed their ex parte temporary restraining order.

Defendants concede that the Plaintiffs' attorney Timothy Lord ("Lord") submitted the required certification, stating among other things, that he specifically notified Assistant United States Attorney Kimberly Gaab of his intention to file the motion on July 21, 2006.  Defendants assert, however, that the information contained within the certification is untrue because:

> 1) Lord [Plaintiffs' counsel] never provided Ms. Gaab with prior notice of the motion, and filed it when he knew Ms. Gaab would be out of town.

> 2) Lord had the opportunity to tell Ms. Gaab he would be seeking a TRO in their 20 minute conversation on July 24, 2006, but failed to do so.

(Doc. 25 at 2.)  Defendants assert that such false statements should not be tolerated by the Court, and therefore the TRO is

**9**

1  not an appropriate remedy.

2       Plaintiffs' respond that:

3            1) The stipulations alone made in the order to stay the
             injunction from April 5, 2006 to August 9, 2006, should
4            put the Defendants on notice that at any time the
             request for injunctive relief could be renewed.

5
             2) On July 5, 2006, Lord sent an email to Ms. Gaab
6            informing her that a request for injunctive relief will
             be filed unless settlement can by effected by July 13,
7            2006. Ms. Gaab acknowledged by her email response.
             Declaration by Timothy Lord (hereinafter Lord Decl.)
8            para. 5 and Exhibit C

9            3) On July 12, 2006, Lord repeated the above
             contention, and explained that maybe he could hold off
10           until Monday but cannot promise.  Lord Decl. para. 6
             and Exhibit D.  On the same day, Gaab responded that
11           should Plaintiffs file for any other relief in her
             absence, another attorney would be able to attend to
12           the matter.  Lord Decl. para. 7.

13           4) On Monday, July 14 (sic), Lord sent an email
             regarding the timing of the hearing for preliminary
14           injunction.  Lord Decl. para. 8 and Exhibit E.

15           5) On July 24, 2006, in a scheduling Conference, Lord
             reiterated that Plaintiffs would seek all possible
16           means of relief.

17  (Doc. 27 at 3.)  Plaintiffs contend that the above actions,

18  accompanied by the stipulation, put Defendants on notice that a

19  request for injunctive relief could be renewed to take effect

20  after August 6, 2006.

21       Although the above communications did not provide <u>specific</u>

22  notice to Defendants that a temporary restraining order request

23  would be filed against them on July 25, 2006, Defendants had

24  notice that a preliminary injunction or other remedies could be

25  sought at any time.  As a practical matter, it is also worth

26  noting that Defendants were afforded an opportunity to respond in

27  writing prior to a public hearing on the motion.

28

**2.   Service of Process.**

Defendants also object that Plaintiffs did not adequately serve Defendants with a copy of the complaint in this case.

Federal Rule of Civil Procedure 4(I) states in relevant part that when serving the United States, service shall be effected:

> (A) by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought...and
>
> (B) by also sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, District of Columbia, and
>
> (C) in any action attacking the validity of an order of an officer or agency of the United States not made a party, by also sending a copy of the summons and of the complaint by registered or certified mail to the officer or agency.

Fed. Rules Civ. Pro. 4(I).  In this case, Plaintiffs needed to serve the United States Attorney General, the Secretary of the Navy, and the United States Attorney's Office for the Eastern District of California.

Defendants asserted in their opposition that service was not made on the Attorney General and Secretary of the Navy.  (Doc. 25 at 5.)  However, according to the declaration submitted by Plaintiffs' counsel, service was effected on all required parties by certified mail on July 31, 2006.  (Lord Decl. Ex. A and B.)

**B.   Applicable Standard for Temporary Injunctive Relief.**

The generally-applicable legal standard for granting a temporary restraining order (TRO) is substantially similar to the standard for a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir.

2001).  The standard for granting a preliminary injunction
balances Plaintiff's likelihood of success against the hardships
to the parties.  *Clear Channel Outdoor, Inc. v. City of L.A.*, 340
F.3d 810, 813 (9th Cir. 2003).  Under the traditional test, a
plaintiff must show

      1)    a strong likelihood of success on the merits,

      2)    the possibility of irreparable harm to the
              plaintiff if injunctive relief is not granted,

      3)    a balance of hardships favoring the plaintiff, and

      4)    advancement of the public interest (in certain
              cases).

