UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LT. CMDR. RICHARD T. GENGLER and LT. CMDR. DANIEL S. McSEVENEY,<br><br>                    Petitioners,<br><br>          v.<br><br>UNITED STATES OF AMERICA THROUGH ITS DEPARTMENT OF DEFENSE AND NAVY; and SECRETARY DONALD C. WINTER,<br><br>                    Respondents. | 1:06-CV-00362 OWW LJO<br><br>MEMORANDUM DECISION AND ORDER DENYING UNITED STATES' MOTION TO DISMISS (DOC. 78),<br><br>ADDRESSING VARIOUS PROCEDURAL MOTIONS (DOCS. 53 & 54), AND<br><br>SETTING FURTHER SCHEDULING CONFERENCE |

## I.   INTRODUCTION

Before the court for decision are numerous motions in this habeas case concerning the military service obligations of Petitioners, Lieutenant Commander Richard T. Gengler and Lieutenant Commander Daniel S. McSeveney.  Petitioners filed first amended petitions for habeas corpus on September 15, 2006, alleging (1) that the Navy's decision to deny their requests for discharge violates the seven-year active duty term of their service agreements; and (2) that the Navy should be equitably estopped from arguing that an eight year statutory active service requirement trumps the written terms of their service agreements. (Docs. 51 & 52.)[1]

_____

[1]   Petitioners each filed Second Amended Petitions on October 5, 2006 (Docs. 72 & 73), without leave of court or consent of the opposing party.  Subsequently, on October 12,

**1**

1    The United States moves to dismiss the petitions, arguing,

2  (1) that military officers have no contract rights and cannot

3  unilaterally terminate their terms of active service; and (2)

4  that Petitioners have failed to properly plead equitable

5  estoppel.  (Doc. 78.)  Petitioners oppose dismissal (Doc. 85),

6  request that the district court enter an order requiring the

7  United States to answer their petitions and participate in

8  discovery (Docs. 53 & 54), and request that the district court

9  set an evidentiary hearing (*id*.).  The government does not oppose

10  being ordered to answer, but requests a minimum of 30 days within

11  which to do so.  (Doc. 79.)  The United States does oppose the

12  scope and nature of the Petitioners' proposed discovery as well

13  as Petitioners' request that discovery take place on an expedited

14  schedule.  (*Id*.)  Finally, the government maintains that the

15  request for an evidentiary hearing is premature.  (*Id*.)

16    In addition, on October 13, 2006, Lt. Cmdr. Gengler filed a

17  separate motion concerning his current leave status.  He

18  requested that the district court either (1) order the Navy to

19  allow him to remain in Chicago until December 8, 2006 (or pending

20  a decision on the merits of this case); or (2) release him on

21  habeas corpus bail.  (*See* Doc. 90 at 2.)  Gengler's request for

22  bail is addressed in a separately filed findings of fact and

23  conclusions of law.  (Doc. 100.)

24

25

---

26  2006, Petitioners each filed Third Amended Complaints (Doc. 76

27  &77), again without leave of court or consent of the opposing
   party.  The United States has requested that these petitions be

28  stricken.  (Doc. 78 at 6 n1.)

**2**

## II. __BACKGROUND__

Petitioners Lt. Cmdr. Richard T. Gengler and Lt. Cmdr. Daniel S. McSeveney are Naval Officers and Aviators who are currently stationed with the Operational Test Evaluation Squadron Nine (VX-9) in China Lake, California.  At least until recently, both had been physically assigned as Operational Test Directors for the F/A-18C-F weapons system programs and currently are on "detachment" in Key West, Florida, performing operational tests on a radar system.  (Doc. 16 at 1; Gengler and McSeveney Decls. at ¶7; Gunter Decl. at 3.)  Lt. Cmdr Gengler's current situation has changed, however.  He was initially granted a 60 day leave to begin studying at the University of Chicago Graduate Business School, but the Navy recently refused to extend his leave past November 4, 2006.  This subject is discussed in greater detail in a separately filed findings of fact and conclusions of law. (Doc. 100.)

Petitioners both entered the Navy in April 1996, after signing separate "Aviation Officer Candidate Program Service Agreements" (the "Service Agreements").  The Service Agreements, which were drafted by the Navy and signed on the Navy's behalf by another Naval Officer, provide in pertinent part:

> 1.  Having volunteered for Aviation Officer Candidate training under the Aviation Officer Candidate Program, I hereby acknowledge:
>
>   a.  If entering the program from civilian life
>
>     (1)  that I will be required to enlist in the Naval Reserve; and

//
//

        (2)   that I will receive orders to active duty for the Aviation Officer Candidate Program and I do hereby consent to serve on active duty in an enlisted status for such period of indoctrination in the program as may be prescribed; and

        (3)   that, in the event I fail to complete satisfactorily the requirements for appointment to commissioned grade or request disenrollment from the Aviation Officer Candidate Program prior to acceptance of a commission, I will be discharged from my enlisted status.

*** 

d.   That upon satisfactory completion of all requirements, I will accept an appointment to commissioned grade as a Reserve Officer in the United States Navy, if such a commission is tendered to me, and upon acceptance, will be discharged from my enlisted status;

e.   That:

        (1)   a commission as a[] Reserve Officer in the United States Navy is held at the pleasure of the President.

        (2)   upon acceptance of a commission, I will be required to serve at least eight years as a Reserve Officer in the United States Navy from the date of appointment to commissioned grade; and

        (3)   any portion of this eight-year period not served on active duty will be served on inactive duty; and

        (4)   a resignation of my commission as a Reserve Officer submitted prior to completion of this eight-year period will normally be rejected and, after this period, may be accepted or rejected by the President, as the needs of the service may then require.

f.   That section 671a and 671b of Title 10, United States Code, currently provides as follows:

**4**

1                                "671a.     Members: Service extension during war.

                  Unless terminated at an earlier date by the Secretary concerned, the period of active service of any member of an armed force is extended for the duration of any war in which the United States may be engaged and for six months thereafter.

                  671b.     Members: Service extension when Congress is not in session.

                  (a)     Notwithstanding any other provision of law when the President determines that the national interest so requires, he may, if Congress is not in session having adjourned sine die [without assigning a day for a further meeting or hearing,] authorize the Secretary of Defense to extend for not more than six months, enlistments, appointments, periods of active duty for training, periods of obligated service of other military status, in any other component of the Armed forces of the United States, that expire before the thirteenth day after Congress next convenes [or] reconvenes.

                  (b)     An extension under this section continues until the sixtieth day after Congress next convenes or reconvenes or until expiration of the period of extension specified by the Secretary of Defense, whichever occurs earlier, unless sooner terminated by law or Executive order."

        g.     That Federal statutes and pertinent regulations applicable to personnel in the United States Navy may change without notice and that such changes may affect my status as a[n] Aviation Officer Candidate or a commissioned officer and obligations to serve as such.

    2.    I consent to serve on active duty as a commissioned officer for a period of <u>seven years</u> from date of designation as a Naval Aviator (unless sooner released to inactive duty or discharged by the Chief of Naval Personnel[)].

                                ***

**5**

1   (Gengler Decl., Doc. 17, & McSeveney Decl., Doc. 19, filed July

2   25, 2006, Ex. A at 1-3.)

3       A few months after signing their Service Agreements, on

4   September 23, 1996, Petitioners received Orders to report to

5   Naval Aviation Schools Command, Pensacola, Florida.  Those orders

6   reiterated that they were "obligated to serve the number of years

7   indicated on [his Service Agreement] following date of completion

8   of training within the Naval Air Training Command."  (GFAP at

9   ¶76; MFAP at ¶75.)

10      Petitioners successfully completed their flight training and

11  were designated as Naval Aviators on February 2, 1999 (Mcseveney)

12  and April 2, 1999 (Gengler), respectively.  The Navy asserts that

13  Petitioners confirmed their <u>eight</u> year term of duty when

14  Petitioners were given their "winging orders," a document both

15  Petitioners received in 1999.  (Gunter Decl. at ¶2.)  Petitioners

16  assert, however, that the <u>seven year</u> commitment term contained in

17  their Service Agreements was confirmed orally by a "Student

18  Control Officer" in April 1999.  (Gengler's First Amended

19  Petition ("GFAP") at ¶82; McSeveny's First Amended Petition

20  ("MFAP") at ¶81.)  Also in April 1999 (to McSeveney) and May 1999

21  (to Gengler), an unidentified "Training Officer" allegedly

22  confirmed the seven year contractual active service term applied,

23  rather than the eight-year statutory active service term.  (GFAP

24  at ¶82; MFAP at ¶81.)

25      It is undisputed that Plaintiffs have served with

26  distinction since 1999 and have been commissioned officers in the

27  Naval Reserve continuously since 1996.  Each logged more than 150

28  hours in combat situations and each received numerous medals for

**6**

1  valor during combat.   (Doc. 16 at 4.)

2      When the end of their respective contractual seven-year term

3  of active service approached, both Plaintiffs timely notified

4  their Commanding Officer ("CO") that they would be requesting

5  release from active duty ("RAD").  (Pltfs' Decls. at ¶8.)  The

6  Navy denied Plaintiffs' requests.  (*Id.*)  Plaintiffs appealed the

7  denials to (a) their CO, (b) the Naval Personnel Department,

8  (c) the Board for Correction of Naval Records ("BCNR"), and (c)

9  the Secretary of the Navy.  (*Id.* at ¶¶9-13 & Ex. I-S.)  All these

10  appeals were rejected, and the Navy informed Plaintiffs that

11  their administrative remedies had been exhausted.  (*Id.* at Ex.

12  E.)

13      Petitioners both were commissioned as Navy Reserve Officers

14  in 1996 and intended to retain that status throughout their

15  service with the Navy, rather than seek "augmentation" to the

16  status of a Regular Officer.[2]  Gengler, for example, asserts that

17  he "determined that remaining a Reserve Officer was a better fit

18  for me personally than being augmented to a Regular Officer."

19  (Doc. 87 at ¶3.)  Some time around 2004, shortly after their

20  first RAD requests were denied, Petitioners received unsolicited

21  paperwork from the Navy, pertaining to augmentation to Regular

22

23      [2]   There is apparently a distinction drawn between the
augmentation process, which would elevate an individual from
24  "Reserve Officer" status to "Regular Officer" status, and
whatever process is applied when one becomes a commissioned
25  "Naval Aviator."  Both Petitioners became Naval Aviators in 1999
but apparently retained their status as "reserve officers" until
26  they were involuntarily augmented.  According to their service
agreements, becoming a Naval Aviator started their seven year
27  commitment.  According to the government, their augmentation to
regular officer status eviscerated this seven year term.
28

**7**

Officer Status.  Both Petitioners "assumed that [the Navy] was simply trying to trick [them] with the augmentation given [their] recent dispute over contractual commitments (there was ambiguous language with respect to possible additional commitments in the instruction pertaining to Augmentation."  (*Id*. at ¶5.)  Both determined that it was in their best interests to decline augmentation and did so.  (*Id*. at ¶6.)  However, in August of 2006, they discovered that they had been augmented without their consent.  This augmentation apparently took place pursuant to a Navy policy aimed at transitioning all Reserve Officers to Regular Officer Status.  But, in implementing this transition program, the Navy promised that an "officers' rights and obligations under their <u>original contract</u> remains unchanged, and their oath of office remains in effect." (Doc. 86, Tab 6 (emphasis added).[3])  At oral argument, the government disclaimed reliance on this regular officer status theory.

