1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT FOR THE

7               EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| LT. CMDR RICHARD T. GENGLER and CMDR DANIEL S. McSEVENEY, | No. CV-F-06-362 OWW/WMW |
| | MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART PETITIONERS' MOTION FOR ATTORNEYS' FEES (Doc. 122) |
| Plaintiffs/ Petitioners, | |
| vs. | |
| UNITED STATES OF AMERICA THROUGH ITS DEPARTMENT OF DEFENSE AND NAVY and SECRETARY DONALD C. WINTER, | |
| Defendants/ Respondents. | |

     By motion filed on March 5, 2007, Petitioners moved for an award of attorneys' fees as prevailing parties pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1). Petitioners seek attorneys fees and costs in the amount of $115,400.60 due to

Lewis Brisbois Bisgard & Smith LLP ("Lewis Brisbois")[1] and $92,295.15 in services and costs provided on a pro bono basis by attorneys at Bingham McCutchen LLP ("Bingham").[2]

The motion was taken under submission after hearing on August 6, 2007.  On October 11, 2007, Petitioners filed a "Supplemental Declaration of William D. Kissinger and Timothy Lord Updating Petitioners' Motion for Attorneys' Fees."   On October 15, 2007, Petitioners filed a "Revised Supplemental Declaration of William D. Kissinger in Support of Petitioners' Motion for Attorneys' Fees."  Petitioners assert that their initial motion for attorneys' fees documented fees and costs incurred through February 28, 2007 for services performed by Bingham and Lewis Brisbois.  Petitioners assert that they have incurred additional attorneys' fees and costs in connection finalization of the motion for attorneys' fees, reviewing Respondents' opposition to the motion for attorneys' fee, drafting Petitioners' reply, and preparing for and attending the August 6, 2007 hearing.  Petitioners assert that they have incurred an additional fees and costs totaling $95,931.43 since February 28, 2007 for services performed by Bingham and $6,020.00 for services performed by Lewis Brisbois since May 1, 2007,

---

[1]Lewis Brisbois initially sought $108,540.60 in fees and costs.  By supplemental declaration filed on July 24, 2007, Lewis Brisbois sought recover of additional fees and costs totaling $6,860.00 for services performed between February 1, 2007 and April 30, 2007.

[2]Petitioners assert that they received approximately $45,000 in legal representation from Professor Charles Weisselberg on a pro bono basis but do not seek recovery for his services.

1  making the total amount sought to be awarded as $310,335.68

2  ($121,420.60 to Lewis Brisbois and $188,915.08 to Bingham).

3  Petitioners note that their initial motion for attorneys' fees

4  filed on March 5, 2007 advised that they would supplement the

5  motion with additional fees and costs incurred after February 28,

6  2007.

7        Respondents object to the Supplemental Declaration and

8  Revised Supplemental Declaration and seek to strike them  on

9  several grounds.  First, Petitioners did not obtain leave of

10 Court to file these supplemental declarations after the motion

11 for attorneys' fees was argued and taken under submission.

12 Second, Petitioners' belated filing of these supplemental

13 declarations precludes any response or challenge to them by

14 Respondents.  Third, the bulk of these additional fees were

15 incurred by Bingham, who was associated in the case one day

16 before orders were issued discharging Petitioners from the Navy

17 and mooting the case.

18       Respondents' objections are well-taken.  Petitioners'

19 statement in a brief filed in March 2007 that they reserved the

20 right to supplement the fee request does not entitle them to do

21 so without leave of court months after the motion was argued and

22 taken under submission, negating Respondents' right to contest

23 the supplemental declarations.  Petitioners' supplemental

24 declarations filed in October 2007 are stricken.

25       28 U.S.C. § 2412(d)(1)(A) provides in pertinent part:

26            (A) Except as otherwise specifically provided

3

by statute, a court shall award a prevailing
party ... fees and other expenses ...
incurred by that party in any civil action
(other than cases sounding in tort) ...
brought ... against the United States ...
unless the court finds that the position of
the United States was substantially justified
or that special circumstances makes an award
unjust.

(B) A party seeking an award of fees and
other expenses shall, within thirty days of
final judgment in the action, submit to the
court an application for fees and other
expenses which shows that the party is a
prevailing party and is eligible to receive
an award under this subsection, and the
amount sought, including an itemized
statement for any attorney or expert witness
representing or appearing on behalf of the
party stating the actual time expended and
the rate at which fees and other expenses
were computed.  The party shall also allege
that the position of the United States was
not substantially justified.  Whether or not
the position of the United States was
substantially justified shall be determined
on the basis of the record (including the
record with respect to the action or failure
to act by the agency upon which the civil
action is based) which is made in the civil
action for which fees and other expenses are
sought.

A.  <u>Prevailing Parties</u>.

To be prevailing parties, Petitioners must meet two criteria.  First, they must achieve a "material alteration of the legal relationship of the parties."  Second, that alteration must be "judicially sanctioned."  *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 604-605 (2001).

1.  <u>Material Alteration of Legal Relationship</u>.

Petitioners assert that a material alteration of a legal

4

relationship between the parties occurs where the defendant is required to do something directly benefitting the plaintiff that the defendant otherwise would not have had to do.  Petitioners rely on *Carbonell v. I.N.S.*, 429 F.3d 894 (9th Cir.2005).

In *Carbonell*, an alien petitioned for attorneys' fees under the EAJA after obtaining a court order incorporating a voluntary stipulation staying deportation.  The Ninth Circuit held in pertinent part:

> Carbonell satisfies the first prong of the prevailing party test, which requires a material alteration in the legal relationship between the parties, as a result of the parties' stipulation to a stay of departure. The case before the district court primarily concerned whether Carbonell was entitled to a stay of deportation until the BIA reconsidered the question whether his due process rights had been violated, thus requiring his case to be reopened.  Before the district court issued its order which incorporated the stay of deportation, the INS had the authority to deport Carbonell immediately.  Had the INS done so prior to the BIA's deciding his motion to reopen his case, the BIA would have dismissed his case and Carbonell would have had no further recourse.  Under the stipulation, however, the government was required to refrain from deporting Carbonell for 45 days pending the BIA's decision on his motion to reopen.  The stipulation for the stay of deportation thus 'materially altered the legal relationship between the parties, because the defendants were required to do something directly benefitting the plaintiff[] that they otherwise would not have had to do.' ....
>
> ... In the instant case, it is irrelevant that Carbonell's underlying effective assistance claim was not resolved, and that he, therefore, remained under a final order of deportation.  Under the stipulation for a stay, Carbonell received much of the relief

1        he sought in the district court and thus met
2        the first requirement to be deemed a
         prevailing party.

3  **429 F.3d at 900.**

4       Petitioners contend that the facts in this case parallel

5  those of *Carbonell*.  Petitioners argue that, at the time this

6  action was filed, Respondents had the power to deploy active-duty

7  Naval Officers and Aviators as they saw fit by issuing lawful

8  orders by virtue of the President's power as commander-in-chief,

9  *Fleming v. Page*, 50 U.S. 603, 615 (1850), and by virtue of the

10 Uniform Code of Military Justice, 10 U.S.C. §§ 890, 892, allowing

11 punishment by court marshal for failing to obey any lawful order

12 or regulation.  Petitioners refer to Respondents' arguments that

13 "[o]rganizing and mobilizing the military in a time of national

14 emergency, and protecting the national security of the United

15 States, are core Executive Branch functions."  (Doc. 25 at 5).

16 By refusing to grant Petitioners' requests for release from

17 active duty, Petitioners argue, Respondents intended to maintain

18 legal authority over Petitioners, including the ability to deploy

19 Petitioners through the issuance of lawful orders.

20      Petitioners argue that Respondents gave up their right to

21 deploy Petitioners outside the United States by a series of

22 orders entered by this Court.

23      Petitioners refer to the Order approving the Stipulation Re

24 Ex Parte Motion for Entry of Temporary Restraining Order filed on

25 April 7, 2006 (Doc. 12), wherein it was agreed *inter alia* that

26 "Defendants shall maintain Petitioners' non-deployable status

with the Navy through July 10, 2006 and will not deploy Petitioners to Iraq or any location outside the Continental United States prior to July 10, 2006." By Order filed on June 12, 2006, the Court approved the parties' stipulation extending Petitioners' non-deployable status through August 9, 2006 (Doc. 14). Petitioners refer to the Order filed on August 11, 2006 (Doc. 37), denying Petitioners' application for a temporary restraining order to order their immediate discharge and to not change their deployment status, but requiring Respondents "to give at least 20 days notice of any intent to change Petitioners' current non-deployment status so they can make application for appropriate relief to the Court should that occur ...." Finally, Petitioners refer to the Order filed on November 3, 2006 (Doc. 107) granting Gengler's motion that he be released from the custody of the Respondents from November 4, 2006 to December 8, 2006. Petitioners refer to Finding of Fact 21 and Conclusions of Law 9 and 12of that Order:

> 21. The government further argues the court has no authority to determine the legality of the contract in dispute, the Navy's actions, and cannot meddle in the Navy's conduct of its business.
>
> ...
> 9. The Court also finds that there are, at a minimum, substantial questions going to the merits of the petition. It is established that the terms of service contracts of enlisted personnel are governed by contract law standards and are enforceable. *See, e.g., Santiago v. Rumsfeld*, 425 F.3d 549, 554 (9th Cir.2005). Though there is no case directly on point, at least one district court has held that an officer's agreement to

serve additional time as a result of
educational programs is also contractual in
nature, even though an officer is a
Presidential appointee.  *See Wallace v.
Brown*, 1979 U.S. Dist. LEXIS 10156 *20 n.2
(S.D.N.Y.1979).