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir.
2005).  Alternatively, a court may grant an injunction if a
plaintiff "demonstrates *either* a combination of probable success
on the merits and the possibility of irreparable injury *or* that
serious questions are raised and the balance of hardships tips
sharply in his favor."  *Id.*  (citation omitted, emphasis in
original).  These two formulations of the injunctive relief test
are not separate tests but rather two points on a sliding scale,
in which the required degree of irreparable harm increases as the
probability of success decreases.  *Id.* (citations and quotations
omitted).

    However, a mandatory injunction, one that compels action
(rather than a prohibitory injunction which forbids action) goes
beyond simply maintaining the status quo and is disfavored.  *LGS
Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th
Cir.2006) (*citing Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320
(9th Cir. 1994)).  The purpose of a preliminary injunction is to

**12**

1   maintain the relative positions of the parties until a trial on
2   the merits is held.  *Id.*  District courts should deny mandatory
3   injunctions "unless the facts and law clearly favor the moving
4   party."  *Stanley*, 13 F.3d at 1320 (internal quotations omitted).[5]
5   Usually, mandatory relief is unnecessary where "it will not
6   further the purpose of a preliminary injunction, which is merely
7   to preserve the relative positions of the parties until a trial
8   on the merits can be held."  *LGS Architects*, 434 F.3d at 1158.

9       A threshold question is whether the preliminary injunctive
10  relief sought by Plaintiffs is prohibitory (requiring the
11  standard showing) or mandatory (requiring a heightened showing).
12  In the Ninth Circuit, mandatory relief is defined as such relief
13  that goes beyond maintaining the "status quo pendente lite."  See
14  Stanley, 13 F.3d at 1319.  This refers "not simply to any
15  situation before the filing of a lawsuit, but instead to the last
16  uncontested status which preceded the pending controversy."
17  *GoTo.com, Inc., v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir.
18  2000).  Here, Plaintiffs' last uncontested status preceding the
19  pending controversy was as active duty Naval Aviators.
20  Plaintiffs now request emergency relief in the form of an
21  immediate discharge from the Navy.  This would not return the
22  parties to the status quo pendente lite.  It would go far beyond
23  that.  Accordingly, this motion is subject to the heightened

24
25      [5]   Other circuits have applied similarly heightened
    standards to requests for mandatory preliminary injunctive
26  relief.  *See, e.g., Sunward Electronics, Inc. v. McDonald*, 362
    F.3d 17, 24 (2d Cir. 2004) (requiring a showing of "clear or
27  substantial likelihood of success where the injunction sought is
    mandatory").
28

standard, barring the requested relief "unless the facts and law clearly favor the moving party."

## C.   **Probability of Success on the Merits**.

### 1.   **Habeas/Contract Claim**.

Plaintiffs argue that by the terms of their Agreement, they should only have to serve seven years of active duty. (*See* Docs. 4 & 5, Ex. A, Agreement ¶ 2.)  The government contends that federal statutes trump contrary terms of a service agreement when the two conflict.  Specifically, 10 U.S.C. § 653(a) provides that fixed wing jet pilots such as Plaintiffs have a minimum service obligation of eight years of active duty.  The government contends that it is the statute, not the Agreement, that controls.

The government cites *Antonuk v. United States*, 445 F.2d 592 (6th Cir. 1971), for the proposition that federal statutes always supersede service agreement terms.  In *Antonuk*, an Army Reservist was ordered to serve active duty pursuant to 10 U.S.C. § 673a (now 10 U.S.C. § 12303) as a sanction for having more than five unexcused absences from scheduled training drills over a one-year period.  *Id.* at 593-94.  Title 10 U.S.C. § 673a (now § 12303) provides that any Reservist who is not assigned to or participating satisfactorily in his reserve unit may be assigned to active duty for 24 months.  Antonuk claimed that this statute did not apply because his enlistment terms stated that if he failed to perform satisfactorily, he would only have to serve 45 days on active duty.  *Antonuk*, 445 F.2d at 598.  The court found that "reservists may be activated pursuant to 10 U.S.C. § 673a,