The seven year active service contractual commitments for Petitioners expired in April 2006 (for Gengler) and February 2006 (for McSeveney).  Petitioners assert that being required to serve on active service beyond the seven-year contractual term has "resulted in the involuntary forfeiture of [their] Constitutionally protected rights to liberty, freedom and right to pursue a career and happiness."  (GFAP ¶70; MFAP ¶69.)

---

[3]    *See All Officers Commissioned Regular Navy, available at*: "http://www.news.navy.mil/cck/NNS050314-11.pdf (last visited Oct. 18, 2006),

### A. Allegations Regarding the Navy's Treatment of Other Aviators.

Petitioners allege that the Navy discharged 400 Naval Aviators in December 2003, and another 120 in May 2004, pursuant to its Involuntary Release from Active Duty (hereinafter "IRAD") policy.  (GFAP at ¶38; MFAP at ¶37.)  These IRAD releases allegedly resulted in many Naval Aviators being released prior to serving their eight or six-year statutory active service terms contained in 10 U.S.C. § 653.  (GFAP at ¶38; MFAP at ¶37.)

Petitioners further allege that the Navy involuntarily released at least one Naval Aviator with essentially the same experience as Lt. Cmdrs. Gengler and McSeveney.  Specifically, Petitioners allege that Lieutenant Commander Charles E. Garret ("Garret"), an F/A-18 pilot currently stationed in San Diego, California, has a similarly exemplary service record and was a member of Gengler and McSeveney's flight squadron from 2002 through 2005.  (GFAP at ¶41; MFAP at ¶40.)  Garret allegedly possesses the same amount of cruise and combat experience, has essentially the same knowledge of "the fixed wing jet aircraft test community," and has performed essentially the same jobs as Petitioners.  Yet, although neither Gengler nor McSeveney were considered for the IRAD program, Garret was scheduled to be discharged pursuant to the IRAD program on September 30, 2006, prior to the running of his eight-year statutory service term.  (*Id.*)

Next, Petitioners allege that the Navy implemented a Voluntary Separation Program ("VSP"), to encourage other Naval Aviators to leave the service prior to the completion of their

**9**

1   statutory service terms.  The VSP process allows Naval Aviators

2   who fall into certain categories, categories which do not

3   encompass either Gengler or McSeveney, to submit a bid stating a

4   reduced amount of retirement benefits each would be willing to

5   accept to be discharged from the Navy.  (GFAP at ¶45; MFAP at ¶

6   44.)  Specifically, the Petitions allege that in September 2006,

7   "the Navy will discharge or release another 300 Naval Aviators

8   pursuant to its [VSP program] many prior to their completion of

9   the statutory service terms contained in 10 U.S.C. § 653."  (GFAP

10  at ¶44; MFAP at ¶43.)  Petitioners allege that "[m]any of the

11  Naval Aviators chosen by Defendants to participate in the VSP

12  process have exemplary service records."  (GFAP at ¶47; MFAP at

13  ¶46.)

14      Petitioners' requests to participate in the VSP program were

15  refused and Petitioners were not considered for the IRAD program

16  because of their "exemplary service records." (GFAP at ¶49; MFAP

17  at ¶48.

18      Finally, Petitioners allege that the Navy has honored the

19  exact same seven-year active service term contained in

20  Petitioners' Service Agreements for at least eight other Naval

21  Aviators, none of whom have less than exemplary service records:

22  Lieutenants William Frado, Keith Hurley, Craig Olsen, Benjamin

23  Renda, Martin Williams, Edward Wilkinson, Eric Werner, and Andrew

24  Smolenack.  (GFAP at ¶¶ 51-58; MFAP at ¶¶ 50-57.)

25      Petitioners contend that the Navy's creation and

26  implementation of the IRAD and VSP programs, as well as their

27  honoring of the seven year active service terms of the eight

28  above-named Naval Aviators, which resulted in the release or

**10**

discharge of Naval Aviators prior to their completion of the
applicable active statutory service terms contained in 10 U.S.C.
§ 653, "was affirmative, knowing, deliberate and intentional."
(GFAP at ¶¶ 42, 48, 59; MFAP at ¶¶ 41, 47, 58.)

## III.  PROCEDURAL HISTORY

On March 31, 2006, Plaintiffs filed their initial complaint
which contained five causes of action: (1) breach of contract;
(2) equitable estoppel based; (3) violation of the Administrative
Procedure Act; (4) a claim styled as a petition for a writ of
habeas corpus, requesting discharge from the Navy; and (5) a
request for declaratory relief.  (Doc. 1.)  Plaintiffs sought
specific performance of the seven year term in their Service
Agreements and attorneys fees and costs.  (*Id.* at ¶¶51-52.)

On the same day the complaint was filed, Plaintiffs filed an
ex parte motion for a temporary restraining order, requesting the
entry of an order "preventing Defendants from changing
Plaintiffs' status from non-deployable to deployable or otherwise
sending them to Iraq or any location outside [the Continental
United States."  (Doc. 2 at 2, filed March 31, 2006.)  A few days
later, the parties reached an agreement as to the requested
injunctive relief.  The Navy promised that Plaintiffs would
remain on non-deployable status until July 10, 2006 in exchange
for Plaintiffs withdrawing their request for a temporary
restraining order.  On June 1, 2006, the parties extended the
duration of the agreement until August 9, 2006, pending further
internal discussion by the Navy regarding Plaintiffs' discharge
requests.  Subsequently, the Navy notified Plaintiffs that they

1  would not be discharged or released from active service.

2  Plaintiffs filed an ex parte motion for a temporary restraining

3  order on July 25, 2006. (Doc. 15.)  Defendants were afforded an

4  opportunity to oppose on July 27, 2006. (Docs. 24 & 25.)  After

5  a hearing on the motion, held August 4, 2006, the request for a

6  temporary restraining order was denied, although the Navy was

7  ordered to give Plaintiffs' at least twenty (20) days notice

8  prior to changing their status from non-deployable to deployable.

9  (Doc. 37.)

10      The United States moved to dismiss on August 3, 2006.  (Doc.

11  31.)  In an August 24, 2006 memorandum decision, the district

12  court dismissed all but one of the claims in the case.

13  Petitioners' habeas corpus claim survived, but their equitable

14  estoppel claim was dismissed with leave to amend.  Petitioners,

15  having indicated their intent to re-plead their equitable

16  estoppel claim, were granted leave to file a revised habeas

17  corpus petition containing an equitable estoppel claim. (Doc. 49

18  at 43-44.)

19      On September 15, 2006, Petitioners filed amended petitions

20  for writ of habeas corpus, each setting forth (1) a breach of

21  contract claim and (2) an equitable estoppel claim. (Docs. 51,

22  52.)

23      On September 20, 2006, Petitioners filed a motion requesting

24  an order requiring the United States to answer the amended

25  petitions, authorizing discovery, and setting an evidentiary

26  hearing. (Docs. 53-62.)  On September 21, 2006, Petitioners

27  filed an ex parte application requesting that this motion be

28  heard on shortened time. (Docs. 63-66.)

**12**

1    On September 28, 2006, a status conference was held

2  regarding the ex parte application, at which time a schedule was

3  set for the filing of the United States' motion to dismiss, its

4  opposition to Petitioners' motion for an

5  answer/discovery/evidentiary hearing, and Petitioners' opposition

6  briefs.  (Docs. 70, 75.)

7    On October 5, 2006, Petitioners filed seconded amended

8  petitions for writ of habeas corpus, without leave of court or

9  stipulation from the United States.  (Docs. 72-73.)  On October

10 12, 2006, again without leave of court or stipulation from the

11 United States, Petitioners filed third amended petitions for writ

12 of habeas corpus.  (Docs. 76-77.)

13   Also on October 12, 2006, the United States filed its motion

14 to dismiss and opposition to Petitioners' motion for an

15 answer/discovery/evidentiary hearing.  (Docs. 78-79.)

16   On October 13, 2006, Lt. Cmdr. Gengler filed a motion

17 requesting an order that would require the Navy to allow Lt.

18 Gengler to remain in Chicago until the end of the academic

19 semester (December 8, 2006) or pending a decision in this matter.

20 Alternatively, Gengler requested that he be released on bail

21 pending a decision on the habeas petition.  Along with this

22 motion, Lt. Cmdr. Gengler filed an ex parte request to shorten

23 time, asking that the motion be heard alongside the other pending

24 motions on October 23, 2006.  The government opposed having this

25 motion heard on an expedited schedule, arguing, among other

26 things, that the motion presents factual issues that will take

27 the government some time to investigate.  (Doc. 89 at 6.)

28   Oral argument on the motion to dismiss was heard on October

**13**

1  23, 2006.  (Doc. 91.)  On October 27, 2006, Lt. Cmdr. Gengler

2  requested a further earing on his motion for habeas bail.  (Doc.

3  92.)  The government filed opposition, along with the declaration

4  of United States Navy Captain Bruce W. Fecht, Gengler's

5  Commanding Officer.  (Doc. 94, filed Oct. 27, 2006.)  Further

6  oral argument on Gengler's motion was heard on November 1, 2006.

7  After oral argument, the district court granted Gengler's request

8  for bail up to and including December 8, 2006, understanding that

9  Gengler had stipulated to adding any missed service days onto his

10  term of service should he not prevail on the merits of his

11  lawsuit.  The district court issued a written order regarding the

12  bail motion along with written findings of fact and conclusions

13  of law concerning.  (Doc. 100, filed Nov. 11, 2006.)

14      On November 2, 2006, the government filed a motion to

15  reconsider the grant of bail.  (Doc. 101.)

16      Also on November 2, 2006, the government filed a

17  supplemental memorandum of points and authorities, addressing

18  Petitioners' third amended petitions for habeas corpus.  (Doc.

19  98.)

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**14**

**IV.   DISCUSSION**

**A.   Motion to Strike**.

In a footnote to its motion to dismiss, the United States requests that the second and third amended petitions for writ of habeas corpus be stricken on the ground that Petitioners neither had leave of court to file the amended petitions nor did the United States stipulate to their filing.  (Doc. 78 at 6 n.1).[4] Petitioners have not sought leave of court to file the amended petitions.  Where an amended pleading cannot be made as of right and is filed without leave of court or consent of the opposing party, it is without legal effect.  *See U.S. ex rel. Mathews v. Healthsouth Corp.*, 332 F.3d 293, 295 (5th Cir. 2003).  The second and third amended petitions are unauthorized and are **stricken**. The remainder of this memorandum decision will rely upon the First Amended Petitions.[5]

//

//

//

//

---

[4]   The government also objects to the substance of some of the material added to Gengler's third amended petition (Doc. 98.), but these objections are mooted by the fact that the second and third amended petitions must be stricken from the record.

[5]   In passing, Petitioners suggest various reasons why it was necessary to file their amended petitions.  In particular, the amended petitions incorporate information about various recent events involving Lt. Cmdr. Gengler.  But, nowhere have Petitioners requested leave to amend or acknowledge that their repeated amendments might affect the government's ability to meet deadlines under the expedited schedule Petitioners have requested.