...

12.  The exceptional circumstances of this
petition to resolve Petitioner's right to be
released from active duty include that
further delay renders nugatory his good faith
expectations and belief as to release from
active duty on which he relied to his
detriment and will obviate any relief in this
case.

Petitioners assert that these orders materially altered the

legal relationship between Petitioners and Respondents by

modifying Respondents' legal authority to deploy Petitioners at

will through the issuance of lawful deployment orders:

First, the requirement that Respondents
refrain from deploying Petitioners outside of
the Continental United States for
approximately four months directly benefited
Petitioners as their temporary restraining
order sought an order 'preventing Defendants
from changing Petitioners' status from non-
deployable to deployable or otherwise sending
them to ... any location outside the United
States.'  (Doc. 2 at 2.)  Second, the order
requiring Respondents to 'give at least 20
days' notice of any intent to change
Plaintiffs' current non-deployment status so
they can make application for appropriate
relief to the Court should that occur'
directly benefited Petitioners as the
language itself gave the Petitioners an
opportunity to seek relief if Respondents
wished to exercise their authority to deploy
Petitioners.  Lastly, the Court's Order
granting Petitioner's bail motion directly
benefitted ... Gengler as he received the
relief he requested in his habeas corpus
petition.  He was released from Respondents'
custody and from active duty, which barred

8

> Respondents from exercising their authority
> over him for the time specified in the bail
> order.  Notably, Petitioner Gengler offered
> the Respondents a mechanism for him to attend
> the University of Chicago and not alter the
> legal relationship between the parties.  With
> the Court's encouragement, he proposed that
> the Navy grant him a series of leaves that
> would still maintain his active duty status.
> The Respondents, however, rejected that
> proposal (Doc. 107, at 10), necessitating the
> ruling by this Court that altered Gengler's
> relationship with the Navy by releasing him
> from the Navy's custody.

Respondents argue that Petitioners are not "prevailing parties" in this action.

Respondents cite *Farrar v. Hobby*, 506 U.S. 103, 111-112 (1992).  In *Hobby*, the Supreme Court held that a civil rights plaintiff who recovers damages in any amount, whether compensatory or nominal, qualifies as a prevailing party under 42 U.S.C. § 1988, but that the court should consider the extent of plaintiff's recovery in fixing a reasonable attorneys' fee award, and that a plaintiff who received only nominal damages of one dollar on a claim for $17 million is not entitled to attorneys' fees under Section 1988.  Respondents rely on the following statement in *Farrar*:

> [T]o qualify as a prevailing party, a civil
> rights plaintiff must obtain at least some
> relief on the merits of his claim.  The
> plaintiff must obtain an enforceable judgment
> against the defendant from whom the fees are
> sought ... or comparable relief through a
> consent decree or settlement.  Whatever
> relief the plaintiff secures must directly
> benefit him at the time of the judgment or
> settlement ... Otherwise the judgment or
> settlement cannot be said to 'affec[t] the
> behavior of the defendant toward the

9

> plaintiff.' ... Only under these
> circumstances can civil rights litigation
> effect 'the material alteration of the legal
> relationship of the parties' and thereby
> transform the plaintiff into a prevailing
> party ... In short, a plaintiff 'prevails'
> when actual relief on the merits of his claim
> materially alters the legal relationship
> between the parties by modifying the
> defendant's behavior in a way that directly
> benefits the plaintiff.

506 U.S. at 111-112.

Respondents also cite *Hewitt v. Helms*, 482 U.S. 755, 760 (1987):

> Respect for ordinary language requires that a
> plaintiff receive at least some relief on the
> merits of his claim before he can be said to
> prevail ... Helms obtained no relief.
> Because of the defendants' official immunity
> he received no damages award.  No injunction
> or declaratory judgment was entered in his
> favor.  Nor did Helms obtain relief without
> benefit of a formal judgment - for example,
> through a consent decree or settlement ...
> The most that he obtained was an
> interlocutory ruling that his complaint
> should not have been dismissed for failure to
> state a constitutional claim.  That is not
> the stuff of which legal victories are made.

*See also Hanrahan v. Hampton*, 446 U.S. 754, 759 (1980)(procedural and evidentiary rulings may affect the disposition on the merits, but are themselves not matters on which a party can prevail for purposes of shifting attorneys' fees).

Respondents also cite *Buckhannon Bd. & Care Home, Inc.*, *supra*, 532 U.S. 598; where a rest home which operated assisted living residences, failed an inspection by the West Virginia fire marshal's office because some residents were incapable of self-preservation as defined by state law.  After receiving orders to

1   close its facilities, Buckhannon filed suit in federal court

2   against the state and state agencies seeking declaratory and

3   injunctive relief that the self-preservation requirement violated

4   the Fair Housing Amendments Act of 1988 and the Americans with

5   Disabilities Act of 1990.  Respondents agreed to stay the orders

6   pending the court's resolution.  The West Virginia legislature

7   then eliminated the self-preservation requirement and the

8   district court granted respondents' motion to dismiss the action

9   as moot.  Buckhannon moved for attorneys' fees as the prevailing

10  party under the FHAA and the ADA, basing their entitlement to

11  attorneys' fees on the "catalyst theory," which posits that a

12  plaintiff is a prevailing party if it achieves the desired result

13  because the lawsuit brought about a voluntary change in the

14  defendant's conduct.  The Supreme Court ruled that the "catalyst

15  theory" is not a permissible basis for the award of attorneys'

16  fees under the FHAA or the ADA.  In so ruling, the Supreme Court

17  stated:

18          We have only awarded attorney's fees where
            the plaintiff has received a judgment on the
19          merits ... or obtained a court-ordered
            consent decree ... - we have not awarded
20          attorney's fees where the plaintiff has
            secured the reversal of a directed verdict
21          ... or acquired a judicial pronouncement that
            the defendant has violated the Constitution
22          unaccompanied by '*judicial relief*,' ... Never
            have we awarded attorney's fees for a
23          nonjudicial 'alteration of actual
            circumstances.' ... While urging an expansion
24          of our precedents on this front, the
            dissenters would simultaneously abrogate the
25          'merit' requirement of our prior cases and
            award attorney's fees where the plaintiff's
26          claim 'was at least colorable' and 'not ...

11

groundless.' ... We cannot agree that the
term 'prevailing party' authorizes federal
courts to award attorney's fees to a
plaintiff who, by simply filing a
nonfrivolous but nonetheless potentially
meritless lawsuit (it will never be
determined), has reached the 'sought-after
destination' without obtaining any judicial
relief.

532 U.S. at 606.

Respondents argue that the Ninth Circuit's decision in

*Carbonell* is distinguishable because Carbonell was under an order

of deportation at the time he obtained a court order

incorporating a voluntary stipulation with the INS staying the

deportation.  Here, Respondents contend:

Petitioners had no orders to be deployed
overseas.  (Gunter Decl. ¶ 6.)  Nor was it
likely Petitioners would be selected for an
assignment overseas.  (Doc. 25, Attach. 1, ¶
4.)  Instead, Petitioners were scheduled to
stay at VX-9 for the remaining year, since
VX-9 was undermanned for pilots.  (Gunter
Decl. ¶ 6.).  The stipulation upon which
Petitioners rely maintained their <u>current</u>
non-deployable status, in effect, maintaining
the status quo.  In reaching this
stipulation, there was no decision whatsoever
on the merits of Petitioners' claims.  The
stipulation provided Petitioners with the
same relief they already had - assignment to
VX-9 ....

Thus, the stipulation did not materially
alter the legal status of the parties; nor
did the Court's order requiring the Navy to
give Petitioners 20 days' notice of any
intent to change Petitioners' <u>current</u> non-
deployable status so that they could make an
application for <u>possible</u> relief.

Petitioner Gengler did obtain a temporary
one-month discharge from the Navy to complete
his first term of business school.  However,
this limited interim relief does not alter

12

the fact that the Court never ruled on the merits, recognized at the hearing that there was no clear right of discharge, and never ordered the relief sought in the habeas petitions - Petitioners' permanent discharge from the Navy.