**14**

notwithstanding clauses in their enlistment contract to the contrary." *Id.* at 599.  To a certain extent, Plaintiffs' situation is distinguishable from that in *Antonuk*.  Antonuk enlisted on February 4, <u>1965</u>.  *Id.* at 553.  Congress first enacted the operative statue as part of the Department of Defense Appropriation Act of <u>1967</u>, 80 Stat. 980, § 101(a), and made the provision permanent by the Military Selective Service Act of 1967, Pub. L. 90-40.  Accordingly, the enlistment contract <u>preceded</u> the statute.  The *Antonuk* court held that Congress, under its constitutional power to raise armies, could abrogate the terms of its Reserve enlistment contracts.  *Id*. at 599. Here, in contrast, Plaintiffs' service Agreements explicitly contradict a <u>pre-existing</u> statute and there is no indication that the Navy (or Congress) acted to abrogate the terms of Plaintiffs' service agreements subsequent to their formation.

The government also cites to *United States v. Larionoff*, 431 U.S. 864 (1977), and *Beckering v. United States*, 22 Cl. Ct. 30 (1990) for the proposition that service members are subject to all applicable federal law, whether or not set forth in their service agreement.  In *Larionoff*, seven Navy plaintiffs sued for their re-enlistment bonus money, which was denied to them after they re-enlisted.  431 U.S. at 865.  Congress passed a statute that provided a bonus for these plaintiffs, but this statute was later repealed.  *Id.* at 866-68.  The United States Supreme Court recognized that "a soldier's entitlement to pay is dependent upon statutory right."  *Id.* at 869 (*citing Bell v. United States*, 366 U.S. 393, 401 (1961)).  Thus, statute, not ordinary contract principles, should govern situations involving *entitlement to*

**15**

*pay.  Id.  Beckering v. United States* similarly held that
"benefits owing to a military service member are governed by
statutes and regulations, and not by general principles of
contract law."  *Beckering*, 22 Cl. Ct. at 32 (*citing Larionoff*,
431 U.S. at 869).

But, the subject matter -- military pay and benefits -- at
issue in *Larionoff* and *Beckering* is an exception to the general
rule that service agreements are subject to traditional
principles of contract law.  *Santiago*, 425 F.3d at 554 n.4
(noting that exceptions to the general rule have been carved out
for the areas of military pay or benefits due to the "unique
nature and characteristics of military service"); *see also Bell*,
366 U.S. at 401 ("common-law rules governing private contracts
have no place in the area of military pay").  Here, Plaintiffs
are not seeking benefits or pay, but rather specific performance
of the durational terms of their service agreements.  The
government does not point to an exception to the general rule
that traditional contract principles should apply.

The United States next cites *Doe v. Rumsfeld*, 435 F.3d 980
(9th Cir. 2006), which concerned a conflict between an enlistment
contract and a Presidential "stop-loss" order issued pursuant to
10 U.S.C. § 12305.[6]  In *Doe*, the plaintiff had enlisted for a

--------

[6]    10 U.S.C. § 12305 provides in pertinent part:

Notwithstanding any other provision of law, during any
period members of a reserve component are serving on active
duty pursuant to an order to active duty under authority of
section 12301, 12302, or 12304 of this title, the President
may suspend any provision of law relating to promotion,
retirement, or separation applicable to any member of the

1   one-year term in the National Guard.  *Doe*, 435 F.3d at 983.

2   During his second one-year enlistment, Doe's unit was ordered to

3   active duty for a period that was eleven months longer than his

4   enlistment contract provided.  *Id.*  Doe's contract contained the

5   express provisions that (1) future enacted statutes and

6   regulations could affect the terms of his contract and that (2)

7   in times of national emergency, the President may order Doe to

8   active duty and extend his enlistment.  *Id.* at 983.  In Doe's

9   case, the contract provision regarding times of national

10  emergency was triggered by the President's use of his authority

11  under § 12305 to extend Doe's enlistment.  *See id.* at 984-85.

12  Doe filed a habeas corpus petition which was denied.  *Id.* at 983.

13  The Ninth Circuit upheld the lower court's decision, citing to

14  *Santiago v. Rumsfeld* as governing in the *Doe* case.  *Id.* at 988-

15  89.