**B.    Motion to Dismiss.**

    **1.    Standard of Review.**

A complaint may be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) if it "appears beyond doubt that the non-movant can prove no set of facts to support its claims." *Simpson v. AOL Time Warner Inc.,* 452 F.3d 1040, 1046 (9th Cir. 2006). Alternatively, dismissal can be based on the lack of a cognizable legal theory. *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F3d 780, 783 (9th Cir. 1996). In evaluating such a motion "[a]ll allegations and reasonable inferences are taken as true, and the allegations are construed in the light most favorable to the non-moving party, but conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Simpson,* 452 F.3d at 1046.

    **2.    Summary of the Government's Arguments**

The United States nominally relies upon both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) as grounds for its motion to dismiss (Doc. 78 at 1). However, apart from repeatedly mentioning the catchphrase "subject matter jurisdiction," the government does not appear to be seriously disputing the district courts jurisdiction over the merits of this case. The United States acknowledges that habeas corpus is the appropriate means by which an individual who claims to be "unlawfully retained" by the armed services may seek relief. *See Parisi v. Davidson*, 405 U.S. 34, 39 (1972).

**16**

1    In substance, the United States advances two central

2  arguments to support its argument that the first amended

3  petitions fail to state legally cognizable claims.  First, the

4  government argues that, as commissioned military officers,

5  Petitioners have no unilateral right to resign from the military

6  until their resignations have been accepted by the President.  In

7  essence, the government argues that Petitioners have no contract

8  rights in their offices and no right to argue that equitable

9  estoppel applies here.  Assuming, arguendo, that this is the

10  case, earlier-cited habeas cases involving the service agreements

11  of enlisted personnel are inapplicable.  In addition, the United

12  States maintains that Petitioners still have not pled the

13  existence of the type of "affirmative misconduct" required to

14  maintain an equitable estoppel claim.

15

16          ***a.   The Government's theory that petitioners
                serve at the pleasure of the President and***
17          ***therefore that their*** contract-based claims
                fail as a matter of law.

18

19    The United States contends:

20          Commissioned officers of the armed forces, as opposed
            to enlisted personnel, have no contract right in their
21          offices.  Officers do not hold their positions by
            contract, but rather serve at the pleasure of the
22          United States.  As such, officers have no unilateral
            right to resign their commissions, even assuming they
23          have fulfilled their contractual terms of service.  An
            officer of the armed forces cannot leave the service
24          until his resignation has been accepted by the
            President, and the decision whether to accept the
25          resignation rests within the sole discretion of the
            executive branch.  Thus, Petitioners, as commissioned
26          Naval officers, cannot state a legally cognizable claim
            for breach of contract or equitable estoppel based on
27          the Navy's denial of their RAD requests.

28  (Doc. 78 at 2.)  As counterintuitive as this may seem, given the

fact that Plaintiffs were both required to sign contracts
containing minimum service terms that apply to their service as
Naval officers, there is some authority that lends support to the
government's position.

### *(1)   Caselaw.*

The government's reasoning finds its origin in a series of
cases.  In *Orloff v. Willoughby*, 345 U.S. 83, 90 (1953), relied
upon by the government, a doctor was lawfully drafted into the
Army.  He brought a habeas corpus action, arguing that the Army
refused to commission him as an officer, a rank to which he
claimed he was entitled under the law that permitted conscription
of doctors.  He argued that the Army should be ordered to either
commission him or discharge him.  The Supreme Court first
concluded that the applicable statues and regulations did not
require that he be commissioned in order to be inducted as a
doctor, *id*. at 88-89, and noted that there was good cause for the
denial of his application for a commission, namely that he
refused to supply certain requested information concerning his
prior affiliation with the Communist Party.  *Id*. at 89-90.
*Orloff* held:

> The petitioner appears to be under the misconception
> that a commission is not only a matter of right, but is
> to be had upon his own terms.
>
> The President commissions all Army officers. 5 U.S.C. s
> 11, 5 U.S.C.A. s 11. We have held that, except one
> hold[ing] his appointment by virtue of a commission
> from the President, he is not an Officer of the Army.
> *United States v. Mouat*, 124 U.S. 303. Congress has
> authorized the President alone to appoint Army officers
> in grades up to and including that of colonel, above
> which the advice and consent of the Senate is required.
> 55 Stat. 728, as amended, 57 Stat. 380, 10 U.S.C.A. s
> 506d note.

**18**

1

2

> It is obvious that the commissioning of officers in the Army is a matter of discretion within the province of the President as Commander in Chief. Whatever control courts have exerted over tenure or compensation under an appointment, they have never assumed by any process to control the appointing power either in civilian or military positions.

3

4

5 345 U.S. at 90-91 (parallel citations omitted).

6 The United States next cites *American Jurisprudence*, Second,

7 on Military and Civil Defense, for the proposition that:

8

> [a]n officer of the Armed Forces, appointed for a definite term or during good behavior, has no vested interest or contract right in his or her office, since he or she does not hold by contract, but enjoys a privilege revocable by the sovereignty at will, and his or her appointment to and tenure of office do not come within the import of the term "contracts" intended to be protected by the United States Constitution.

9

10

11

12

13 53 Am. Jur. 2d, Military and Civil Defense, § 46 (2006). This

14 passage is drawn from *Crenshaw v. United States*, 134 U.S. 99

15 (1890). *Crenshaw* involved a dispute between an individual who

16 graduated from the Naval Academy in 1883. After graduation, he

17 was sent home and told to await orders. Later that month,

18 however, the Navy informed him that there were no appropriate

19 vacancies in the Navy and discharged him from service with one

20 year's sea pay. Crenshaw filed suit, arguing that his discharge

21 was unlawful and seeking recovery of back pay. In this context,

22 the Supreme Court concluded that an officer has no vested

23 contract right in his office. Rather, the sovereign retains the

24 power to revoke his commission at will. *Id.* at 108.

25 Similarly, *Hix v. United States,* 229 Ct. Cl. 546 (1981),

26 also cited by the government, involved an individual who sued on

27 the theory that the Army had wrongfully <u>released</u> him from active

28 duty. In holding that this claim had no merit, the *Hix* court

**19**

noted that "Plaintiff's breach of contract theory ignores the well-established principle that a military officer's status has no contractual basis." *Id*. at 546.

The government also relies upon *Mimmack v. United States*, 97 U.S. 426, 432 (1878). That case involved an Army officer (Mimmack) who tendered his resignation to the president. The resignation was accepted, but then the acceptance was revoked and the President ordered him to active duty. Meanwhile, Mimmack had enlisted in the marine corps and was paid accordingly (i.e., not as an officer). Mimmack filed suit in the Court of Claims, asserting that the President's revocation of the acceptance of his resignation reinstated him to officer status and, accordingly, he should recover back pay at the officer salary rate. The Supreme Court rejected this claim, reasoning that, because re-commissioning Mimmack as an officer would have required the advice and consent of the Senate, the President's revocation of the acceptance of the resignation was invalid without the Senate's consent. Accordingly, Mimmack was not entitled to recover pay as an officer for the time period he served in the marines as an enlisted man. In reaching this conclusion, the Supreme Court reasoned:

> Nothing short of a written resignation to the President, or the proper executive department, by a commissioned officer of the army, navy or marine corps, and the acceptance of the same duly notified to the incumbent of the office, in the customary mode, will of itself create a vacancy in such an office....

> Prior to notice that the resignation tendered has been accepted by the President, the officer in such a case may not without leave quit his post or proper duties, nor is he deprived of any of the rights or privileges conferred and enjoyed by virtue of his appointment and commission.

**20**

1  *Id.* at 427.  (As discussed below, the government relies upon
2  cases that apply this reasoning in a different context.)

3      *Mimmack, Crenshaw*, and *Hix* stand for the simple proposition
4  that an officer cannot sue on a breach of contract theory to
5  require a branch of the armed forces to <u>retain</u> him in service,
6  while *Orloff* stands for the principle that one's commission as an
7  officer cannot be "had upon [ones] own terms," 345 U.S. at 90,
8  and courts should not intrude upon a military branch's decision
9  <u>not</u> to issue an individual a commission.

10      *Springstead v. Claytor*, 586 F.2d 990, 992 (4th Cir. 1978),
11  upon which the government places great weight, appears to be the
12  first and only published case to apply the general language used
13  in *Mimmack, Crenshaw, Hix, and Orloff,* to an officer's right to
14  resign from the military, holding that an officer is <u>not entitled</u>
15  <u>to resign</u> from the military because he holds his position at the
16  pleasure of the president.  In other words, an officer may not
17  resign his commission unilaterally.  Springstead originally
18  joined the Marine Corps as a reserve officer.  His service
19  agreement required him to accept a reserve commission as a second
20  lieutenant upon graduation from college and to serve on active
21  duty for four years after he completed law school.  Springstead
22  began his period of active service as a second lieutenant, but
23  subsequently accepted a presidential commission as a first
24  lieutenant in the regular service on the condition that he remain
25  on active duty through his original four-year obligation.  *Id.* at
26  991.  Upon the conclusion of his four-year service obligation,
27  Springstead submitted his resignation, but the Navy denied his
28  request for a discharge.  *Id.*  After his administrative appeals

**21**

were denied, Springstead filed suit, arguing "that the
Secretary's action was arbitrary and capricious because it
abrogated his right to resign after the four-year period for
which he contracted in his original service agreement."  The
district court agreed with Springstead, and ordered the Navy to
accept his resignation.  *Id*.  The Fourth circuit reversed,
reasoning:

> [T]he contract [the officer] made when he became a
> reservist does not limit the duration of the
> obligation he subsequently assumed when he
> accepted a commission as a regular officer.
> Consequently, [the officer] has no unilateral
> right to resign his commission after the
> satisfaction of his minimum service obligation.

> [The officer's] commission as a regular military
> officer has no definite duration.  An officer
> serves until his appointment terminates in a
> manner prescribed by statute or regulation.  The
> commission of a regular officer who originally
> enlisted as a reservist with a fixed period of
> service does not differ from the commissions of
> other regular officers in this respect. . . .

> ***

> As a regular Marine Corps officer, [the officer]
> serves at the pleasure of the President under
> regulations promulgated by the Secretary of the
> Navy.  Although [the officer] may resign his
> commission, he is not released from his indefinite
> term of service until his resignation has been
> accepted by the Secretary acting on behalf of the
> President.

*Id*. at 992.

At first glance, *Springstead* appears to be easily
distinguishable, as there is no indication that Springstead
signed a contract limiting the length of his active service as a
first lieutenant.  However, the government argued in its motion
to dismiss that, like Springstead, Petitioners abandoned their
contractually limited obligation when they were elevated from

**22**

reserve officer to regular officer status:

> Petitioners entered the Navy as enlisted personnel and upon satisfactory completion of the requirements, were then appointed as commissioned Reserve Officers. Petitioners, both Lieutenant Commanders, now hold regular commissions in the Navy.  (Doc. 51, ¶ 14; Doc. 52, ¶ 14.)  As in *Springstead*, the service agreements that Petitioners entered into in conjunction with the Aviation Officer Candidate Program do not limit the duration of the obligation they subsequently assumed when they became regular commissioned officers.  As regular commissioned officers, they have no unilateral right to resign their commissions after satisfaction of their minimum service obligations.  *Springstead*, 586 F.2d at 992.  Rather, they serve at the pleasure of the President under regulations promulgated by the Secretary of the Navy.  *Ibid.*

(Doc. 78 at 12-13.)