Respondents cite *Dearmore v. City of Garland*, 519 F.3d 517, 524 (5th Cir.), *cert. denied*, ___ U.S. ___, 129 S.Ct. 131 (2008):

Under these facts, to qualify as a prevailing party under § 1988(b), we hold that the plaintiff (1) must win a preliminary injunction, (2) based upon an unambiguous indication of probable cause of the merits of the plaintiff's claims as opposed to a mere balancing of the equities in favor of the plaintiff, (3) that causes the defendant to moot the action, which prevents the plaintiff from obtaining final relief on the merits. Such a test satisfies *Buckhannon* because it requires that a party obtain a judicial ruling which results in a material change in the legal relationship between the parties. It also does not implicate the 'catalyst theory,' which the Supreme Court struck down in *Buckhannon*, because this test grants prevailing party status only when the defendant moots the plaintiff's action in response to a court order, not just in response to the filing of a lawsuit.

Petitioners reply that Respondents attempt to distinguish *Carbonell* is unavailing: "[U]nder *Carbonell* what matters is that the Navy lost *the authority* to deploy Petitioners outside the Continental United States, not whether the Navy intended to exercise that authority." Petitioners further contend that Respondents' assertion is contradicted by the statement of Respondents' counsel at the hearing on November 1, 2006:

The government has in good faith, from the beginning of this case, originally tried to work it out. The only stipulation we had was not to deploy these officers to Iraq because

13

> that was the concern with the original
> temporary restraining order - motion for
> temporary restraining order.  It was to
> prevent them from being deployed to Iraq
> because they were going to go for either six
> or 12-month deployments.
>
> So we, in a spirit of cooperation, agreed to
> find replacements there.  I got it cleared
> through the Navy to do that.

(Doc. 124 at 87:1-10).

Petitioners further argue that the Supreme Court cases cited by Respondents do not negate their status as prevailing parties. Petitioners cite Ninth Circuit authority that a grant of a preliminary injunction may satisfy the "prevailing party" requirements.

In *Watson v. County of Riverside*, 300 F.3d 1092, 1096 (9th Cir.2002), *cert. denied*, 538 U.S. 923 (2003), the Ninth Circuit held:

> A preliminary injunction issued by a judge
> carries all the 'judicial imprimatur'
> necessary to satisfy *Buckhannon*.  In this
> case, the County was prohibited from
> introducing Watson's report at the
> termination hearing for one reason and one
> reason only: because Judge Timlin said so.
> Under *Williams*, Watson was a prevailing
> party.  And under *Buckhannon*, he was not a
> mere catalyst of an extra-judicial voluntary
> change in conduct.   There was nothing
> voluntary about the County's inability to use
> the report.
>
> We recognize that there will be occasions
> when the plaintiff scores an early victory by
> securing a preliminary injunction, then loses
> on the merits as the case plays out and
> judgment is entered against him - a case of
> winning a battle but losing the war.  The
> plaintiff would not be a prevailing party in
> that circumstance.  But this case is

14

> different because Watson's claim for
> permanent injunctive relief was not decided
> on the merits.  The preliminary injunction
> was not dissolved for lack of entitlement.
> Rather, Watson's claim for permanent
> injunction was rendered moot when his
> employment termination hearing was over,
> after the preliminary injunction had done its
> job.

*See also Carbonell*, *supra*, 429 F.3d at 899: "[A]lthough Carbonell obtained relief that was not an enforceable judgment on the merits or a consent decree, he nonetheless can qualify as a prevailing party."  *But see Center for Biological Diversity v. Marina Development Co.*, 535 F.3d 1026, 1037 n.16 (9th Cir.2008):

> The mere fact that the Center achieved a
> preliminary injunction will not support an
> award of fees.  *See Sole v. Wyner*, ___ U.S.
> ___, 127 S.Ct. 2188, 2195 ...
> (2007)('Prevailing party status, we hold,
> does not attend achievement of a preliminary
> injunction that is reversed, dissolved or
> otherwise undone by the final decision in the
> same case.')

Petitioners argue that this line of cases is unaffected by the Supreme Court's decision in *Sole v. Wyner*, 551 U.S. 74 (2007).

In *Sole*, an organizer of an event in which participants were to form a peace symbol with their nude bodies at a state beach brought a Section 1983 action against state officials seeking preliminary and permanent injunctions prohibiting state officials from interfering with the event or with future such events.  The district court granted a preliminary injunction but, following the event, denied the motion for a permanent injunction.  The district court awarded attorneys' fees to the organizer based on

15

the preliminary injunction.  The Supreme Court reversed, holding in pertinent part:

> Wyner ... urges that despite the denial of a permanent injunction, she got precisely what she wanted when she commenced this litigation: permission to create the nude peace symbol without state interference. That fleeting success, however, did not establish that she prevailed on the gravamen of her plea for injunctive relief, *i.e.*, her charge that state officials had denied her and other participants in the peace symbol display 'the right to engage in constitutionally protected expressive activities.' ... Prevailing party status, we hold, does not attend achievement of a preliminary injunction that is reversed, dissolved, or otherwise undone by the final decision in the same case.

551 U.S. at 83.  However, the Supreme Court cautioned:

> We express no view on whether, in the absence of a final decision on the merits of a claim for permanent injunctive relief, success in gaining a preliminary injunction may sometimes warrant an award of counsel fees. We decide only that a plaintiff who gains a preliminary injunction does not qualify for an award of counsel fees under § 1988(b) if the merits of the case are ultimately decided against her.

*Id.* at 86.

With regard to the stipulated Order temporarily releasing Gengler from Respondents' custody, Petitioners argue that "though the bail order did not then effect a permanent discharge, it released him from active duty and achieved some of the relief ... Gengler sought in his habeas corpus case."

Whether Petitioners were prevailing parties under the governing standards is a close and difficult question.

16

Petitioners' objectives in the lawsuit were twofold: (1) to prevent their deployment to Iraq and (2) to secure their immediate discharge from the Navy.  By Court Orders, Respondents' *power* to deploy Petitioners was abrogated, when no orders for Petitioners' deployment existed.  That the Court Orders permitted Petitioners to remain at VX-9 does not detract from the fact that Respondents were prevented from issuing orders for Petitioners' overseas deployment. Petitioner's discharge was not achieved.

> 2.   <u>Judicially Sanctioned</u>.

Respondents do not respond to this aspect of the motion. From this silence it is inferred that Respondents concede that Petitioners have demonstrated this prong of the "prevailing party" test given the Court orders described above.  Through this series of orders, Plaintiffs' non-deployable status was maintained until their claims were mooted by their discharge after eight years, not the seven years their contracts provided, after they entered into pilot training and service agreements with the Navy.  Gengler also obtained a one month separation to start graduate business school.  Plaintiffs did not achieve discharge after seven years in accordance with the contract term. Their success was limited.

> B.   <u>Substantially Justified</u>.

Respondents bear the burden of proving substantial justification.  *United States v. $12,248 U.S. Currency*, 957 F.2d 1513, 1517 (9th Cir.1991).  "A position is 'substantially justified' if it is 'justified in substance or in the main,' that

17

1   is, if it has a 'reasonable basis both in law and fact.'" *United*
2   *States v. One 1984 Ford Van, Etc.*, 873 F.2d 1281, 1282 (9th
3   Cir.1989), quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).
4   A position can be justified even though it is not correct.
5   *Pierce v. Underwood,* 487 U.S. 566 n.2.  "In evaluating the
6   government's position to determine whether it was substantially
7   justified, we look to the record of both the underlying
8   government conduct at issue and the totality of circumstances
9   present before and during litigation." *Barry v. Bower*, 825 F.2d
10  1324, 1330 (9th Cir.1987).  The government's position must be
11  substantially justified at each stage of the proceedings.  *Corbin*
12  *v. Apfel*, 149 F.3d 1051, 1052 (9th Cir.1998).  The government may
13  sustain its burden by showing its position is a novel but
14  credible extension or interpretation of the law.  *Petition of*
15  *Hill*, 775 F.2d 1037, 1042 (9th Cir.1985).  That the government
16  lost does not raise a presumption that its position was not
17  substantially justified and the government need not show that it
18  had a substantial likelihood of prevailing.  *Id.*

19      Petitioners argue that Respondents cannot demonstrate that
20  their position before and during this litigation was
21  substantially justified under these standards:

22          First and foremost, the Navy cannot justify
            drafting Service Agreements with seven-year
23          terms, and then disregarding those terms.
            During discovery, the Navy admitted that at
24          the time the Service Agreements were drafted
            in 1996, the Respondents 'had knowledge of or
25          were otherwise aware of the existence of the
            eight-year statutory service term ...
26          codified as 10 U.S.C. § 653.'  (Lopez Decl.,

                              18

Ex. A, Resp. to Req. for Admis. Nos. 97, 107.)  If the Respondents truly believed that 10 U.S.C. § 653 set forth unwaivable eight-year active duty service obligations, they could not be justified in drafting Service Agreements that obligated the Petitioners to serve only seven years.  The Respondents may try to assert that its conduct in drafting the Service Agreements was due to some sort of good-faith error.  It should not be heard to do so.  During discovery, the Respondents stonewalled on this point, failing to provide 'any documents or information showing why the Navy executed Service Agreements with seven-year active duty requirements for fixed-wing pilots after 1989, when Congress passed section 653.'  (Doc. 114, Joint Scheduling Conference Statement at 3).

...