16      *Santiago* involved a very similar conflict between am

17  enlistment contract and a stop-loss order.  Santiago enlisted in

18  the National Guard on June 28, 1996 for an eight-year term.

19  *Santiago*, 425 F.3d at 553. Shortly before his term was about to

20  expire, his enlistment was extended by a stop-loss order when his

21  unit received a mobilization alert prior to being ordered to

22  active service.  *Id*.  Santiago filed a writ of habeas corpus,

23  which was denied by the district court.  *Id.* at 554.   The Ninth

24  Circuit affirmed.  *Id.* at 552.

25  _____

26          armed forces who the President determines is essential to
            the national security of the United States.

27

28

1    The Ninth Circuit first held that enlistment contracts are

2    subject to general contract law, with exceptions not relevant in

3    *Santiago*.  *Id.* at 554.  The court found that Santiago's contract

4    contained terms that specifically anticipated and allowed for the

5    application of <u>current and future statutes</u>.  One section

6    contained a passage stating that

7                    Many laws, regulations and military customs will
                    govern my conduct and require me to do things a
8                    civilian does not have to do.  The following
                    statements are not promises or guarantees of any kind.
9                    They explain some of the present laws affecting the
                    Armed Forces which I cannot change but which Congress
10                   can change at any time.

11   *Santiago*, 425 F.3d at 555.  The Ninth Circuit interpreted this

12   term to mean that the parties understood and intended that

13   "subsequently enacted, as well as pre-existing, law would

14   apply."  *Id.*  Because § 12305(a) was enacted in 1983, it was one

15   of the federal laws to which Santiago's enlistment was subject

16   when he enlisted in 1996.  *Id.*  Santiago's contract contained

17   another term that explicitly stated:

18                   Laws and regulations that govern military personnel
                    may change without notice to me.  Such changes may
19                   affect my status, pay, allowances, benefits, and
                    responsibilities as a member of the Armed Forces
20                   REGARDLESS of the provisions of this
                    enlistment/reenlistment document.

21

22   *Id.*  The stop-loss order which authorized suspension of

23   separation laws qualified as a change in the law.  *Id.* at 555-

24   56.  By the provisions of Santiago's enlistment contract,

25   Santiago had his enlistment properly extended.

26       The government maintains that 10 U.S.C. § 653 (requiring

27   fixed-wing pilots to serve eight years in active duty) likewise

28   trumps any contrary contractual terms.  But, unlike in *Doe* and

**18**

*Santiago*, where the contracts both incorporated pre-existing law and anticipated the incorporation of subsequent orders in times of national emergency, Plaintiffs service Agreements do no such thing. Gengler and McSeveney's Agreements do have a clause that allows for <u>subsequent</u> changes in law to apply to pre-existing service Agreements.   (Doc. 4 & 5, Ex. A, Agreement ¶ 1(g).)

> That federal statutes and pertinent regulations applicable to personnel in the United States Navy <u>may change without notice</u> and that <u>such changes may affect my status</u> as an Aviation Officer Candidate or a commissioned officer and <u>obligations to serve</u> as such.

(Agreement at g (emphasis added)).   This is an express acknowledgment that future changes in federal law could affect Plaintiffs' obligation to serve as aviation officers.   However, unlike in *Doe* and *Santiago*, Plaintiffs' Agreements <u>do not</u> provide that *pre-existing laws* trump the terms of their service agreements, nor has the United States pointed to any caselaw that so holds, absent language to that effect in the service agreement.   Here, the pre-existing law is 10 U.S.C. § 653, which provides a minimum eight-year term of active duty for pilots like Plaintiffs.   This directly conflicts with paragraph 2 of their service Agreements, which provide that the parties agree Plaintiffs will serve a seven year term of active duty.

Although the cases cited by the government are distinguishable, Plaintiffs have not cited to a single case that is directly on point, nor have they pointed to any authority in which the relief they seek was granted.   In other words, neither the facts nor the law clearly demonstrate that Plaintiffs will prevail.   Therefore, the requested mandatory injunction is not justified on a contract theory.