However, Petitioners vehemently object to the way in which the government attempts to draw parallels to the *Springstead* case.  Specifically, the government's argument rests at least in part on the assertion that Petitioners "now hold regular commissions in the Navy."  Thus, the government maintains, "[a]s in Springstead, the service agreements that Petitioners entered into in conjunction with the Aviation Officer Candidate Program do not limit the duration of the obligation they subsequently assumed when they became regular commissioned officers." Petitioners assert, however, <u>that they never consented to augment their commissions as reserve officers to regular officer status</u>:

> Until the summer of 2006, Petitioners served in the Navy Reserve, as they agreed to do in their Service Agreements.  They completed ten years of active duty in the Navy Reserve and seven years as aviators on active duty as Reserve officers.  On several occasions, the Navy asked the men if they wished to augment their commissions and join the Regular Navy.  The Petitioners consistently declined an appointment into the Regular Navy.

1
2
3
4
5
6
7

> McSeveney declined these requests for augmentation in 2002 and 2004.  McSeveney declined to augment his commission because there are fewer restrictions placed on the resignation process for Reserve officers, and Reserve officers  find it easier to transfer to an inactive Reserve status.  Although he desired to remain in the Reserve, the Navy augmented McSeveney in summer 2006 without his consent.  He was not informed about the augmentation and he was given no choice.  He learned of his augmentation while researching another request with the Navy's Bureau of Personnel.  Gengler's situation was similar in all important aspects.

8
9
10
11
12
13
14
15
16
17

(Doc. 85 at 12 (record citations omitted).)  According to the Petitioners' version of events, "the Navy augmented the men's commissions to Regular status without their knowledge or consent."  (*Id.*)  Assuming the truth of these assertions for the purposes of this motion to dismiss, the government's argument -- that Petitioners' "consent" to become regular commissioned officers eviscerates the terms of their pre-existing Service Agreement under *Springstead* -- cannot be countenanced.  The government at oral argument agreed not to pursue the argument as to the regular officer status theory.

18
19
20
21
22
23
24
25

In addition, the involuntary augmentation apparently took place "as part of a program to transition all reserve commissioned officers on the active duty list to regular officer status."  (*See* McSeveney Dec., Doc. 88, ¶8 & Ex. B.)  In implementing this transition program, the Navy promised that an "officers' rights and obligations under their original contract remains unchanged, and their oath of office remains in effect."  (*See* Doc. 86, Tab 6.[6])  The Navy's own policy statements

26

---

27
28

> [6]    *All Officers Commissioned Regular Navy, available at*: "http://www.news.navy.mil/cck/NNS050314-11.pdf (last visited Oct. 18, 2006).

1  undermine the government's argument.

2      There is also reason to question the soundness of

3  *Springstead,* a Fourth Circuit case, as persuasive decisional

4  authority.  It relied upon the language from *Mimmack* without

5  closely examining the context within which the *Mimmack* court

6  utilized that language.  In so doing, *Springstead* adapted the

7  holding from *Mimmack,* in which an officer sued to recover back

8  pay, to an entirely different factual circumstance.

9      The government next cites a recent unpublished decision from

10  the District Court for the District of Arizona, *Klein v.*

11  *Rumsfeld*, 2006 WL 1788952 (D. Ariz., June 27, 2006), the <u>only</u>

12  federal court decision that has relied upon *Springstead*.[7]  Klein

13  graduated from the United States Naval Academy in 1985 and served

14  as a helicopter pilot in the Marine Corps until his discharge

15  from active duty in 1996, after which he worked as a civilian

16  engineer.  After the September 11, 2001 terrorist attacks,

17  Plaintiff inquired about serving in the national guard as an

18  attack helicopter pilot.  On July 1, 2002, he was commissioned as

19  a "Chief Warrant Officer Two."  After going through some training

20  regarding the operation of a particular military helicopter,

21  Klein tendered his resignation three times in 2005 due to chronic

22  mental illnesses suffered by his three children.  *Id*. at *1.  All

23  of his requests to resign were rejected.  On April 14, 2006,

24  Klein was ordered to active duty.  He filed suit in federal

25  district court to enjoin his activation.

26

27      [7]  *Springstead* is also cited without much discussion in a
   footnote by the Fifth Circuit in *Nicholson v. Brown*, 599 F.2d
28  639, 644 (5th Cir. 1976).

1    Klein apparently did not sign a service agreement with any

2    particular duration or term when he rejoined the military in

3    2002, as there is no mention made of any such agreement in the

4    district court opinion.  Rather, the legal dispute in *Klein*

5    involved the interpretation of 10 U.S.C. § 12241(c), which

6    provides that,

7            Appointments as Reserves in permanent warrant officer
             grades are for an <u>indefinite term</u> and are held during
8            the pleasure of the Secretary concerned.

9    (emphasis added).  Klein argued that the § 12441(c) did not

10   create an indefinite "obligation" but rather created an

11   "indefinite term," simply meaning that a warrant officer need not

12   <u>re-enlist</u>, "because his term of service (as opposed to his

13   service obligation) has no built-in expiration."  *Id.* at *3.  In

14   support of this argument, Klein looked to a different statue, 10

15   U.S.C. § 651(a), which provides:

16           Each person who becomes a member of an armed
             force...shall serve in the armed forces for a total
17           initial period of not less than six years nor more than
             eight years...
18

19   This statute, Klein maintained, creates a six to eight year

20   service "<u>obligation</u>" after which the military lacks authority to

21   deny a resignation (subject to the President's stop-loss

22   authority), and during which resignation is subject to the

23   discretion of the military.  (The district court opinion implies,

24   by omission of any discussion of the issue, that Klein satisfied

25   this requirement through his initial term of service after

26   graduation from the Naval Academy.)  Klein argued that

27   § 12441(c)'s use of the phrase "indefinite term," read alongside

28   § 651(a), merely obviates the need for re-enlistment should a

**26**

1   warrant officer choose to remain in the military.

2       The district court rejected this interpretation, reasoning

3   that the plain language of the statute states that warrant

4   officers serve an "indefinite term" "at the pleasure of the

5   Secretary concerned."  The *Klein* court concluded that "[t]he

6   plain meaning of the latter phrase is that a warrant officer may

7   not simply resign at will, but must seek a favorable exercise of

8   discretion from his superiors."  *Id.*

9           Plaintiff's argument confuses <u>eligibility</u> for
            voluntary separation with the <u>right</u> to voluntary
10          separation.  An officer who undergoes certain
            training <u>must</u> continue to serve for a specified
11          period of time; that is, he is ineligible for
            voluntary separation.  Once the obligation ends
12          (and he becomes eligible for voluntary
            separation), he is free to tender his resignation,
13          but the Army is under no requirement to accept
            it....

14
            In sum, because Plaintiff is an officer, he may
15          not resign at will.  His resignation is subject to
            [the Secretary of the Army's] discretion.  The
16          manner in which [the Secretary] [has] chosen to
            exercise that discretion, even Plaintiff concedes,
17          is beyond this Court's review.

18  *Id.* at *5.

19      *Klein* marginally supports the government's position insofar

20  as it stands for the proposition that one's eligibility for

21  voluntary separation is not equivalent to a right to voluntary

22  separation.  But, *Klein* is distinguishable, because Klein signed

23  no service agreement when he was re-commissioned in 2002 and was

24  under a statutory indefinite term of service.  Moreover, *Klein* is

25  an unpublished opinion from another District that is, at best,

26  only persuasive authority.  Its value as any form of authority is

27  questionable, as the district court's opinion is currently on

28  appeal to the Ninth Circuit.  The Ninth Circuit granted Klein's

**27**

1   emergency motion for injunctive relief pending decision on the
2   appeal, staying the Marine Corps' order requiring Klein to report
3   for active military service.  (*See* Order, *Klein v. Rumsfeld*, No.
4   06-16203 (9th Cir. July 20, 2006), Doc. 86 at Tab 4.)

5       The final case cited by the government, *Baldauf v. Nitze*,
6   261 F. Supp. 167 (S.D. Cal. 1966), is equally unavailing.  In
7   that case, a Naval officer tendered his resignation, but the Navy
8   refused to accept it pursuant to various directives allowing for
9   deferral of resignations on a selective basis.  *Id*. at 169.  The
10  district court, noting the contemporaneous build-up of the armed
11  forces through conscription of enlisted personnel for the war in
12  Vietnam, concluded that the directives promulgated by the Navy
13  authorizing deferral of resignations were valid and enforceable.
14  The court also noted that "[h]istorically, it has been
15  universally accepted that an officer of the armed forces of the
16  United States cannot leave the service until his resignation is
17  accepted by the President."  The government cites this quote out
18  of context, advancing it in support of the proposition that any
19  officer's term of service may be extended indefinitely for any
20  reason.  But, in *Baldauf*, the Navy not only had a reason
21  (Vietnam) but a written regulation permitting deferral of
22  resignations.  Here, no currently effective directive,
23  regulation, or statute specifically permitting the Navy to defer
24  acceptance of resignations.  Moreover, it is undisputed that the
25  Navy has (or at least had when Petitioners tendered their
26  resignations) a surplus of Naval Aviators.

27      Petitioners cite one unpublished district court case that
28  has issued habeas relief to an officer who challenged the term of

**28**

his service obligation.  *Wallace v. Brown*, 1979 U.S. Dist. LEXIS 10156 (S.D.N.Y. 1979).  Although the circumstances of *Wallace* are distinct from this case, the district court in *Wallace* referred to cases involving enlistment contracts (i.e., the service agreements of enlisted personnel) and applied those cases to an officer service agreement to find enforceable contract rights.  *Id*. at *20.  The *Wallace* court did not, however discuss any of the cases or regulatory provisions which discuss that an Officer serves "at the pleasure of the President."

### *(2)    The Service Agreements.*

The government also argues that the Service Agreements signed by Petitioners give them notice of the general rule that a commission as an officer is held at the pleasure of the President and any resignation after the minimum service period may be accepted or rejected by the President, as the needs of the service then require.  Petitioners' Service Agreements provide, in pertinent part:

> 1.   Having volunteered for Aviation Officer Candidate training under the Aviation Officer Candidate Program, I hereby acknowledge:
>
>      a.   If entering the program from civilian life
>
>           (1)  that I will be required to enlist in the Naval Reserve; and
>
>           (2)  that I will receive orders to active duty for the Aviation Officer Candidate Program and I do hereby consent to serve on active duty in an enlisted status for such period of indoctrination in the program as may be prescribed; and

//
//

(3)  that, in the event I fail to complete
satisfactorily the requirements for
appointment to commissioned grade or
request disenrollment from the Aviation
Officer Candidate Program prior to
acceptance of a commission, I will be
discharged from my enlisted status.