Of course, once the Navy decided that it had made a mistake in drafting the Service Agreements for the Petitioners and an unknown number of other pilots, the Navy did nothing to rectify its mistake.  It did not inform Petitioners of the error.  It did not try to accommodate in any meaningful way the Petitioners' reasonable expectations about the length of their Navy service.

Nor does it appear that the Navy has consistently interpreted § 653.  In drafting the Service Agreements, the Navy may have believed that the provision was not mandatory, and that the Navy could enter into contracts with different terms.  We do not know what the Navy believed as it drafted the Service Agreements; the Navy refused to disclose any information or documents on this point in discovery.  We do know, however, that even after it decided that the statute contained a mandatory provision, the Navy has acted inconsistently.

The Petitioners' requests for release from active duty were denied by the Navy on the claim that it did not 'have the authority to waive Title 10 law and that "misinformation by a government authority does not form the basis or justification for violating a

19

statute."' (Doc. 59, Ex. 32).  But the
Respondents themselves later indicated that
the provision was not mandatory.  In the
administrative process, the Navy and the
Secretary of the Navy had the authority to
grant Petitioners' RAD requests, but the BCNR
'was not persuaded that such authority should
have been exercised.'  (Doc. 56, Ex. 7).

More tellingly, even after deciding that §
653 was mandatory, the Navy has discharged
fixed-wing jet pilots prior to their service
of seven years on active duty.  The
Respondents were forced to make this
concession during discovery: 'The United
States admits that its IRAD program and
Voluntary Separation Program resulted in or
will result in the discharge or release of
Naval Aviators prior to the completion of the
applicable statutory service terms contained
in 10 U.S.C. § 653.'  (Lopez Decl., Ex. A,
Resp. to Req. for Admis. No. 86.).  The Navy
also admitted that it granted individual RAD
requests of at least five fixed-wing jet
pilots prior to the service of eight years on
active duty.  (Lopez Decl., Ex. A., Resp. to
Req. Admis. Nos. 77, 78, 81-85).

After the Petitions were filed in this Court,
Respondents took such positions as 'the
plaintiffs' enlistment agreements is [sic]
simply irrelevant' (Doc. 25 at 6) and that
'an officer's commission is indefinite in
term, and an officer serves at the pleasure
of the President and can only resign a
commission effective upon acceptance, which
means, a court may not order that the
resignation be accepted and the officer
discharged.'  (Doc. 78, at 7-17).  The Court
rejected all of these claims noting, 'Under
this position [of the Navy], the length of
time of active duty service is limited by
neither the Service Agreement nor by § 653.'
(Doc. 107 at 9.)  The Respondents also argued
that 'the court has no authority to determine
the legality of the contract in dispute, the
Navy's actions, and cannot meddle in the
Navy's conduct of its business' - a position
that was also rejected by this Court.  Thus,
Respondents will not be able to meet their
high burden of proving that their actions

20

were substantially justified.

This Court's bail order establishes that Respondents' positions were without justification ....

Specifically, the Court found that the 'unusual and exceptional circumstances' present here were created by the Navy through its error in drafting the Service Agreement.' (Doc. 107 at 13. Emphasis added.) In fact the Court was 'troubled by the lack of disclosure, in a contract drafted by the Navy, which results in a mistake from which the Navy seeks to benefit, by considering the express term relating to time of service on active duty to be invalid and unenforceable.' Id. at 15. The Court stated that it was the Navy that 'knew or should have known of the existence of § 653 and of any conflict between their Service Agreement and provisions of § 653 and the minimum term of active duty' - not Petitioners. (Id. at 13.) The Court further held that the Service Agreement created a 'reasonable and justifiable expectation that [Petitioner] would only be required to serve on active duty for seven years after his designation as a Naval Aviator.' Id. at 14. Finally, the Court found that the 'Navy did not explain or take any action to resolve the conflict between the active duty term of the service agreement and § 653.' Id.

Respondents argue that the record establishes that their position was substantially justified under the governing standards:

Nothing more than negligence has been established with respect to the incorrect term in the Service Agreements. There was absolutely no evidence presented that the Navy intentionally entered into the Service Agreements with erroneous terms. Moreover, Petitioners' winging orders, executed without question, contained the correct eight-year term of service. (Gunter Decl. ¶ 3 & Ex. A.) The Navy has explained why some officers were discharged prior to completion of their

21

eight-year terms and why Petitioners'
requests were denied. (<u>See</u> Gunter Decl. ¶¶
4-5 & Ex. C.)  In short, the manpower needs
of the Navy changed in 2004, when
Petitioners' [sic] made their RAD requests,
as a result of the impact of Operation Iraqi
Freedom and the long-term effects of the
Global War on Terror.  (Gunter Decl. ¶ 5.)
In addition, officers who had fallen 'off
track' in their careers (which did not
include Petitioners) were discharged through
voluntary incentive programs and involuntary
RAD programs.  (Gunter Decl. ¶ 5.)

The Navy has further explained why its legal
analysis with respect to the enforceability
of 10 U.S.C. § 653 was modified.  (<u>See</u> Hester
Decl. ¶¶ 2-3.)  Given that the Court has
recognized there is no case directly on point
with the facts here, the Navy's Office of
Legal Counsel can hardly be criticized for
further researching and evaluating the issue
and ultimately changing its opinion.  Neither
legal counsel's initial opinion or its
modified opinion was contrary to any
established law.

Petitioners set forth sweeping statements
concerning the Court's purported rejection of
the United States' arguments in this
litigation.  In fact, the Court has
recognized on multiple occasions that the law
is unsettled in this area and has issued <u>two</u>
published decisions on the United States'
motions to dismiss ... With respect to the
United States' argument that a contrary term
in a service agreement cannot trump a federal
statute, set forth in the first motion to
dismiss, the Court denied the motion <u>without
prejudice</u> to it being renewed following
further factual development.  (<u>See</u> Doc. 31.)
Given the novelty of the issues, and the lack
of controlling case law, the United States'
position in these motions was substantially
justified ....

...

The mere fact that Petitioner Gengler
prevailed in the bail hearing does not create
a presumption that the United States'

22

position was not substantially justified ...
The hearing on Petitioner Gengler's bail
request consumed several hours.  The Court
recognized that the case was close, the
United States had not acted unreasonably in
trying to resolve the case, and some of the
exceptional circumstances were self-created
by Petitioner Gengler.  (Doc. 124 ...
79:1015, 80:11-24, 81:16-18, 82:15-18.)

Petitioners reply that the Navy bears full responsibility

for creating "this whole mess" by drafting Service Agreements

with seven-year active duty terms.  To the extent Respondents

seek to rely on "new evidence" in arguing that the Navy was

merely negligent in drafting Service Agreements that were

contrary to the statute, Petitioners assert that even a good

faith mistake is not a defense to an EAJA fees motion because the

government's action must be justified so as to satisfy a

reasonable person.  Petitioners further cite *In re Application of*

*Mgndichian*, 312 F.Supp.2d 1250, 1262 (C.D.Cal.2003):

Good faith alone, however, does not
demonstrate that the government's decision to
deny petitioner's claim and litigate the case
was substantially justified.  *Taylor v.*
*United States*, 815 F.2d 249, 254 (3rd
Cir.1987)(Becker, J., concurring)(' ... we
are not denying attorney's fees because of
the government's good faith.  Good faith or
laudatory motives are not a defense to an
EAJA claim'); *Truckers United for Safety v.*
*Mead*, 201 F.Supp.2d 52,56 (D.D.C.2002)('...
the Government's arguments that its "good
faith belief" equates to substantial
justification of its actions and that the
decisions of other courts provide substantial
justification are without merit'), rev'd on
other grounds, 329 F.3d 891 (D.C.Cir.2003);
*Cf. Pierce*, *supra*, 487 U.S. at 563 ... ('to
be "substantially justified" means, of
course, more than merely undeserving of
sanctions for frivolousness').

23

1    Petitioners further argue that the government concedes that

2  their requests were denied in March 2004 on the basis of the "now

3  repudiated Hester memorandum."  Petitioners assert:

4            Even though it was disavowed, Mr. Hester's
             memorandum was sent to the BCNR by the Navy
5            Personnel Command with a recommendation that
             the Board follow it.  The Navy Personnel
6            Command did not advise the BCNR that its own
             legal counsel had, instead, concluded that
7            'the Navy was not necessarily bound by the
             eight-year statute.'  (Hester Decl., ¶ 5).
8            The BCNR asked Petitioners' counsel to
             respond to Mr. Hester's March 18 memorandum.
9            And the BCNR relied upon the memorandum.  The
             BCNR 'substantially concurred' with Hester's
10           finding 'that [the] eight-year obligation was
             established by statute and not subject to
11           change by contractual agreement.'
             (Weisselberg Supp. Decl., ¶ 14 & accompanying
12           Exhibits B, C, D, E & F).