**19**

### 2. **Estoppel Claim.**

Plaintiffs assert that equitable estoppel should apply here. Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor*, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006). "[T]he party claiming estoppel must have relied on his adversary's [misleading] conduct in such a manner as to change his position for the worse, and than reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *River City Ranches #?1 Ltd v. Comm'r Internal Revenue*, 401 F.3d 1136 (9th Cir. 2005). The Ninth Circuit applies a two-prong test to determine when it is appropriate to apply equitable estoppel against the government. First Plaintiff must demonstrate "affirmative conduct [by the government] going beyond mere negligence," *Purcell v. United States*, 1 F.3d 932 (9th Cir. 1993), and second that the "government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted. *United States v. Hatcher*, 922 F.2d at 1411 n.12.

In the context of ruling on an equitable estoppel claim brought against the government, the Ninth Circuit held that "[n]either the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Suilt v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). Plaintiffs assert, however, that the Navy's conduct went beyond mere negligence, citing *Watkins*

**20**

*v. United States Army*, 875 F.2d 699 (9th Cir. 1989), for the proposition that the government's conduct in this case is actually affirmative misconduct.  In *Watkins*, the Army was well aware from the time of Watkins' initial enlistment in 1967 that he had "homosexual tendencies," to which he admitted on several occasions.  At that time, engaging in homosexual acts with other servicemen was considered a crime under military law.  Watkins was investigated several times by the Army for allegedly committing sodomy and his fitness for duty was questioned on several other occasions.  But, until 1981, he was always cleared of all wrongdoing and allowed to reenlist on several separate occasions because of his excellent performance.  *Id*. at 702.  In 1981, the Army promulgated a regulation which mandated the discharge of homosexuals regardless of merit.  Soon thereafter an Army Board convened and determined that Watkins should be discharged.  *Id*.

The Ninth Circuit held that equitable estoppel could be invoked against the government in *Watkins* because the Army repeatedly represented over a 14-year period that Watkins was qualified for reenlistment.  The court noted that the government "acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins."  *Id.* at 708.  Furthermore, the defendant's conduct "involve[d] ongoing active misrepresentations by Army officials acting well within their scope of authority."  *Id.*  Consequently, the Ninth Circuit found the Army's conduct to be "affirmative misconduct."  *Id.*

Plaintiffs attempt to compare the facts of this case to *Watkins*, asserting that ongoing misrepresentation occurred when

**21**

the Navy drafted Plaintiffs' Agreements, presented the

Agreements to Plaintiffs, signed the Agreements (through a

Lieutenant in 1996), and then, in 1999 again represented to

Plaintiffs that the seven-year term applied. (*See* Doc. 16 at

12.)  But, there is absolutely no evidence that the drafting,

presenting, and signing of the Agreements containing a seven-

year term was anything other than negligence (i.e., a mistake).

Plaintiffs submitted no evidence of any wrongful conduct by the

government when they entered into their service contracts. By

contrast, the earlier incidents in *Watkins*, where the Army

effectively ignored a de facto policy against homosexuals for

more than a decade in continuing to allow Watkins to reenlist,

despite his admissions that he was homosexual.

At best, there is evidence that a single "Student Control

Officer" orally confirmed Plaintiffs <u>seven year</u> commitment in

April 1999, shortly after Plaintiffs received their "winging

orders," which indicated an <u>eight-year</u> service obligation.

(Plaintiffs' Decls. at ¶6.)  Plaintiffs' counsel suggested at

oral argument that the Student Control Officer directly refuted

the contents of Plaintiffs' winging orders by, essentially,

telling them "not to worry about it."  The record evidence is

not so clear.  Plaintiffs' own declarations make no direct link

between the winging orders and the representations made by the

"Student Control Officer."  For example, Lt. Gengler states:

> On April of 1999 I received orders to report to my
> next command, Strike Fighter Squadron 125, for follow-
> on training in the F-18 Hornet.  Shortly thereafter, I
> spoke to the Student Control Officer at my training
> squadron's administration department (VT-22, NAS
> Kingsville, TX), who verbally reaffirmed the seven

**22**

1    year term contained in the Agreement.