***

d.  That upon satisfactory completion of all
requirements, I will accept an
appointment to commissioned grade as a
Reserve Officer in the United States
Navy, if such a commission is tendered
to me, and upon acceptance, will be
discharged from my enlisted status;

e.  That:

(1)  a commission as a[] Reserve Officer
in the United States Navy is held
at the pleasure of the President.

(2)  upon acceptance of a commission, I will
be required to serve at least eight
years as a Reserve Officer in the United
States Navy from the date of appointment
to commissioned grade; and

(3)  any portion of this eight-year period
not served on active duty will be served
on inactive duty; and

(4)  a resignation of my commission as a
Reserve Officer submitted prior to
completion of this eight-year
period will normally be rejected
and, after this period, may be
accepted or rejected by the
President, as the needs of the
service may then require.

f.  That section 671a and 671b of Title 10, United
States Code, currently provides as follows:

"671a.   Members: Service extension during
war.

Unless terminated at an earlier date by the
Secretary concerned, the period of active
service of any member of an armed force is
extended for the duration of any war in which
the United States may be engaged and for six
months thereafter.

30

671b.    Members: Service extension when
Congress is not in session.

(a)   Notwithstanding any other provision of
law when the President determines that
the national interest so requires, he
may, if Congress is not in session
having adjourned sine die [without
assigning a day for a further meeting or
hearing,] authorize the Secretary of
Defense to extend for not more than six
months, enlistments, appointments,
periods of active duty for training,
periods of obligated service of other
military status, in any other component
of the Armed forces of the United
States, that expire before the
thirteenth day after Congress next
convenes [or] reconvenes.

(b)   An extension under this section
continues until the sixtieth day after
Congress next convenes or reconvenes or
until expiration of the period of
extension specified by the Secretary of
Defense, whichever occurs earlier,
unless sooner terminated by law or
Executive order."

g.   That Federal statutes and pertinent
regulations applicable to personnel in
the United States Navy may change
without notice and that such changes may
affect my status as a[n] Aviation
Officer Candidate or a commissioned
officer and obligations to serve as
such.

2.   I consent to serve on active duty as a
commissioned officer for a period of seven
years from date of designation as a Naval
Aviator (unless sooner released to inactive
duty or discharged by the Chief of Naval
Personnel[)].

***

(Gengler Decl., Doc. 17, & McSeveney Decl., Doc. 19, filed July

25, 2006, Ex. A at 1-3 (emphasis added).)

    The government places great emphasis on the underlined

passages, which express consent that one's "commission as a[]

**31**

Reserve Officer in the United States Navy is held at the pleasure of the President," and that the "resignation of [one's] commission as a Reserve Officer submitted prior to completion of this eight-year period will normally be rejected and, after this period, may be accepted or rejected by the President, as the needs of the service may then require."

First, the government ignores the distinction drawn in the Service Agreement between being commissioned as a reserve officer and a committing to a term of service on <u>active</u> duty. Petitioners consented to serve as reserve officers for a period of eight years; agreed that "any portion of this eight-year period not served on active duty will be served on inactive duty" (Service Agreement ¶1.e(3)); and acknowledged that their commissions as reserve officers are held "at the pleasure of the President."  It is undisputed, however, that Petitioners have already served eight years as reserve officers.  The critical language concerns their further commitment to specifically serve seven years on <u>active</u> duty after being "designat[ed] as a Naval Aviator."  (Service Agreement at ¶2.)

Perhaps more importantly, the government entirely ignores the context within which this language is placed in the contract. Immediately following the language acknowledging that one's commission as a reserve officer "may be accepted or rejected by the President as the needs of the service may then require," the Service Agreement quotes verbatim from 10 U.S.C. § 671a and 671b, which provide mechanisms by which one's service may be extended:

//

//

**32**

f. That section 671a and 671b of Title 10, United States Code, currently provides as follows:

"671a. Members: Service extension during war.

Unless terminated at an earlier date by the Secretary concerned, the period of active service of any member of an armed force is extended for the duration of any war in which the United States may be engaged and for six months thereafter.

671b. Members: Service extension when Congress is not in session.

(a) Notwithstanding any other provision of law when the President determines that the national interest so requires, he may, if Congress is not in session having adjourned sine die [without assigning a day for a further meeting or hearing,] authorize the Secretary of Defense to extend for not more than six months, enlistments, appointments, periods of active duty for training, periods of obligated service of other military status, in any other component of the Armed forces of the United States, that expire before the thirteenth day after Congress next convenes [or] reconvenes.

(b) An extension under this section continues until the sixtieth day after Congress next convenes or reconvenes or until expiration of the period of extension specified by the Secretary of Defense, whichever occurs earlier, unless sooner terminated by law or Executive order."

Service Agreement at 2-3.  Finally, the Service Agreements explain that subsequent statutes may alter one's obligations to serve.

g. That Federal statutes and pertinent regulations applicable to personnel in the United States Navy may change without notice and that such changes may affect my status as a[n] Aviation Officer Candidate or a commissioned officer and obligations to serve as such.

Here, none of the provisions of sections 671a or 671b, nor any subsequent law has been invoked by the government to justify retaining Petitioners in active duty service.

### *(3)   Naval Regulations.*

The government next points to various Naval regulations to support its position that Naval officers may not resign at will. Congress delegated to the Secretary of the Navy the authority to manage the Department of the Navy, including the authority to staff the Navy to ensure its proper functioning and efficiency. 10 U.S.C. § 5013.  The Secretary promulgated various regulations under this authority, including a number of regulations concerning officer resignations.  For example, the Secretary of the Navy ("SECNAV") issued an instruction that explains:

> Officers serve at the pleasure of the President and no terminal dates are established for their commissions.  SECNAV, by virtue of his authority to act for the President, may establish such criteria for the voluntary resignation of an officer's commission as deemed necessary for the maintenance of a sound officer corps.

SECNAV Instruction 1920.6C, Policy Governing Voluntary Separation ¶ 1(a), attached to Doc. 78 at Tab 5.  Various other related provisions explain the conditions under which an officer may be voluntarily separated:

> a.   <u>Expiration of Statutory Service Obligation</u>. An officer may be separated upon completion of the statutory service obligation... provided the officer has no other obligated service.
>
> b.   <u>Expiration of Obligated Service</u>.  An officer may be separated upon completion of all service prescribed in the officer program through which accessed, any other obligation incurred by the officer in consideration for being tendered an initial appointment, and any additional obligated service incurred by the officer while serving on active duty, or in an active status in the Ready Reserve.

SECNAV Instruction 1920.6C, at ¶5.

**34**

Additionally, the Naval Military Personnel Manual

("MILPERSMAN") states:

>    a.   Once members have legally accepted a
>         commission or warrant and have executed the
>         oath of office, they have acquired a legal
>         status.  <u>Termination of this status may be
>         effected only through a specific legal
>         process</u>.  The forms of termination presently
>         authorized for officers include dismissal,
>         revocation of commission, acceptance of
>         resignation, dropping from rolls, termination
>         of commission, and separation for cause.
>
>                        ***
>
>    c.   <u>Separations of officers from Naval Service
>         must be approved by Secretary of the Navy</u>.

MILPERSMAN 1920-130(1), Doc. 78 at Tab 4 (emphasis added).

MILPERSMAN reiterates the general rule that there are no

"terminal dates" established for an officer's commission:

>    1.   **Policy.**  Officers of the Regular Navy and
>         Navy Reserve retain their commissions at the
>         pleasure of the President and no terminal
>         dates are established for their commissions.
>         The Secretary of the Navy (SECNAV) by virtue
>         of his authority to act for the President,
>         prescribes criteria for the voluntary
>         termination of an officer's status.
>
>                        ***
>
>    7.   **Approval Considerations.**  Action on any
>         resignation submitted under the above
>         provisions will be governed by the needs of
>         the service, including availability of a
>         qualified relief.

MILPERSMAN 1920-200.

But, Petitioners cite other Navy regulations and provisions

of Navy policy that essentially codify the Navy's obligation to

<u>abide</u> by the terms of duty set forth in service agreements.

First, Petitioners cite MILPERSMAN 1001-090 ("Minimum Required

Active Service of Reserve Officers") which provides in pertinent

part:

> 1.   Policy.   Reserve officers will be eligible for release from active duty after completing their minimum required (obligated) active service, and any additional required (obligated) active service incurred by them.
>
> 2.   Minimum Required Active Service
>
> > a.   Minimum required active duty service is specified in the directive which describes the program through which the officer obtained a commission or is specified in the service agreement executed by the officer.

(emphasis added).

In response to the government's argument that the term set forth in the Service Agreement merely establishes an officer's eligibility to be released from active duty, without obligating the Navy to accept an officer's resignation, Petitioners argue that such assertion is contrary to the Navy's own policies.  As an example of how the Navy's own policies conflict with the government's theory, Petitioners point out that the Navy revised the timing requirements for when Reserve Officers must file requests for release from active duty.  The revised policy, which became effective on January 1, 2000, provides in pertinent part that the timing changes are:

> ...intended to preserve Reserve officers' rights for release from active duty upon completion of their minimum service requirement (MSR) and any obligated service in addition to MSR.  It is also intended to make timing of the request for RAD consistent with the one applicable to resignation requests for regular officers.

(Doc. 86, Tab. 2, "Policy revised for Naval Reserve officer resignations.")  Petitioners assert that this is an acknowledgment of the right of Reserve officers to be released upon completing their minimum service requirement (MSR).

1    The government's position is premised on two grounds:
2  (1) that an officer's commission has no termination date and (2)
3  that resignation by an officer is not effective until it is
4  accepted.  With respect to the first proposition, Petitioners
5  argue that, the fact "[t]hat an officer's commission has no
6  terminal date merely relieves an officer of the need to re-enlist
7  at the end of a fixed term to continue on active duty, as an
8  enlisted soldier must do.  *See, e.g.*, 10 U.S.C. § 505(d)
9  (re-enlistment of enlisted men)."  This understanding of the
10 difference between a terminal date and an obligation was
11 expressly rejected by the district court in *Klein*, but, as
12 discussed, *Klein* is of dubious value as it is an unpublished
13 decision currently on appeal to the Ninth Circuit, which <u>granted</u>
14 Klein's emergency motion for injunctive relief.  (*Klein v.*
15 *Rumsfeld*, No. 06-16203 (9th Cir. July 20, 2006).)  Rather,
16 Petitioners' assertion that service without a terminal date does
17 not obligate an officer to an indefinite term of service on
18 active duty is <u>supported</u> by MILPERSMAN 1331-010, which provides:

19           4.   Reserve Officers

20                a.   Requests for extension on active duty beyond
                       Minimum Service Requirement (MSR) are no
21                     longer required for Naval Reserve officers.
                       Absence of a Release from Active Duty (RAD)
22                     request prior to the first day of the sixth
                       month before the month of an officer's
23                     Projected Rotation Date (PRD) will be
                       construed as an officer's request to be
24                     retained beyond MSR.  These officers can be
                       issued orders and will be obligated to no
25                     less than the Minimum Tour for Separation
                       (MTS) outlined in MILPERSMAN 1321-010 at the
26                     next duty station.