13  Petitioners argue that Respondents cannot be "substantially

14  justified" in using a legal memorandum that the author and his

15  office disavowed.  Petitioners cite *Wilderness Soc. v. Babbitt*, 5

16  F.3d 383 (9th Cir.1993):

17           The Refuge Manager's report did not foreclose
             the possibility that the Service could
18           formulate a grazing plan that would be
             compatible with purposes of the Refuge.
19           Based upon this report, however, the Service
             had a duty to investigate the compatibility
20           of grazing with the Refuge's purposes prior
             to permitting grazing on the Refuge.
21           Nonetheless, the Service continued its same
             practices, issuing grazing permits for 1990
22           without any compatibility determination.  It
             made little headway in formulating a new
23           management plan prior to the initiation of
             the Wilderness Society lawsuit in 1991.  In
24           light of the Refuge Manager's report, we
             cannot find that the Service's actions were
25           substantially justified.

26    Petitioners further argue that Respondents' positions were

                                 24

not substantially justified:

> The Navy took inconsistent positions throughout these proceedings, insisting at times that the statute necessarily invalidates the Service Agreements (i.e., the Navy has no discretion) but then sometimes demonstrating that the Navy had some kind of amorphous, unexplained discretion to release pilots earlier than eight years.  Because the BCNR 'substantially concurred' in Mr. Hester's conclusion that the statute contained no exceptions, however, and because this conclusion was the basis for the Navy's final administrative actions, Petitioners were required to go to great lengths to prove that the position was wrong and that the Navy should be estopped from taking it. Petitioners were required to show that the Navy regularly demonstrated that it had authority to release pilots prior to the completion of the eight-year statutory term. Through discovery, the Navy was forced to admit that it granted other pilots' requests for release at seven years from active duty and also released pilots through the VSP and IRAD Programs.  Though the Navy now offers a variety of reasons for exercising its discretion to release these other aviators, <u>Respondents have never explained why signing the Petitioners' Service Agreements was not a valid exercise of such authority.</u>  If, as Mr. Hester belatedly admits, 'the Navy was not necessarily bound by the eight-year statute' (Hester Decl., ¶ 5), nothing prevented the Navy from signing Service Agreements with seven-year terms.  Even Mr. Hester's recent declaration does not provide details of the Navy's 'changed' position.  Nor does it attempt to explain why a Navy not bound by the statute would not be free to contract for a seven-year term.

Finally, with regard to Respondents' position that the Court recognized on multiple occasions that the law in this area is unsettled, Petitioners cite *Gutierrez v. Barnhart*, 274 F.3d 1255, 1261 (9th Cir.2001)("[T]here is no per se rule that EAJA fees

cannot be awarded where the government's litigation position contains an issue of first impression") and *United States v. Marolf*, 277 F.3d 1156, 1163 n.2 (9th Cir.2002)("[W]hether an issue is one of first impression is but one factor to be considered; it is not dispositive").

Respondents have not carried their burden of demonstrating substantial justification.  Respondents' positions during this litigation were not justified "in substance or the main" because they had no reasonable basis both in fact and law.  The case was precipitated by the Navy's mistake in the term of its contract with Petitioners.  Respondents were unable to show by clearly established law that Petitioners were not entitled to enforce the written contract in accordance with its terms.  Based on the lack of certainty in the law, Petitioners achieved limited success in forestalling their deployment to Iraq.

   C.  Reasonable Attorneys' Fees.

Under the EAJA, attorneys' fees are set at the market rate, but capped at $125 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee".  28 U.S.C. § 2412(d)(2)(A).

   1.  Statutory Cap.

In the Ninth Circuit, three requirements must be satisfied before the court can exceed this statutory limit: "First, the attorney must possess distinctive knowledge and skills developed through a practice specialty.  Second, those distinctive skills

must be needed in the litigation.  Lastly, those skills must not be available elsewhere at the statutory rate." *Love v. Reilly*, 924 F.2d 1492, 1496 (9th Cir.1991).

In arguing that Petitioners are entitled to a higher hourly rate, Petitioners submit the Declaration of Timothy R. Lord, a partner of Lewis Brisbois Bisgard & Smith LLP.  Mr. Lord avers in pertinent part that he was a trial attorney with the United States Department of Justice from 1992 until 2001 in the DOJ's Civil Division, Torts Branch, Admiralty/Aviation Section.  ¶ 4. Mr. Lord further avers:

> 5. My 15-year career includes the first nine with DOJ where I also litigated well over 100 cases in over 25 federal District Courts throughout the nation and handled numerous appeals in various Circuit Courts of Appeals, and on two occasions, assisted the Solicitor General's Office at DOJ in briefing two cases that came before the United States Supreme Court.
>
> 6.  My clients at DOJ included Departments of the United States Military, including the Navy, when the government's litigated conduct implicated admiralty jurisdiction.  As part of my duties, I worked closely with local United States Attorneys, Navy Jag [sic] and other government agency counsel on numerous cases involving contract dispute actions, one of which I tried in the District Court of Maryland.  I also represented dozens of seamen and litigated other personal injury actions where terms of employment contracts with the government were at issue.
>
> 7.  My experience at DOJ provided the necessary, if not unique, experience and knowledge needed to undertake the representation of Petitioners in this action. This includes knowledge of the myriad of unique procedural requirements and law applicable to actions against the United

States based on government employment
contracts.  My familiarity with and
understanding of the litigation practices of
the United States Attorneys and their clients
and counsel was a unique qualification for
representation of the Petitioners in this
case.

8.  In private practice, I have developed a
specialty practice in federal litigation and
government contracts and I have authored
publications in this area of law. I have
represented numerous clients that have either
brought suit against the government or have
been sued by the government on contract
claims.

...

12.  My minimum hourly rate for handling
litigation involving the United States
Government is $225.00.  In this case, my
hourly rate was discounted to $200.00 per
hour in deference to the Petitioners'
financial situation.  Associate, Jeffrey
Stoltz, billed a minimal amount of time at
his normal rate of $150.00 per hour.  Mr.
Stoltz [who had been a college roommate of
Petitioner McSeveney] had represented
Petitioners on a pro bono basis at the
Administrative level and was therefore
uniquely suited to assist in the early stages
of litigation.

Petitioners also submit the Declaration of William D. Kissinger,

a partner of Bingham McCutchen.  Mr. Kissinger avers in pertinent

part:

2.  Bingham has been involved in this lawsuit
since November 2006.  Since that time I have
been the lead attorney at Bingham
representing Petitioners in this matter.
Bingham has represented a number of military
reserve officers and enlisted soldiers in the
past as part of its pro bono practice.

3. ... From 1997-2001, I worked for the
United States Department of State in
Washington in the Office of Legal Adviser.

28

From 2001-2203, I was senior Deputy Legal Affairs Secretary to California Governor Gray Davis.  I returned to private practice in 2003, I returned to my former partnership, which had become Bingham McCutchen, where I now specialize in energy and environmental litigation matters as well as a general litigation practice.  My general litigation practice has included frequent pro bono representations that have included petitions for attorneys fees following the successful prosecution of these matters.  As co-counsel for Petitioners, I have experience in the litigation matters involved in this litigation.

4.  I was first contacted about this case in November, 2006.  Charles Weisselberg, co-counsel for Petitioners Gengler and McSeveney, sought my advice and assistance to finish discovery and prepare the case for an evidentiary hearing.  In light of a similar matter my firm was handling at the time, Bingham McCutchen agreed to serve as co-counsel on a *pro bono* basis.  Working with Mr. Lord and Mr. Weisselberg, Bingham attorneys reviewed and planned discovery, consulted with the Petitioners and co-counsel, conducted extensive legal research, and engaged in many other tasks as the case moved forward towards an evidentiary hearing. I anticipated that we would use our Washington D.C. office to aid in discovery.

5.  I staffed this case as I would have any other case of this size handled by my firm, dividing the work into issue areas and discrete projects.  I worked with and supervised more junior Bingham attorneys who worked on this matter.  I am informed and believe the following are the professional backgrounds of these individuals.

6.  Jennifer Lopez is a senior associate at Bingham.  She graduated from ... the University of Southern California School of Law in 2001.  Jennifer has significant experience will all aspects of litigation at the federal and state levels.  She has been an associate on this case since Bingham became co-counsel on this case in November

29

2006.  She has taken the lead on drafting motions, preparing for and will attend the hearing on Respondents' motion to dismiss on April 2, 2007 and preparing for and will attend the hearing on Petitioners' motion for attorneys' fees on April 2, 2007 [sic].

7.  David Beach is an associate at Binghan. He graduated from ... the University of California, Hastings College of the Law in 2003.  David assisted in research and drafting Petitioners' motion for attorneys' fees.  David has significant experience with habeas corpus proceedings, having prosecuted a similar matter in 2006.

8.  Zak Smith is an associate at Bingham.  He graduated from. ... the University of California at Los Angeles School of Law in 2003.  Zak assisted in research and drafting Petitioners' motion for attorneys' fees.  Zak has considerable experience with all aspects of litigation at the federal and state levels.

9.  Briana Lynn Morgan is an associate at Bingham.  She graduated from ... Hastings College of the Law in 2004.  Briana assisted in research regarding Respondents' motion to dismiss.  Briana has experience with all aspects of litigation at the federal and state levels.