2   (Doc. 17 ¶6.)   In any case, this conduct is far from the ongoing

3   and repeated representations made by the Army in *Watkins*.   The

4   record currently before the court does not clearly indicate that

5   Plaintiffs' will prevail on their equitable estoppel claim.

6

7        **3.   APA Claim.**

8        In addition to their claim for entitlement to a writ of

9   habeas corpus, Plaintiffs also seek relief pursuant to the

10  Administrative Procedures Act (APA), 5 U.S.C. § 702-706.

11  Specifically, Plaintiffs assert that the Navy's rejections of

12  Plaintiffs' discharge requests were "arbitrary and capricious,

13  an abuse of discretion, or otherwise contrary to law..."   (*Id.*

14  at ¶¶41-42.)   Plaintiffs summarize the factual and legal

15  theories offered by the Navy during the administrative process

16  as follows:

17           1.   The seven year term in the Agreements was
                  "erroneous" or "misinformation;"
18
19           2.   The Secretary of the Navy has the authority to
                  grant Plaintiffs' RAD requests but the BCNR "was
20                not persuaded that such authority should have
                  been exercised;"

21           3.   The BCNR found no compelling harm to Plaintiffs
22                as a result of having to serve an extra-year of
                  active duty;

23           4.   Plaintiffs did not present evidence to "establish
24                the existence of probable material error or
                  injustice;"

25           5.   Defendants granting previous RAD requests of
26                Naval Aviators with identical agreements by
                  others in similar circumstances did not entitle
27                Plaintiffs to similar relief;

28           6.   "[N]otwithstanding the errors found [in the
                  Agreements] or any other documents or promises
                  made by government officials and agents to fixed

**23**

wing jet pilots entering service after Oct 1990,"
there is no waiver or exception to the eight-year
minimum service requirement for fixed wing pilots
contained in 10 U.S.C. § 653.

7.  Review of "federal case law interpreting
situations in which government officials gave
erroneous information to individuals about
governing programs [determined that the]... U.S.
Supreme Court has ruled that misinformation by a
government authority does not form the basis or
justification for violating a statute. [Footnote
to O.P.M. v. Richmond, 496 U.S. 414 (1990)]."

8.  "The bottom line is that the Navy does not have
authority to grant RAD requests for fixed wing
jet pilots."

(Doc. 16, at 4-5.)

Plaintiffs appear to recite the Navy's reasoning in an
attempt to demonstrate that the denial of their discharge
requests was "arbitrary and capricious."  But, at its core, the
relief sought by Plaintiffs, through their APA claim and the
other claims in the suit is specific performance of the terms of
the Agreements.  But, the APA does not waive sovereign immunity
for such a suit.  *See North Star Alaska v. United States*, 14
F.3d 36, 38 (9th Cir. 1994).

In *North Star Alaska v. United States*, 9 F.3d 1430 (9th
Cir. 1993)(en banc), the Ninth Circuit considered a claim
brought by North Star Housing Corporation seeking reformation of
a contract it entered into with the Army.  North Star argued
that the district court could assert jurisdiction over the case
under either APA § 702 or the Little Tucker Act.  Section 702
limits the APA's sovereign immunity where other statutes
impliedly forbid the relief sought:

Nothing herein (1) affects other limitations on
judicial review or the power or duty of the court to
dismiss any action or deny relief on any other
appropriate legal or equitable ground; or (2) confers

1
2

> authority to grant relief if any other statute that
> grants consent to suit expressly or impliedly forbids
> the relief which is sought.

3    5 U.S.C. § 702.  The Ninth Circuit in *North Star* reasoned that

4    the Tucker Act and the Little Tucker Act prohibited the relief

5    sought by North Star if North Star's claim was grounded in

6    contract, rather than statute.

7
8

> The Tucker Act, which waives sovereign immunity and
> provides for claims court jurisdiction over certain
> claims, states:

9
10
11
12
13

>> The United States Court of Federal Claims shall
>> have jurisdiction to render judgment upon any
>> claim against the United States founded either
>> upon the Constitution, or any Act of Congress or
>> any regulation of an executive department, or
>> upon any express or implied contract with the
>> United States, or for liquidated or unliquidated
>> damages in cases not sounding in tort.

14
15
16

> 28 U.S.C. § 1491(a)(1). Under the "Little Tucker Act,"
> the district court has concurrent jurisdiction with
> the claims court for actions not exceeding $10,000. 28
> U.S.C. § 1346(a)(2); Price v. United States Gen. Serv.
> Admin., 894 F.2d 323, 324 (9th Cir.1990) ( Price ).