27 //
28 //

**37**

1
2
3
4
5
6
7

          b.    If an officer's MSR extends beyond his or her current PRD, a letter of intent may be submitted to notify Chief of Naval Personnel that officer does not desire to remain on active duty beyond MSR plus any additional service obligations. <u>If received at least 6 months prior to PRD, a letter of intent will preclude issuance of orders obligating officer for service beyond MSR plus any additional service obligations</u>.

      NOTE: Officer must still file RAD request 9-12 months prior to MSR.

8    (emphasis added).

9        The first part of this policy, at paragraph 4a, is entirely
10   consistent with the proposition that the fact that an officer's
11   commission has no termination date merely relieves a commissioned
12   officer of the need to re-enlist (or be "re-commissioned").  As
13   MILPERSMAN 1331-010 ¶4b explains, an officer who does not submit
14   a request for release from active duty agrees by default to serve
15   past his MSR, without any need to re-enlist or obtain a new or
16   extended commission.  Paragraph 4b supports Petitioners' critical
17   assertion that the terms of service set forth in a Service
18   Agreement are enforceable.  MILPERSMAN 1331-010 ¶4b clearly
19   explains that if an officer submits a timely RAD request, such a
20   request "will preclude issuance of orders obligating officer for
21   service beyond" his or her minimum service requirement plus any
22   additional service obligations.

23       With respect to the second ground -- that a resignation is
24   not effective until it is accepted -- Petitioners maintain,
25   essentially, that this begs two questions: (1) "whether and under
26   what circumstances the Navy <u>must</u> accept a tendered resignation"
27   and (2) "whether the Navy <u>must</u> honor an agreement about length of
28   service on active duty." (Doc. 85 at 7.)  According to the

government's theory, the Navy is under essentially no obligation
to accept a tendered resignation.  (In other words, such
resignations may be rejected at will and without any cause or
justification, and any officer's term of service on active duty
is unlimited.)

Petitioners insist that accepting the government's theory
would have dramatic practical implications for the entire
military.[8]  If it is indeed the case that "Officers serve at the
pleasure of the President and no terminal dates are established
for their commissions," there would be no limitation at all to
the time that Petitioners must serve on active duty.

> They need not be released from active duty after seven
> years.  Indeed, they need not even be released after
> eight years, the period set forth in § 653(a).  They
> must continue to serve on active duty until the Navy
> decides, in its sole and unreviewable discretion, to
> let them go.  Accordingly, an officer's commission and
> his or her service on active duty may be for life.
> This would seemingly apply to commissioned officers in
> both the Naval Reserve and Regular Navy.

(Doc. 85 at 3.)  Petitioners argue that "[t]he implications of
Respondents' new legal theory are breathtaking."

> If Respondents are correct, then the provisions of the
> Service Agreements have no force—not because of §
> 653(a) but because the Navy does not consider itself
> bound either by contractual service terms contained in
> the Service Agreements they drafted and issued to
> recruits such as Petitioners, or the service terms
> enacted as law by Congress.  Obviously, Respondents'
> position will affect the Service Agreements of
> thousands of other commissioned officers that would

---

[8]     Petitioners also note that the position now taken by
the government is "completely different from the stance taken by
the Navy when it denied the two men's requests for relief from
active duty.  In moving to dismiss the amended Petitions,
Respondents now assert that the Service Agreements...have no
force or effect at all." (Doc. 85 at 2.)  Although Petitioners
are correct that the government is advancing a dramatically new
theory in this motion, it is not improper for it to do so.

1    similarly be without force or effect, regardless of the
2    expectations of the honorable men and women who entered
     the armed forces after signing them.

3    (*Id.*)  Petitioners also suggest adoption of the government's

4    position would likely require the military to reform its officer

5    recruiting practices to avoid making material misrepresentations.

6    In response, the government asserts that "all officers are aware

7    that they may be retained in the military for indefinite periods

8    of time and that their resignations may be accepted or rejected

9    at the 'pleasure of the President.'"  But, as is evidenced by

10   this case, not all officers share this understanding and the very

11   fact that the Service Agreement contains a term that explicitly

12   defines the numbers of years Petitioners must commit to active

13   duty belies the government's assertion.

14       Petitioners next argue that the government's focus on the

15   fact that a commission as an officer in the Navy is held "at the

16   pleasure of the President" is largely irrelevant to the matter at

17   hand.  It is undisputed that the President retains the power to

18   appoint or remove a person from his or her commissioned office.

19   *See, e.g., Blake v. United States*, 103 U.S. 227, 233-35 (1880)

20   (explaining the history of the President's power to remove or

21   discharge officers); *Parsons v. United States*, 167 U.S. 324, 334

22   (1897) (discussing the President's discretion to remove

23   officers); *Orloff,* 345 U.S. at 90-91 (confirming the President's

24   discretion to issue an officer's commission).  Petitioners

25   acknowledge that this power is "relevant...to the initial

26   appointment power or power to remove," but insist that "it does

27   not somehow confer unfettered authority on the President to

28   require a person to continue to serve on active duty,

**40**

1   particularly in the face of a Service Agreement that expressly

2   states the period during which an officer has consented to be on

3   active duty."  The only cases that so hold, *Springstead* and

4   *Klein*, are distinguishable, and in the case of *Klein*, arguably

5   not good law.

6        In the final analysis, the government's position is

7   unsupportable.  It cannot be the law that any service term

8   contained within any service agreement signed by any officer in

9   the nation is unenforceable.  The government has not demonstrated

10  that *Springstead*, the strongest case cited in support of its

11  motion to dismiss, should control here.  First, *Springstead*, a

12  Fourth Circuit case, is distinguishable because Petitioners here

13  contend that they did not voluntarily consent to being

14  transferred from reserve officer status into regular officer

15  status and never accepted regular officer status.  The Navy's

16  policy that apparently caused this involuntary transfer expressly

17  states that such a transfer shall not alter the terms of service

18  set forth in prior agreements.  The reasoning of *Springstead* is

19  suspect, as it draws its critical holding from a line of cases

20  that concern disputes over backpay, not over whether branches of

21  the armed forces have the right to unilaterally obliterate the

22  service terms contained within service agreements drafted by

23  those branches.  Moreover, contrary to the government's

24  assertions, the Service Agreements did not disclose to

25  Petitioners that the Navy would retain unilateral authority to

26  deny their requests to be released from active duty after serving

27  the number of years on active duty contractually provided.

28  Finally, the Navy's own regulations conflict with the

**41**

government's positions that officers serve unlimited service

terms at the pleasure of the President and Secretary of the Navy

and that express minimum service terms contained withing military

Service Agreements are meaningless.

The habeas based contract claims cannot be dismissed.  The

August 24, 2006 decision held that service agreements are subject

to general principles of contract interpretation.  (Doc. 49 at

29.)  No cases definitively hold that a contradictory active duty

service term contained within a <u>pre-existing</u> law trumps the

express minimum active duty service terms contained within

Petitioners' Service Agreements.  Finally, in articulating an

applicable standard, the district court reasoned that:

> Essentially, Plaintiffs seek specific enforcement of
> the Service Agreement, which contains an erroneous term
> of service, while the United States argues that the
> seven year service term cannot be enforced because it
> is contrary to statute.  Many cases have held that
> unlawful contracts (or unlawful contract terms) may not
> be enforced.  *See Fomby-Denson v. Dept. of Army*, 247
> F.3d 1366, 1374 (Fed. Cir. 2001)(reviewing the "well-
> settled" "principle[] of general contract law that
> courts may not enforce contracts that are contrary to
> public policy").  The Supreme Court in *Hurd v. Hodge*,
> 344 U.S. 24, 34-35 (1948), held that
>
> > The power of the federal courts to enforce the
> > terms of private agreements is at all times
> > exercised subject to the restrictions and
> > limitations of the public policy of the United
> > Sates as manifested in the Constitution, treaties,
> > federal statutes, and applicable legal precedents.
> > Where the enforcement of private agreements would
> > be violative of that policy, it is the obligation
> > of courts to refrain from such exertions of
> > judicial power.
>
> *Id.*  A long line of cases from federal labor law has
> applied this "public policy doctrine" in determining
> whether to enforce agreements.  *See e.g.*, *W.R. Grace &
> Co. v. Local Union*, 759, *Intern. Union of Un. Rubber,
> Cork, Linoleum and Plastic Workers of Am.*, 461 U.S.
> 757, 766-67 (1983)(refusing to bar enforcement of
> collective bargaining agreement because it did not
> compromise public policy); *Kaiser Steel Corp. v.*

*Mullins*, 455 U.S. 72, 79 (1982)(refusing to command contracting party to perform under contract, as that would "command conduct that assertedly renders the promise an illegal undertaking under the federal statutes.").

Whether a contract is unlawful is determined by referencing "laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace*, 461 U.S. at 766 (quoting *Muschany v. United States*, 324 U.S. 49, 66-67 (1945)).  However, "good faith contracts of the United States should not be lightly invalidated."

> Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral standards, this Court should not assume to declare contracts of the War Department contrary to public policy. The courts must be content to await legislative action.

*Muschany*, 324 U.S. at 66-67.

The Restatement (Second) of Contracts, section 178, concerns the enforceability of bargains that violate public policy.  It provides:

> (1) A promise or other term of an agreement is unenforceable on grounds of public policy <u>if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms</u>.

> (2) In weighing the interest in the enforcement of a term, account is taken of

>> (a) the parties' justified expectations,

>> (b) any forfeiture that would result if enforcement were denied, and

>> (c) any special public interest in the enforcement of the particular term.

> (3) In weighing a public policy against enforcement of a term, account is taken of

>> (a) the strength of that policy as manifested by legislation or judicial decisions,

>> (b) the likelihood that a refusal to enforce the term will further that policy,

>> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

43

1          (d) the directness of the connection between
           that misconduct and the term.
2
   (emphasis added.)

3  The United States Supreme Court relied upon this
   provision to evaluate whether public policy was
4  violated by a plea agreement providing for dismissal of
   criminal charges in exchange for a waiver of the
5  defendant's right to file a civil rights action.  *Town
   of Newton v. Rumery*, 480 U.S. 386, 392 n.2 (1987).
6  More recently, the Court of Federal Claims relied upon
   this provision to reject the government's argument that
7  a contractor should be strictly liable for the unlawful
   acts of its subcontractors.  *Transfair Int'l, Inc., v.*
8  *United States*, 54 Fed. Cl. 78 (2002).  The government
   in *Transfair* argued that a contract should be declared
9  void because a <u>subcontractor</u> performed the contract in
   an unlawful manner (by employing an Iranian airliner to
10 deliver goods), even though the contractor argued that
   it had no knowledge of the unlawful performance.
11 Following similar decisions from other circuits,
   including the Seventh Circuit case, *Northern Indiana*
12 *Public Service Co. v. Carbon County Coal Co.*, 799 F.2d
   265 (7th Cir. 1986), the *Transfair* court reasoned that
13 "the defense of illegality, being in character if not
   origins an equitable and remedial doctrine, is not
14 automatic but requires...a comparison of the pros and
   cons of enforcement." *Transfair*, 54 Fed. Cl. at 85
15 (quoting *Carbon County*, 799 F.2d at 273).  The
   *Transfair* court denied the United States' motion to
16 dismiss the contractors' suit for payment.  Its
   reasoning is instructive:

17
        This court is mindful of the vital foreign policy
18      concerns at issue and the result here is in no way
        intended to denigrate those concerns. But, the
19      short of the matter is that while it is highly
        relevant that legal requirements, tied to those
20      concerns, were apparently violated here, that fact
        alone is not decisive. Rather, this court must
21      determine, first, whether, under the
        circumstances, plaintiff is responsible for the
22      illegal performance of its subcontractor and,
        then, applying the balancing test of the
23      Restatement, consider whether the nature of that
        illegality was such as to warrant the forfeiture
24      of all compensation. <u>As fact issues lurk beneath
        both considerations, this court must deny
25      defendant's motion</u>.