According to Paragraph 13 of Mr. Kissinger's declaration his hourly rate was $500 in 2006 and $540 in 2007; Ms. Lopez's hourly rate was $395 in 2006 and $440 in 2007; Mr. Beach's and Mr. Smith's hourly rates were $340 in 2006 and $395 in 2007; and Ms. Morgan's hourly rate was $255 in 2006 and $270 in 2007.

    In support of their request to exceed the statutory cap, Petitioners submit the Declaration of Robert Rubin.  Mr. Rubin avers that he is currently the Legal Director of the Lawyers' Committee for Civil Rights of the San Francisco Bay Area and that

30

he has practiced for the past 25 years in the area of complex

federal and state civil rights litigation.  Mr. Rubin further

avers:

> 5.  Since graduating from law school [in
> 1979], I have participated in the litigation
> or more than 60 civil rights matters on
> behalf of plaintiffs.  Almost all of these
> matters involved cases in which prevailing
> plaintiffs were entitled to an award of
> attorneys' fees and costs.  Of these civil
> rights matters, approximately half included
> an award of attorneys' fees and costs.  Most
> awards were made pursuant to 42 U.S.C.§ 1988
> or its California analog, C.C.P. § 1021.5.
> The remaining awards were made pursuant to
> ... EAJA ....

After listing some of the more significant cases Mr. Rubin has

been involved in, he further avers:

> 7.  I have become familiar with the rates
> charged and the billing and work practices of
> lawyers in California and the nation in many
> ways: (1) from my own considerable
> involvement in attorneys' fees litigation and
> expert consultations and testimony; (2) by
> discussing attorneys' fees, billing, and work
> practices with other attorneys; (3) by
> representing other attorneys' seeking fees;
> (4) by obtaining declarations from other
> attorneys regarding market rates, attorneys'
> fees, billing and work practices; (5) by
> reviewing surveys, legal newspapers, reported
> decisions, and treatises regarding prevailing
> attorneys' rates, fees, billing, and work
> practices; (6) by reviewing attorneys' fees
> applications and awards in other cases, as
> well as unpublished decisions; and (7) by
> reviewing rates charged by, and billing, and
> work practices of, firms with which my
> organization has associated.
>
> ...
>
> 8.  The hourly billing rate of $200 per hour
> for Tim Lord (1992 law graduate) and $540 per
> hour for Bill Kissinger in 2007 and $500 per

1      hour in 2006 (1987 law graduate) are wholly
2      consistent with the rates charged by
       comparable attorneys in the San Francisco Bay
       Area and numerous other locales within
3      California for work comparable to that
       performed in the instant case.  (In fact,
4      they are lower than rates at many San
       Francisco Bay Area firms).
5
       ...
6
       10.  Mr. Lord's rate of $200 per hour ...
7      $540 per hour for Bill Kissinger in 2007 and
       $500 per hour in 2006 are wholly appropriate
8      for lawyers of this background and
       experience.  Their rates are well within the
9      range of rates charged and awarded to lawyers
       with comparable background, experience, and
10     skill in cases comparable to the instant
       case.
11
       ...
12
       13.  In addition to those factors listed in ¶
13     7 above, I have become familiar with the
       rates and practices of law firms through
14     working with them on *pro bono* matters.  Over
       the past 25 years, I have co-counseled cases
15     with private attorneys in at least 40
       instances.  And I know the kinds of cases
16     they'll accept or reject.  I can
       unequivocally state that few, if any, private
17     attorneys would be willing to take a case
       such as this one with the knowledge that
18     their attorneys' fee claim would be capped at
       $150 per hour.  The risk and expense are
19     simply too great.

20     Although Petitioners are not seeking an award of the

21 attorneys' fees incurred by Charles D. Weisselberg.  Mr.

22 Weisselberg, who is a professor at Boalt Hall, avers in pertinent

23 part:

24     3.  One of my areas of expertise is federal
       habeas corpus practice and procedure.  In the
25     eleven years I taught at USC, I supervised
       students in the Post-Conviction Justice
26     Project.  The project represented inmates at

                                    32

FCI Terminal Island under an arrangement with the Federal Bureau of Prisons.  We later expanded our representation to include state inmates at CIW Frontera.  With my colleagues and students, I litigated many habeas corpus and post-conviction cases.  My work included habeas corpus petitions for federal inmates and detainees under 28 U.S.C. sec. 2241 (often on issues such as sentence credit, parole, and immigration detention).  I have filed federal habeas corpus petitions for state inmates under 28 U.S.C. sec. 2254 and motions to vacate federal convictions under 28 U.S.C. sec. 2255.  In addition, I litigated other federal matters, including civil rights actions.  I continued to handle post-conviction cases after I moved to Boalt Hall in 1998.  I have been counsel or co-counsel in all federal districts in California, as well as in the U.S. Courts of Appeals for the Second, Third, Fifth, Sixth, Seventh, Ninth, and Tenth Circuits, and the U.S. Supreme Court.

4.  In addition to my habeas corpus litigation practice, I have studied (and taught) federal habeas corpus doctrines and procedures.  I was a consultant to the Federal Courts Study Committee in 1989-1990 on issues of federal habeas corpus.  My work for the Committee was subsequently published ... I also served as a member of the State Bar of California's Committee on Federal Courts.  During that time, I was the principal author of the State Bar's comments on proposed amendments to the federal habeas statutes.

5.  I was first contacted about this case on October 12, 2006.  Timothy Lord, counsel for Petitioners ..., sought my advice and assistance on federal habeas corpus practice and procedure.  I was moved by the plight of the Petitioners and I was upset at the conduct of the Navy.  I agreed to serve as co-counsel on a *pro bono* basis.  In November, as it appeared that we would need to complete discovery and prepare for an evidentiary hearing on an expedited basis, I contacted William Kissinger of Bingham McCutchen LLP for assistance.  In addition to his deep

33

litigation experience (and his firm's
experience representing reservists), Bingham
McCutchen has a Washington D.C. office which
could help in completing discovery.

6.   Working with Mr. Lord (and later with
counsel from Bingham McCutchen), I researched
and wrote portions of briefs and other
pleadings, argued the Respondents' (second)
motion to dismiss, argued at the hearing on
the bail motion, reviewed and planned
discovery, spent many hours consulting with
the Petitioners, and engaged in many other
tasks as the case moved forward towards an
evidentiary hearing.  I conservatively
estimate that I worked over a hundred hours
on the matter.  My billing rate is $450 per
hour.  I estimate the value of my services on
this case as at least $45,000.

Respondents argue that Petitioners have not made the showing

required under the EAJA to exceed the statutory cap.  Respondents

cite *Pierce v. Underwood*, 487 U.S. 552, 572-573 (1988):

[T]he 'special factor' formulation suggests
Congress thought that $75 an hour was
generally quite enough public reimbursement
for lawyers' fees, whatever the local or
national market might be.  If that is to be
so, the exception for 'limited availability
of qualified attorneys for the proceedings
involved' must refer to attorneys 'qualified
for the proceedings' in some specialized
sense, rather than just in their general
legal competence.  We think it refers to
attorneys having some distinctive knowledge
or specialized skill needful for the
litigation in question - as opposed to an
extraordinary level of the general lawyerly
knowledge and ability useful in all
litigation.  Examples of the former would be
an identifiable practice specialty such as
patent law, or knowledge of foreign law or
language.  Where such qualifications are
necessary and can be obtained only at rates
in excess of the $75 cap, reimbursement above
that limit is allowed.

For the same reason of the need to preserve

34

1          the intended effectiveness of the $75 cap, we
2          think the other 'special factors' envisioned
           by the exception must be such as are not of
           broad and general application.  We need not
3          specify what they might be, but they include
           nothing relied upon by the District Court in
4          this case.  The 'novelty and difficulty of
           issues,' 'the undesirability of the case,'
5          the 'work and ability of counsel,' and 'the
           results obtained,' ... are factors applicable
6          to a broad spectrum of litigation; they are
           little more than routine reasons why market
7          rates are what they are.  The factor of
           'customary fees and awards in other cases,'
8          ... is even worse; it is not even a routine
           reason for market rates, but rather a
9          description of market rates.  It was an abuse
           of discretion for the District Court to rely
10         on these factors.

11   *See also Love v. Reilly, supra*, 924 F.2d at 1496 (environmental

12   litigation is an identifiable practice specialty that requires

13   distinctive knowledge); *Pirus v. Brown*, 869 F.2d 536 (9th

14   Cir.1989)(attorney specialized in social security cases).

15   Respondents argue:

16         Although the issues in this action were
           novel, they did not require specialized
17         skill.  And there is certainly no specialized
           skill required in researching and filing a
18         claim under EAJA.  An increased EAJA rate is
           not justified.  Should the Court determine
19         that an EAJA fee award is proper, the United
           States requests leave for additional
20         discovery on the issue of the reasonableness
           of the fees and the enhanced rates requested.
21
22        Petitioners respond that their showing of entitlement to

     fees in excess of the EAJA cap "cannot be rebutted" because
23
     Respondents have not filed any declarations countering their
24
     declarations on this issue.  Petitioners further contend:
25
26         This is a habeas corpus proceeding which
           necessarily requires knowledge beyond simply

                                   35

> filing a claim under the EAJA. Habeas
> petitions are unique from other types of
> litigation, requiring lawyers with experience
> in this area. Timothy Lord, Charles
> Weisselberg and William Kissinger have all
> declared that they have specialized skills
> and that these skills were necessary for this
> litigation.