17
18
19
20
21

> Generally speaking, the Tucker Act does not permit the
> claims court to grant equitable or declaratory relief
> in a contract dispute case. [citations] <u>Similarly, the
> Little Tucker Act does not specifically authorize the
> district court to grant declaratory or equitable
> relief against the United States in contract cases</u>.
> Price, 894 F.2d at 324; [citations] However, the
> district court does have jurisdiction to hear claims
> for equitable relief which "rest [ ] at bottom on
> statutory rights." [citations]

22   *Id*. at 1432.  The Ninth Circuit then remanded the case to the

23   panel for them to determine whether the claim was grounded in

24   contract or statute.   *Id.*

25       The panel held that:

26
27
28

> If a plaintiff's claim is "concerned solely with
> rights created within the contractual relationship and
> has nothing to do with duties arising independently of
> the contract ··· [the] claim is 'founded ··· upon [a]
> ··· contract with the United States' and is therefore
> within the Tucker Act and subject to its restrictions

1          on relief."

2     14 F.3d at 38.

3          Plaintiffs attempt to distinguish *North Star* by arguing

4     that this is not a claim for damages based on contract,

5     suggesting that the Little Tucker Act therefore waives sovereign

6     immunity and allows jurisdiction in the district court.

7     However, the en banc opinion specifically noted that the Little

8     Tucker Act does not authorize injunctive relief as a remedy in

9     contract claims brought against the government in district

10    court.  9 F.3d at 1432.  Moreover, it is well settled law that

11    "the APA does not waive sovereign immunity for claims that arise

12    out of a contract and that seek specific performance of the

13    contract as relief."  *Robbins v. United States Bureau of Land*

14    *Management*, 438 F.3d 1074, 1082 (10th Cir. 2006); *see also*

15    *Tuscon Airport Auth. v. Gen. Dynamics Corp.*, 136 F.3d 641, 647

16    (9th Cir. 1998)(APA does not waive sovereign immunity with

17    respect to claims for specific performance of a contract).

18    Plaintiffs do not assert that their claim is grounded in

19    statute.  Accordingly, on the present record, Plaintiffs' APA

20    claim has little merit.[7]  Even if the APA did waive sovereign

21    immunity for such a lawsuit, the current state of the record

22    (e.g., no administrative record has been filed) does not permit

23    a determination that the facts and law clearly favor the moving

24    party.

25

26

27

28         [7]This conclusion, reached in the context of a motion for
      injunctive relief, does not dispose of Plaintiffs' APA claims,
      which are the subject of a pending motion to dismiss.

1      **D.    Balance of the Hardships**.

2           **1.    Hardship to Plaintiffs**.

3      First, it cannot be disputed that the loss of liberty

4 Plaintiffs are experiencing as a result of being required to

5 serve beyond their contractual commitment is a hardship.  But,

6 the only relief sought from that hardship is discharge, the

7 ultimate remedy that is unavailable at this stage.

8      In addition, Plaintiffs place great weight on the asserted

9 hardship of possible deployment overseas.  Although the Navy

10 asserts that deployment overseas is "unlikely," the Navy is

11 unwilling to rule out the possibility that the current situation

12 might change.  For example, six months from now, the global

13 security situation might warrant the deployment of greater

14 numbers of pilots than is currently expected.  Plaintiffs

15 contend that this uncertainty is a hardship.  But, the Navy

16 correctly pointed out during oral argument that there is

17 currently no "imminent threat" that Plaintiffs will be deployed

18 overseas.  Absent such a threat, Plaintiffs cannot obtain

19 injunctive relief to prevent deployment.  However, in order to

20 ensure that Plaintiffs have ample opportunity to seek injunctive

21 relief should the Navy decide to deploy them before this case is

22 resolved, the Navy shall provide Plaintiffs at least twenty (20)

23 days notice prior to changing their deployment status.