26 Here, although the contract directly conflicts with a
   federal statute, the legislation does not explicitly
27 state that any contract made in violation of the
   statute is unenforceable.  There are fact inquiries
28 that must precede any reasoned application of the
   restatement factors, including the strength of the

**44**

> public policy that underlies the statutory eight year service provision; the government's interest in a return on its investment in training Navy fixed-wing jet pilots; the impact upon Plaintiffs that would result if relief was denied; and the nature of any misrepresentations and/or mistakes that have occurred as a result of the Navy's negligence in drafting the service contracts.

(Doc. 49 at 35-39.)

It is anomalous that the government asks officers to sign service agreements and to abide by their terms, except when the contract is sought to be enforced against the government. The motion to dismiss the contract based habeas claim must be **DENIED**.

### 3.   **Equitable Estoppel Claim.**

The second claim advanced in the habeas petitions is for equitable estoppel. Petitioners essentially argue that the government should not be permitted to advance its illegality defense because it has engaged in ongoing misrepresentations warranting the application of equitable estoppel. The government moves to dismiss this claim on the ground that it fails as a matter of law. The August 24, 2006 opinion set forth the relevant standard and discussed a key Ninth Circuit case:

> Equitable estoppel "precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor*, Inc., 436 F.3d 1098, 1101 (9th Cir. 2006). "[T]he party claiming estoppel must have relied on his adversary's [misleading] conduct in such a manner as to change his position for the worse, and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *River City Ranches #1 Ltd v. Comm'r Internal Revenue*, 401 F.3d 1136 (9th Cir. 2005). The Ninth Circuit applies a two-prong test to determine when it is appropriate to apply equitable estoppel against the government. First Plaintiffs must demonstrate "affirmative conduct [by

the government] going beyond mere negligence," *Purcell v. United States*, 1 F.3d 932 (9th Cir. 1993); and second that the "government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted, *United States v. Hatcher*, 922 F.2d 1402, 1411 n.12 (9th Cir. 1991).

In the context of ruling on an equitable estoppel claim brought against the government, the Ninth Circuit held that "[n]either the failure to inform an individual of his or her legal rights nor the negligent provision of misinformation constitute affirmative misconduct." *Suilt v. Schiltgen*, 213 F.3d 449, 454 (9th Cir. 2000). Plaintiffs assert, however, that the Navy's conduct went beyond mere negligence, citing *Watkins v. United States Army*, 875 F.2d 699 (9th Cir. 1989), for the proposition that the government's conduct in this case is actually affirmative misconduct. In *Watkins*, the Army was well aware from the time of Watkins' initial enlistment in 1967 that he had "homosexual tendencies," to which he admitted on several occasions. At that time, engaging in homosexual acts with other servicemen was considered a crime under military law. Watkins was investigated several times by the Army for allegedly committing sodomy and his fitness for duty was questioned on several other occasions. But, until 1981, he was always cleared of all wrongdoing and allowed to reenlist on several separate occasions because of his excellent performance. *Id.* at 702. In 1981, the Army promulgated a regulation which mandated the discharge of homosexuals regardless of merit. Soon thereafter an Army Board convened and determined that Watkins should be discharged. *Id.*

The Ninth Circuit held that equitable estoppel could be invoked against the government in *Watkins* because the Army repeatedly represented over a 14-year period that Watkins was qualified for reenlistment. Although acknowledging the general principle that "persons dealing with the government assume the risk that government agents may exceed their authority and provide misinformation," the *Watkins* court noted that the government "acted affirmatively in admitting, reclassifying, reenlisting, retaining, and promoting Watkins." *Id.* at 708. Furthermore, the defendant's conduct "involve[d] ongoing active misrepresentations by Army officials acting well within their scope of authority." *Id.* Consequently, the Ninth Circuit found the Army's conduct to be "affirmative misconduct." *Id.*

(Doc. 49 at 39-41.)

In ruling on the prior motion to dismiss, the district court

applied the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b) to Petitioners' equitable estoppel claim. *See Miscellaneous Service Workers Drivers & Helpers v. Philco-Ford Corp.*, 661 F.2d 776, 782 (9th Cir. 1981)(pleading pursuant to Rule 9 was required for a claim that alleged affirmative misrepresentation).  The district court found the initial complaint to be "insufficient to state a claim for equitable estoppel."

> Paragraph 32 is conclusory as it fails to describe what misrepresentations about Plaintiffs' service term were made, when, or by whom.  Intentional misrepresentation is not alleged, nor do Plaintiffs allege a pattern of affirmative misrepresentations like those in *Watkins*. Negligence is not enough.

(Doc. 49 at 43.)

The government again moves to dismiss the equitable estoppel claim, raising some new arguments, while repeating the argument that the petitions are not pled with sufficient specificity.[9]  To justify application of equitable estoppel against the government, Petitioners must demonstrate (1) "affirmative conduct [by the government] going beyond mere negligence," *Purcell v. United States*, 1 F.3d 932 (9th Cir. 1993); and (2) that the "government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted, *United States v. Hatcher*, 922 F.2d

_____

[9]     In an apparent attempt to rebut the government's argument that the equitable estoppel claim is barred because Petitioner's have no contract rights in the terms of their Service Agreements, Petitioners engage in a lengthy discussion of whether equitable estoppel can be applied outside the realm of contract Law.  (Doc. 85 at 15-17.)  It is not necessary to engage in this debate here because the government's "no contract right" theory has been rejected.

1402, 1411 n.12 (9th Cir. 1991).

### a. *Showing of Affirmative Misconduct.*

It is undisputed that a party seeking to estop the government must make an additional showing of "affirmative misconduct going beyond mere negligence." *Morgan v. Heckler*, 779 F.2d 544, 545 (9th Cir. 1985).  Under the heightened pleading standard of Rule 9, at a bare minimum, Petitioners must plead what misrepresentations about Plaintiffs' service term were made, when, and by whom.

> Rule 9(b) demands that, when averments of fraud are made, the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by "the who, what, when, where, and how" of the misconduct charged. A plaintiff must set forth more than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false.

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

The government insists that Petitioners have failed to meet this heightened pleading standard because the "make no factual allegations evidencing that any misstatements were deliberately false and not the result of negligence or mistake."  (Doc. 78 at 19.)  More specifically, the government argues:

> Petitioners first allege that the United States engaged in affirmative misconduct by entering into Service Agreements with them that contained service terms in conflict with federal statute.  However, Petitioners set forth no facts evidencing that the individuals who entered into the Service Agreements were aware of the change in statutory law or in any way acted to deliberately mislead them of their service obligations in entering into the Service Agreements.  Nor do Petitioners allege any facts to establish that the language in their "form" Service Agreements was intentionally retained <u>after</u> the change in federal law. (Doc. 51, ¶¶ 32-37; Doc. 52, ¶¶ 31-36.)  Petitioners

1  have demonstrated nothing more than mere negligence or
oversight on the part of the Navy in not updating its
2  service agreement form.

3  Petitioners next allege that the Navy's release of
other naval aviators evidences affirmative misconduct.
4  (Doc. 51, ¶¶ 38-40; Doc. 52, ¶¶ 37-39.)  Petitioners
wholly fail to show how the Secretary of the Navy's
5  discretion in granting certain naval aviators discharge
from the military is in any way misconduct.
6  Petitioners apparently confuse affirmative "conduct"
with affirmative "misconduct."

7  Petitioners next allege that they received orders
reiterating that they were obligated to serve the
8  number of years in their Service Agreements.  (Doc. 51,
¶¶ 76-81; Doc. 52, ¶¶ 75-80.)  Again, Petitioners fail
9  to plead any facts to suggest that the individuals
issuing those orders were aware of any inconsistency
10  between the Service Agreements and federal law and yet
deliberately concealed such misinformation.  Contrary
11  to Petitioners' allegations, the issuance of such
orders does not constitute affirmative misconduct.
12

13  Petitioners finally allege that they were told on two
occasions, by unnamed officers, that the seven-year
14  contractual service term applied.  (Doc. 51, ¶¶ 82-94;
Doc. 52, ¶¶ 81-93.) Yet, Petitioners fail to allege
15  specific facts to establish any affirmative misconduct
going beyond mere misinformation.  Petitioners fail to
16  identify the names of the officers, the specific
fraudulent statements made, or even that the
17  individuals involved had knowledge of the change in the
federal statutory provision or knowledge that the Navy
18  would not discharge Petitioners at the end of their
seven-year terms.
19

20  Instead, Petitioners set forth conclusory statements
that the United States engaged in deliberate,
intentional, affirmative misconduct.  Under Ninth
21  Circuit precedent, as a matter of law, Petitioners'
allegations fail to establish affirmative misconduct
22  required to maintain an estoppel claim against the
government.  See Sulit v. Schiltgen, 213 F.3d 449, 454
23  (9th Cir. 2000) ("Neither the failure to inform an
individual of his or her legal rights nor the negligent
24  provision of misinformation constitute affirmative
misconduct.")....

25  (Doc. 78 at 19-21.)  The government ignores the crux of the Ninth

26  Circuit's holding in *Watkins*, 875 F.2d 699.  As the district

27  court previously explained, in *Watkins* "ongoing active

28

**49**

misrepresentations by Army officials acting...within their scope of authority," constituted "affirmative misconduct."  *Id.*   There is no need for direct proof of intentional misconduct.  As a result, the government's myriad of related arguments (e.g., that "Petitioners set forth no facts evidencing that the individuals who entered into the Service agreements were aware of the change in statutory law or in any way acted to deliberately mislead them of their service obligation in entering into the Service Agreements") fail.  Under *Watkins*, a widespread pattern of misrepresentations may be sufficient:

> Affirmative misconduct does require an affirmative misrepresentation or affirmative concealment of a material fact by the government... although it <u>does not require that the government intend to mislead a party</u>.

*Watkins*, 875 F.2d at 707.

The amended petitions sufficiently <u>allege</u> such a pattern of misconduct.  For example, one petition alleges:

> 23.  At some time preceding the enactment of 10 U.S.C. § 653, Defendants became aware that Congress was deliberating on a bill that would establish a longer service term for Naval Aviator candidates than those in existence at that time....
>
> 25.  Prior to the enactment of 10 U.S.C. § 653, Defendants, through Vice Admiral Jeremy Boorda, former Deputy Chief of Naval Operations, and others participated in discussions with various members of Congress and their staff regarding the initially proposed nine-year statutory service term for Naval Aviators in the bill that became law as codified at 10 U.S.C. §653.
>
> 31.  At the time of the enactment of 10 U.S.C. § 653, Defendants became aware and had knowledge of the eight-year statutory service terms for Naval Aviator candidates trained to fly "fixed-wing jet aircraft,"and the six-year term for those trained to fly "other type of aircraft" established by law as codified at 10 U.S.C. §653.