Petitioners have not shown that any counsel's "distinctive skills" were needed in the litigation or that those skills were not be available elsewhere at the statutory rate, both of which must also be shown. Specifically, the Court observed that Mr. Lord, who handled the case before Mr. Weisselberg's entry to the case, lacked knowledge of applicable law and did not effectively advocate in court. None of Mr. Lord's prior defense department experiences applied to the circumstances of this case, except the EAJA fees issue. Mr. Lord is not, by background or performance, entitled to a rate in excess of the statutory cap. While Mr. Weisselberg may have the "distinctive skills" in habeas law, Petitioners do not seek recovery of his fees. In addition, the fact that Mr. Lord had to retain Mr. Weisselberg as co-counsel is further indication that Mr. Lord did not have the distinctive skill required by the case law. That Mr. Lord offered a Washington, D.C. office, no specialized knowledge or experience in any field other than military service contract law and habeas corpus law were required in this case.

More noteworthy, federal habeas corpus practice is funded and managed by federal trial and appellate courts under the Criminal Justice Act, which establishes rates for panel attorneys

in non-capital and capital habeas cases.  These rates for 2009 were $110 and $175, respectively.  The nature of the applicable law in this case does not justify exceeding the cap.  None of the associate attorneys, whose time is billed, has demonstrated any level of distinctive skill required; experience in federal and state litigation is not a distinctive skill, nor is working on one habeas matter, nor is conducting legal research as directed by a senior attorney.  Petitioners are not entitled to an award of attorneys' fees in excess of the EAJA statutory cap of $125 per hour.

Respondents accurately argue that attorneys' fees sought by Petitioners are not reasonable because $92,295.15 of that request "are claimed by a firm that associated in <u>one</u> day before orders were issued discharging Petitioners from the Navy and mooting the case."  The Notice of Association of Counsel advising that Bingham McCutchen was associating as counsel was executed by counsel filed on December 12, 2006 (Doc. 115).  Petitioners were advised at the December 13, 2006 Scheduling Conference that discharge orders had been issued for Petitioners and were expected to take effect within 24 to 48 hours.  (Doc. 117).  Respondents discharged Petitioners from the Navy on December 19 and 20, 2006.  As Respondents correctly contend:

> [S]ince Petitioners' discharge from the Navy, their numerous attorneys have devoted extraordinary hours and significant resources in vehemently opposing a request to dismiss the case as moot and crafting proposed stipulated orders with particular and detailed findings (never reached by the

Court) to strengthen an attorney fees motion. Such conduct is directly contrary to the policy behind EAJA.

28 U.S.C. § 2412(d)(1)(C) provides:

The court, in its discretion, may reduce the amount to be awarded pursuant to this subsection, or deny an award, to the extent that the prevailing party during the course of the proceedings engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy.

In a Supplemental Declaration, Mr. Weisselberg avers in pertinent part:

3.   In late October or early November, the Petitioners both told me that they could not afford to continue to pay Mr. Lord.  I asked Mr. Lord whether he and his firm could represent the Petitioners on a pro bono basis, but I was informed that they could not.

4.   In late November 2006, the government responded to our discovery requests and answered the petitions for writ of habeas corpus.  It became clear that we would need to seek additional discovery, that the case would not be resolved through the pleadings and motions, and that there would be an evidentiary hearing in late 2006 or early 2007.

5.   I concluded that we needed to arrange for additional (pro bono) counsel in order to litigate the case to conclusion without significantly increasing the Petitioners' financial obligations to Mr. Lord and his firm.  I could not litigate the case by myself.  As a full-time law professor, I do not have litigation support or a working law office.  I do not have a litigation budget. I could not underwrite the expense of depositions, some of which would likely take place in Washington, D.C. or elsewhere in the eastern United States, even if I could arrange time to complete the discovery myself given my teaching schedule.

38

6.  I approached William Kissinger and the law firm of Bingham McCutchen LLP.  They agreed to take on the case.  The firm is seeking to recover its fees under the Equal Access to Justice Act, but I understand that it will not seek to obtain any fees or expenses from the Petitioners.

7.  I specifically went to Bingham McCutchen because the firm has experience representing military personnel in similar matters, has highly skilled counsel and a Washington D.C. office, and could staff the case fast.  I had in fact called the firm for advice as I was briefing the Petitioners' opposition to the government's (second) motion to dismiss in October, and the firm sent me briefs from another case.

8.  The Bingham firm jumped into the case. One of the earliest tasks completed by the Bingham lawyers was drafting a 'meet and confer' letter demanding further discovery, which I sent to government counsel on December 11, 2006 ....

...

10.  We tentatively agreed to hold a 'meet and confer' session on December 12, 2006 to discuss outstanding discovery.  The government later asked to hold the session after our December 13 scheduling conference. At the scheduling conference, the government announced that it would discharge the Petitioners from the military.  The 'meet and confer' session was not held. My recollection is that I advised the Court at the December 13 conference that the discovery requests remained outstanding, and that while we of course were glad that the Petitioners were being discharged, we were not waiving any rights with respect to discovery.

The Court finds that no further "discovery" was required after December 12, 2006.  There was no need for another  law firm to attempt to perpetuate and multiply the litigation for EAJA fee purposes.  The extended opposition to the government's motion to

39

1    dismiss the case which had been mooted by the Petitioners'

2    discharges was entirely unnecessary and unjustified.  Bingham did

3    not provide any legal services of value to the resolution of this

4    action.  That law firm did the opposite.  The case had been

5    reduced to a habeas case based on Petitioners' original counsel,

6    Mr. Lord's unfamiliarity or inexperience with the law under which

7    he advanced other meritless claims eliminated by Rule 12(b)(6)

8    motions to dismiss.  Petitioners' request for attorneys' fees is

9    reduced pursuant to Section 2412(d)(1)(C) by the $92,295.15 in

10   fees incurred by Bingham, which are denied.

11                    2.   Lodestar.

12        In *Commissioner, INS v. Jean*, 496 U.S. 154, 161 (1990), the

13   Supreme Court held:

14            [O]nce a private litigant has met the
             multiple conditions for eligibility for EAJA
15            fees, the district court's task of
             determining what fee is reasonable is
16            essentially the same as that described in
             *Hensley [v. Eckerhart*, 461 U.S. 424, 433-437
17            (1983)].

18        "'In determining what a reasonable attorneys' fee entails,

19   the district court must apply the hybrid approach adopted in

20   *Hensley v. Eckerhart*, 461 U.S. 424, 423 ... (1983).' ... 'The

21   most useful starting point for determining the amount of a

22   reasonable fee is (1) the number of hours reasonably expended on

23   the litigation (2) multiplied by a reasonable hourly rate.' ...

24   The resulting figure is known as the 'Lodestar.'" *Wal-Mart

25   Stores, Inc. v. City of Turlock*, 483 F.Supp.2d 1023, 1040

26   (E.D.Cal.2007).  Although there is a strong presumption that the

                                40

lodestar represents a reasonable fee, *Burlington v. Dague*, 505 U.S. 557, 562 (1992), the district court has the discretion to exclude from the initial fee calculation hours that were not reasonably expended, for example, cases that are overstaffed. Furthermore, the Supreme Court in *Hensley* held:

> Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. 'In the private sector, "billing judgment" is an important component in fee setting.  It is no less important here.  Hours that are not properly billed to one's <u>client</u> also are not properly billed to one's <u>adversary</u> pursuant to statutory authority.' ....

*Id.* at 434.  As explained in *Wood v. Sunn*, 865 F.2d 982, 991 (9th Cir.1988):

> Many factors previously identified by courts as probative on the issue of 'reasonableness' of a fee award, *see e.g., Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir.1975), *cert. denied*, 425 U.S. 951 ... (1976), are now subsumed within the initial calculation of the lodestar amount.  *Blum v. Stenson*, 465 U.S. 886, 898-900 ... (1984)('the novelty and complexity of the issues,' 'the special skill and experience of counsel,' the 'quality of the representation,' and the 'results obtained' are subsumed within the lodestar); *Pennsylvania v. Delaware Valley Citizen's Council*, 478 U.S. 546 ... (1986), *rev'd after rehearing on other grounds*, 483 U.S. 711 ... (1987)(an attorney's 'superior performance' is subsumed).

*See also Clark v. City of Los Angeles*, 803 F.2d 987, 990 & n.3 (9th Cir.1986).  As the *Clark* court explained:

> [T]he Supreme Court has recognized that

41

> adjustments, both upward and downward to the lodestar amount are sometimes appropriate, albeit in 'rare' and 'exceptional' cases ... *Blum*, 465 U.S. at 898-901 ... The possibility of adjustments to the lodestar amount necessitates an analysis of various factors that could justify an adjustment.  In this circuit, the relevant factors were identified in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975).  Although several of these factors are now considered to be subsumed within the calculation of the lodestar figure ..., review of the *Kerr* factors remains the appropriate procedure for considering a request for a fee-award adjustment.