24      Plaintiffs also assert other personal hardships.

25 Specifically, Lt. McSeveney recently purchased a home in Denver,

26 Colorado, which his family planned to occupy in December 2005.

27 Instead, the house sits empty "and the mortgage payment is

28 rapidly eating into [his family] savings."  (McSeveney Decl. at

**27**

¶16.)  He has also been forced to cancel numerous aviation-
related job interviews pending the outcome of this case.  (*Id.*)
But, again, nothing short of immediate discharge would alleviate
these purported hardships.[8]

Lt. Gengler has been accepted for admission to the
University of Chicago Business School.  His acceptance, however,
is contingent upon his attending classes in August of this year.
Additionally, Gengler believes that his ability to obtain a
deferment of admission may be adversely affected by his age.  He
is currently 33 years old and he oldest student accepted at
Chicago Business school this year was 35.  (*See* Gengler Decl. at
¶16.)  Again, only discharge would permit him to enroll in
business school this fall.  Moreover, as the United States
points out, Gengler only speculates that Chicago Business School
would deny him admission at the age of 34, particularly given
the unique circumstances causing his delayed matriculation.

Finally, the government asserts that the public interest
would be harmed if Plaintiffs were released from active duty.
Specifically, Lt. Commander Gunter states that the current
manning of Plaintiffs' test squadron unit (VX-9) is at 81% and
that releasing Plaintiffs from their current "billet" would
result in a coverage gap which would be a detriment to the
unit's ability to accomplish its mission.  (Gunter Decl. at ¶3.)
All eligible officers who could be assigned to take Plaintiffs'

---

[8]      McSeveney stated in his March 31, 2006 declaration that
he and his wife scheduled an in-vitro fertilization attempt for
this summer and that these plans would be disrupted if the Navy
chooses to deploy him.  (*Id.*)  As of the filing of the renewed
motion for a temporary restraining order on July 25, 2006, it is
no longer clear that this concern is still relevant.

1  places within VX-9 are currently under other orders until
2  January 2007.  (*Id.*)

3      Most of the hardships articulated by Plaintiffs can only be
4  alleviated if Plaintiffs obtain the ultimate relief sought on
5  the merits in this case.  It is not appropriate to give such
6  relief in the context of a motion for interim injunctive relief.
7  Plaintiffs are not in imminent danger of deployment overseas, so
8  the Navy cannot be enjoined from altering their deployment
9  status.  The purported hardship caused by the uncertainty of
10  potential deployment overseas can be addressed by requiring the
11  Navy to give Plaintiffs ample notice prior to altering their
12  deployment status.  Should such notice be given, Plaintiffs may
13  apply for injunctive relief, and the Navy will have an
14  opportunity to justify the changed status under the
15  circumstances presented.

16

17          **E.   Request for Hearing on Habeas Petition**.

18      In their ex parte motion, Plaintiffs also requested a
19  hearing on the merits of their habeas petition.  (Docs. 15-16.)
20  Plaintiffs now suggest that they actually requested habeas
21  relief (not just a hearing) in their ex parte motion and that
22  "Defendants completely ignore[d]" that request and "[a]s such,
23  the proposition is unopposed and should be decided in favor of
24  Plaintiffs."  Insofar as Plaintiffs are asserting that the Navy
25  has conceded the merits of this lawsuit, this assertion is
26  misplaced.  Plaintiffs plainly were requesting a hearing on the
27  merits, and even suggested that the court set a briefing
28  schedule for the merits issues.  (*See* Doc. 22, Prop'd Order, at

**29**

2.)  A minute order issued on July 26, 2006, set a briefing schedule on "plaintiffs ex parte application for a TRO and Preliminary Injunction" (Doc. 24.), while a subsequent minute order issued on July 28, 2006 set August 8, 2006 as the date for a hearing on "plaintiffs application for a TRO."  No briefing schedule or hearing date has yet been set regarding the merits of this case.  Defendants failure to address the merits is completely consistent with these prior orders and cannot be interpreted as a failure to oppose on the merits.

### V.   <u>CONCLUSION</u>

For the reasons set forth above:

(1)   The United States' objections to the hearing of this motion on notice and service of process grounds are not well-founded and are DENIED;

(2)   Plaintiffs' motion for a temporary restraining order in the form of discharge from the Navy is DENIED; and

(3)   The Navy shall provide Plaintiffs with at least twenty (20) days notice prior to changing their deployment status.

IT IS SO ORDERED.

**Dated:   August 23, 2006** _____        _____**/s/ Oliver W. Wanger**_____
emm0d6                                    UNITED STATES DISTRICT JUDGE