36. Defendants' continued drafting, issuing and signing Service Agreements with Naval Aviator candidates, including McSeveney, that contained a seven-year service term that conflicted with the eight and six-year statutory service terms established by law as codified at 10 U.S.C. § 653 was knowing and deliberate, and constitutes a pattern of affirmative misconduct going beyond mere negligence.

(Doc. 52, MFAP).  To the extent possible, Petitioners have identified specific individuals and specific instances of misconduct.

Petitioners have also alleged that Respondents have engaged in a systematic release of hundreds of pilots in recent years, including seven in accordance with the same exact seven-year service term that is contained in their Service Agreements:

63. The release of the Naval Aviators by Defendants as described above created a justified expectation in [Petitioner] that he too would be released after completion of the seven-year contractual service term contained in his Service Agreement and not be held to serve the eight-year statutory service term contained in 10 U.S.C. § 653.

64. The release of the Naval Aviators by Defendants as described above makes any expectation by Defendant that [Petitioner]  would not be released after completion of the seven-year contractual term contained in the Service Agreement unjustified.

(*Id.*)[10]

_____

[10]  Although the government argues that "Petitioners wholly fail to show how the Secretary of the Navy's discretion in granting certain naval aviators discharge from the military is in anyway misconduct," (Doc. 78 at 20), Petitioners point out that at least one district court (albeit in an unpublished case) has held that evidence of the inconsistent and disparate application of policies and regulations governing the service terms in the military provides a basis to construe conflicting regulations against the military and result in the grant of a serviceman's habeas petition.  See *Wallace v. Brown*, 1979 U.S. Dist. LEXIS 10156 (S.D.N.Y. 1979).

Finally, Petitioners specifically allege that the Navy represented that they were to serve only seven years in orders issued to Petitioners in 1996.  The government contends that the "issuance of such orders does not constitute affirmative conduct."  (Doc. 78, at 20.)  Perhaps not, if those orders were isolated, but, under *Watkins* it is impossible to conclude as a matter of law that Petitioners have failed to state a claim.

The government makes much of the fact that Petitioners cannot identify the names of individual officers who reassured Petitioners that their seven year service terms controlled, but the petitions are sufficiently specific.  For example, Gengler's petition alleges:

> 82.  Gengler successfully completed his flight training and was designated as a Naval Aviator in April 1999.  Defendants orally confirmed that the seven-year contractual service term contained in Gengler's Service Agreement applied rather than the eight-year statutory service for the first time to Gengler in April 1999, <u>through Defendants' representative and "Student Control Officer" at Gengler's command, Training Squadron Two located in Kingsville, Texas</u> (hereinafter the "first oral representation").

> 83.  The first oral representation was made by Defendants through its Student Control Officer acting within his authority and official capacity.  The first oral representation made by the Student Control Officer constituted affirmative misconduct.

***

> 88.  Defendants [again] orally confirmed that the seven-year contractual service term contained in Gengler's Service Agreement applied rather than the eight-year statutory service term for a second time to Gengler in April or May 1999 by Defendants through a "Training Officer" at Gengler's command, Strike Fighter Squadron One Two Five in Lemoore, CA (hereinafter the "second oral representation").

89. The second oral representation was made by Defendants through its Training Officer acting within his authority and official capacity.

(GFAP.)  These allegations sufficiently apprise the government of the circumstances constituting the alleged misrepresentations so as to "give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess,* 317 F.3d at 1106

Although it is not clear whether the Petitioners will ultimately be able to demonstrate a pattern of affirmative misconduct sufficient to establish entitlement to equitable estoppel, their claim cannot be dismissed as a matter of law at this stage.

There is no single test for detecting the presence of affirmative misconduct; each case must be decided on its own particular facts and circumstances.

*Watkins*, 875 F.2d at 707.

### b.   *No Serious Injustice; Public Interest*

After sufficiently pleading the existence of affirmative misconduct, Petitioners must also sufficiently allege that "government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage" if the requested relief is granted, *United States v. Hatcher*, 922 F.2d 1402, 1411 n.12 (9th Cir. 1991).  The government argues in the alternative that the equitable estoppel claim must fail as a matter of law because:

There is no "serious injustice" in requiring Petitioners to adhere to their obligation "to serve at the pleasure of the President" as commissioned naval officers.  In addition, no serious injustice can possibly result from Petitioners' alleged reliance on representations that they would be discharged after

**53**

1
2
3

> seven years, particularly in light of the specific
> language in the Service Agreements advising Petitioners
> that, as Reserve Officers, they would be serving at the
> pleasure of the President and that any request for
> resignation of their commissions may be rejected by the
> President.

4

(Doc. 78 at 18-19.)  The government's argument that service "at

5

the pleasure of the President" equates to a complete loss of

6

one's contract rights has been rejected.

7

The United States' motion to dismiss the equitable estoppel

8

claim must be **DENIED** in its entirety.

9

10

### C.   Petitioners' Procedural Motions.

11

Petitioners seek an order requiring that the government

12

answer their petitions and  participate in discovery on an

13

expedited basis.  Petitioners also request that an evidentiary

14

hearing be held.

15
16

### 1.   Request for an Order Requiring the United States to Answer the Petitions on an Expedited Basis.

17

Petitioners request that the United States be ordered to

18

answer the petitions within five (5) days.  The government does

19

not oppose answering the Petition, but opposes doing so on an

20

expedited basis.  The government requests 30 days from the date

21

of decision.  Given the length of the petitions and the

22

complexity of the issues raised, it is not reasonable to expect

23

the government to answer within five days.  The government shall

24

answer the amended petitions within ten (10) days of service of

25

this order, given the time this case has been pending and the

26

government has had the pleadings.

27
28

**54**

**2.   Request for an Order Requiring the United States
to Participate in Discovery on an Expedited Basis.**

Next, Petitioners request that the government be required to
respond to their discovery requests on an expedited schedule,
specifically within ten (10) days.  The government objects both
to the scope and nature of the discovery and to the request that
they be required respond on such an expedited basis.

Habeas Corpus Rule 6, which governs discovery in habeas
cases, provides in pertinent part:

> (a) Leave of Court Required.  A judge may, for
> good cause, authorize a party to conduct discovery
> under the Federal Rules of Civil Procedure and may
> limit the extent of discovery...
>
> (b) Requesting Discovery.  A party requesting
> discovery must provide reasons for the request.  The
> request must also include any proposed interrogatories
> and requests for admission, and must specify any
> requested documents.

Habeas Corpus Rule 6.  Granting discovery is left to the
discretion of the court, to be exercised where there is a
"showing of good cause why discovery should be allowed."  Habeas
Corpus Rule 5 Advisory Committee notes.  Any discovery must be
"relevant and appropriately narrow."  Habeas Corpus Rule 6
Advisory Committee notes.

The government maintains that the "majority of Petitioners'
requested discovery is not supported by a showing of good cause.
Moreover, until the United States files an answer to the amended
petitions, it is impossible to evaluate what, if any, discovery
is needed and whether the discovery is relevant and appropriately
narrow.

For example, Petitioners propose 174 requests for admission
that essentially recite verbatim the allegations in the amended

**55**

petition.  (Doc. 60, Ex. A.)  The government argues that any such discovery is duplicative, as the government would be required to make such admissions in its answer.  This is untrue.  The government can deny and provide no information with its denial.

The United States also objects to Petitioners' document requests as violative of the attorney-client privilege, overbroad, unduly burdensome, irrelevant, vague, and premature. (Doc. 79 at 6.)  For example, Petitioners seek all documents reviewed or consulted by the Navy in preparing the Responses and Answers to Gengler and McSeveny's Petitions.  (See Doc. 60, Ex. B., Request for Production No. 1.)  Petitioners also seek all documents "reviewed or generated by Defendants related to or evidencing its position on or policy concerning the bill that became law as codified and amended as 10 U.S.C. § 653 including documents prior and subsequent to the enactment.  (*See id.*, Request for Production No. 4.)  These requests appear to implicate the work product privilege.

The government objects to the proposed interrogatories, which essentially mirror the requests for production.  (*See* Doc. 60 at Ex. C.)  Petitioners seek to depose:

> The individual or individuals most knowledgeable about: 1) each and every allegation contained in Gengler's and McSeveny's Petitions; 2) the responses and affirmative defenses and other information contained in Defendants' Answer or other response to the Petitions; the Response to Petitioners' Request for Admissions; and 3) the facts, documents and communications identified and produced by Defendants in its Response to Petitioners' Interrogatories and Request[s] for Production.

(Doc. 60 at Ex. D.)  The government argues that the deposition notice "does not set forth proper matters for examination pursuant to Federal Rule of Civil Procedure 30(b)(6) and "calls

**56**

for legal conclusions, violates the attorney-client privilege and third party privacy rights, and is overboard, unduly burdensome, and vague."  The government is correct that the request "is certainly not narrowly tailored for a habeas proceeding."

However, it does not appear that the parties have followed the normal procedure for resolving discovery disputes.  First, they must meet and confer to attempt to resolve the dispute. Local Rule 37-251.  This does not appear to have happened yet and it is therefore premature for the district court to intercede.

### 3. Request for an expedited schedule.

Petitioners request that any discovery responses be due 10 days after the court issues an order authorizing discovery.  The government objects "[b]ecause of the broad nature and voluminous amount of discovery requested, and the need for the government to respond to requests related to events nearly two decades ago." The government requests a minimum of 30 days to respond to any discovery.  It appears a further scheduling conference is best suited to determine an appropriate schedule.

### 4. Request for an evidentiary hearing.

Finally, Petitioners request an evidentiary hearing. Whether to hold an evidentiary hearing is governed by Habeas Corpus Rule 8(a), which provides:

> (a) Determining Whether to Hold a Hearing, If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The government resists setting an evidentiary hearing, suggesting that one is not necessary where only issues are raised or when

questions presented in the petition can be readily resolved by reference to the record.  (Doc. 79 at 8, citing *Yeaman v. United States*, 326 F.2d 293, 294 (9th Cir. 1963)).  This is incorrect, as Petitioners make specific allegations that can only be confirmed by the testimony of the individuals alleged to have made the misrepresentations.

In ruling on the previous motion to dismiss, the district court suggested that an evidentiary inquiry is required to resolve some of the remaining issues in this case.  Although some evidentiary matters may be undisputed after discovery, it appears likely in this case that some fact issues can only be resolved by a trier of fact.

Whether this case can be resolved on summary judgment, without the need for an evidentiary hearing appears unlikely. This issue will be discussed at the further scheduling conference.

## V.   CONCLUSION

For the reasons set forth above,

(1)   Petitioners' Second and Third Amended Petitions (Docs. 72, 73, 76 & 77) are **stricken**;

(2)   The Untied States' motion to dismiss is **DENIED.**

(3)   A further scheduling conference is set for Thursday, November 9, 2006 at 11:30 a.m. in Courtroom 3.

**SO ORDERED**

**DATED: November 3,2006**

          /s/ Oliver W. Wanger
          **OLIVER W. WANGER**
          **UNITED STATES DISTRICT JUDGE**