*Id.*  The *Kerr* factors, as modified by *Stewart v. Gates,* 987 F.2d 1450, 1453 (9th Cir.1993), are:

> (1) the time and labor required of the attorney(s);
>
> (2) the novelty and difficulty of the questions presented;
>
> (3) the skill requisite to perform the legal service properly;
>
> (4) the preclusion of other employment by the attorney(s) because of the acceptance of the action;
>
> (5) the customary fee charged in matters of the type involved;
>
> (6) any time limitations imposed by the client or the circumstances;
>
> (7) the amount of money, or the value of the rights involved, and the results obtained;
>
> (8) the experience, reputation and ability of the attorney(s);
>
> (9) the 'undesireability of the action;
>
> (10) the nature and length of the professional relationship between the attorney and the client;

42

1          (12) awards in similar actions.

2   *Id.; see also* Rule 54-293(c), Local Rules of Practice.

3          The fee applicant bears the burden of documenting the

4   appropriate hours expended in the litigation and must submit

5   evidence in support of those hours worked.  *Hensley, supra* at

6   433, 437.  The party opposing the fee application has a burden of

7   rebuttal that requires submission of evidence to the district

8   court challenging the accuracy and reasonableness of the hours

9   charged or the facts asserted by the prevailing party in its

10  submitted affidavits.  *Blum v. Stenson*, 465 U.S. 886, 892 n.5

11  (1984); *Toussaint v. McCarthy*, 826 F.2d 901, 904 (9th Cir. 1987).

12         Here, because of the reduction pursuant to Section

13  2412(d)(1)(C) of the attorneys' fees incurred by Bingham, the

14  lodestar determination focuses solely on the attorneys' fees and

15  costs requested by Lewis Brisbois for Mr. Lord's services.

16         Because of the statutory cap, the hourly rate is set at $125

17  per hour.  *See discussion supra*.

18         Respondents do not challenge Petitioners' documentation of

19  the hours incurred by the various attorneys at issue in this

20  motion, i.e., they do not contend that the billing statements or

21  declarations are not supported or are otherwise deficient.

22  However, Respondents contend:

23         A review of the bills discloses excessive,
           duplicate and unreasonable billing.  There
24         are five attorneys of record, as evidenced on
           the title page of Petitioners' motion: two
25         attorneys from the Lewis, Brisbois firm; two
           attorneys from the Bingham, McCutchen firm;
26         and one law professor.  In addition, the

43

> Bingham firm employed another three
> associates in researching the attorney fees
> issues and opposing the United States' motion
> to dismiss as moot ... The bills are replete
> with interoffice conferences with these
> attorneys on virtually every aspect of the
> proceedings since the Bingham firm associated
> into the case.  For example, on December 13,
> 2006, two attorneys and the law professors
> all prepared for and attended the scheduling
> conference.  All three later conferenced with
> counsel for the United States ... There is
> simply no justification for the battalion of
> lawyers working on this matter after
> Petitioners were discharged from the Navy.
> The billing was excessive and duplicative.

Because Petitioners do not seek recovery of the fees incurred by Professor Weisselberg and because the fees incurred by Bingham are disallowed, Respondents' contention that the billing was excessive and duplicative is no longer applicable. Respondents do not challenge the reasonableness of the hours incurred by attorneys at Lewis Brisbois prior to the association of Bingham as co-counsel.  Petitioners contend that the fees incurred by Bingham McCutchen are reasonable in light of the government's positions throughout this litigation, including in this motion:

> Bingham McCutchen entered the case because
> Petitioners could no longer afford Mr. Lord's
> fees, and there was a need (on shortened
> time) to conduct further discovery and
> prepare for a hearing ... As soon as they
> were retained, the firm began preparing for
> discovery and an evidentiary hearing ...
> Bingham McCutchen then this [sic] motion for
> attorneys fees, which are certainly
> recoverable ... Petitioners have submitted
> documentation sufficiently explaining all of
> the fees that have been incurred.

The most important declaration concerning attorneys' fees is

44

that of William Kissinger.  Although it is understandable that there would have been conferences between the attorneys from the two law firms and Mr. Weisselberg about the case concerning the need to associate Bingham as co-counsel, there are a number of time entries concerning research, drafting, discussions, etc. of a voluntary stipulation of dismissal and entries concerning research about the possibility of damages claims by Petitioners. Given that the United States declared its intent to discharge Petitioners from the Navy and forthwith moved to dismiss the action as moot, such work is unjustified and was unnecessary. That Petitioners opposed that motion to dismiss in lieu of a voluntary stipulation of dismissal or a cross-motion to dismiss under Rule 41 is not reasonable and not compensable.  There is no justification for attorney's fees incurred for researching the possibility of damages claims by Petitioners at the time the case was ended.  The Court is not required to accept the judgment of pro bono counsel about how the case should be staffed.

The Declaration of Timothy Lord filed on March 5, 2007, (Doc. 122-4) and attached bills establish that Mr. Lord devoted 304.2 hours to Petitioner Gengler's case and 209.8 hours to Petitioner McSeveney through January 31, 2007, and that Mr. Stolz devoted 2.5 hours to Petitioner Gengler and 5.7 hours to Petitioner McSeveney through January 31, 2007.  There was undoubtedly duplication in the underlying legal work on common issues of law that were identical for Petitioners.  Gengler had the separate issue of graduate school, which was not a legal

issue. Mr. Lord's declaration filed on July 23, 2007, (Doc. 144-3) and attached bills establish that Mr. Lord devoted 16.9 hours to Petitioner Gengler and 17.4 hours to Petitioner McSeveney between February 1, 2007 and April 30, 2007, presumably on billing and attorneys fees issues.  The total number of hours devoted by Mr. Lord to Petitioners' case is 548.3.  Multiplied by the statutory hourly rate of $125.00, the lodestar for Mr. Lord's professional services is $68,537.50.  The total number of hours devoted by Mr. Stolz to Petitioners' case is 8.2.  Multiplied by the statutory hourly rate of $125.00, the lodestar for Mr. Stolz's professional services is $1,025.00.  The total lodestar for Lewis Brisbois is $69,537.50.

However, as has been discussed, some of the hours devoted by Lewis Brisbois after the association of Bingham in December, 2006, were incurred in connection with a meritless opposition to Respondents' motion to dismiss the action as moot because of Petitioners' discharges from the Navy in late December, 2006. From the Court's review of the bills attached to Mr. Lord's declarations, it is difficult to isolate these specific amounts of time because the bills do not break out the time to specific tasks.  Five hours, in the amount of $625.00, of Mr. Lord's time incurred after December 1, 2006 is deleted to eliminate this unnecessary time. The net recoverable attorneys to Lewis and Lord are $68,902.50.

## CONCLUSION

Petitioners' pro bono counsel was "upset" by the Navy's

1   conduct in this case.  The Navy was upset by Petitioners' conduct
2   to the extent that it lost confidence in their ability to perform
3   honorably and competently as Naval aviators.  The Navy forcefully
4   argued that Petitioners' case was about their own selfish
5   interests, and despite the Navy's mistake in the written contract
6   term of service, that all persons, including Petitioners, are
7   presumed to know the law, as reflected in their winging orders.
8   Further, in view of the huge investment the United States makes
9   in training a Naval aviator, that the eight year statutory term
10  of service was entirely reasonable.  Without engaging in
11  hyperbole, the Navy characterized the case as one where
12  Petitioners sought to advance their personal interests over that
13  of their country's.  The Navy also emphasized that large numbers
14  of American military service people have had their terms of
15  service involuntarily extended.  Petitioners rejoined they were
16  entitled to profit from the Navy's error by strict adherence to
17  the terms of their written contracts' terms.  It is hard to
18  discern that any interest has been served in this case, other
19  than Petitioners' objective to avoid alleged 8 year statutory
20  service obligations.  This objective was not achieved.  The
21  objective to prevent deployment to Iraq was achieved.  It was
22  categorically unnecessary to have six or more lawyers working on
23  the case.  The size, lack of complexity, and merits of the case
24  in no way justified such an attorney staffing selection, which
25  was Petitioners' choice.  They cannot bill the taxpayers for this
26  over-allocation of resources.  For the reasons stated above:

1.   **Petitioners' motion for attorneys' fees is GRANTED IN PART AND DENIED IN PART;**

2.   **EAJA attorneys fees are awarded to Lewis Brisbois and Mr. Lord, jointly, in the amount of $68,912.50;**

3.   **Petitioners' counsel, Lewis Brisbois Bisgard & Smith LLP, shall prepare and lodge a form of order consistent with this Memorandum Decision within five (5) court days following service of this Memorandum Decision**

IT IS SO ORDERED.

**Dated:    January 8, 2010            _____/s/ Oliver W. Wanger_____**
                                       UNITED STATES DISTRICT JUDGE